No. 19-2373

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

vs.

ERIN F. GRAHAM, JR.,
a/k/a Sonny,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin

Case No. 18-CR-043
Honorable Judge James D. Peterson

BRIEF AND REQUIRED SHORT APPENDIX OF
DEFENDANT-APPELLANT, ERIN F. GRAHAM, JR.

Adam Stevenson
Clinical Associate Professor

Michael Doering          Natalia Gess
Law Student              Law Student

Carol English            Trenton Piltz
Law Student              Law Student

Alex Gelhar              Jordan Vassel
Law Student              Law Student

Frank J. Remington Center
University of Wisconsin Law School
975 Bascom Mall
Madison, WI 53706
Telephone:   608.262.9233
Fax:            608.263.3380
Email:          adam.stevenson@wisc.edu

Attorney for Defendant-Appellant,
ERIN F. GRAHAM, JR.

**ORAL ARGUMENT REQUESTED**

# CORPORATE DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellant, Erin F. Graham, Jr., furnishes the following list in compliance with Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1:

1. The full name of every party or amicus the attorney represents in this case:

   Erin Forest Graham, Jr.

2. Said party is not a corporation.

3. The names of all law firms whose partners or associates have appeared, or are expected to appear, for the party in the case:

   Adam Stevenson, Frank J. Remington Center, University of Wisconsin Law School, Madison, WI;

   Reed W. Cornia, Cornia Law, LLC, Madison, WI;

   Nicholas Frederick Gansner, Nicholson, Gansner & Otis, Madison, WI.

Adam Stevenson is counsel of record pursuant to Circuit Rule 3(d).

Dated: December 12, 2019          */s/ Adam Stevenson*
                                  Adam Stevenson
                                  Counsel for Defendant-Appellant
                                  ERIN F. GRAHAM, JR.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...............................................i

TABLE OF CONTENTS ............................................. ii

TABLE OF AUTHORITIES ............................................. iv

JURISDICTIONAL STATEMENT ......................................1

ISSUES PRESENTED FOR REVIEW .........................................3

STATEMENT OF THE CASE ..........................................4

SUMMARY OF THE ARGUMENT........................................18

ARGUMENT .........................................20

   I.   The Government Violated Mr. Graham's Confrontation Rights Guaranteed by the Sixth Amendment. ................................................20

     A.   Standard of Review ..........................................22

     B.   Ms. Moore's Statements in the Grand Chute Videos Were Testimonial..........................................22

     C.   The Government Did Not Meet Its Burden Before It Introduced the Testimonial Statements..........................................25

       i.   Ms. Moore Was Not Unavailable as a Witness. ....................................27

       ii.   Mr. Graham Did Not Have A Prior Opportunity to Cross-Examine Ms. Moore..........................................29

     D.   The Confrontation Clause Violation Was Not Harmless Beyond a Reasonable Doubt..........................................30

II.  A Curing Instruction Could Not Remedy a Testimonial Statement Made by a Known Co-Defendant...................................................................................31

   A.  Standard of Review .........................................................................31

   B.  No Curing Instruction is Sufficient to Cure the Prejudice Against Mr. Graham. ........................................................................................32

III.  The Court Abused its Discretion Denying Mr. Graham's Motion for a Mistrial Because the Curing Instruction Given was Untimely, Ineffective, and Left an Overwhelming Probability that the Jury Would be Unable to Follow the Instruction..........................................................................38

**CONCLUSION** ......................................................................................**46**

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)** .................**48**

**CIRCUIT RULE 31(e) CERTIFICATION** ...................................................**49**

**APPENDIX TABLE OF CONTENTS**............................................................**i**

# TABLE OF AUTHORITIES

<u>Cases</u>

*Arizona v. Washington*, 434 U.S. 497 (1978) ...................................................................38

*Bruton v. United States*, 391 U.S. 123 (1968) ....................................................32, 33, 36

*Crawford v. Washington*, 541 U.S. 36 (2004) ...........................................................18, 20

*Davis v. Alaska*, 415 U.S. 308 (1974)................................................................................29

*Davis v. Washington*, 547 U.S. 813 (2006)........................................................22, 23, 24

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986)..............................................................30

*Hardy v. Cross*, 565 U.S. 65 (2011) ..................................................................................27

*Jones v. Basinger*, 635 F.3d 1030 (7th Cir. 2011)..........................................................29

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009)..................................................26

*Michigan v. Bryant*, 562 U.S. 344 (2011) .......................................................................23

*Renico v. Lett*, 559 U.S. 766 (2010)..................................................................................38

*Simmons v. United States*, 440 F.2d 890 (7th Cir. 1971) ...................................26, 33, 34

*United States ex rel Ashford v. Director of Illinois
Department of Corrections*, 871 F.2d 680 (7th Cir. 1989) ............................................29

*United States v. Castelan*, 219 F.3d 690 (7th Cir. 2000) ...............................................30

*United States v. Clarke*, 227 F.3d 874 (7th Cir. 2000)..............................................38, 39

*United States v. Eskridge*, 164 F.3d 1042 (7th Cir. 1988) ............................................30

*United States v. Guajardo-Melendez*, 401 F.2d 35 (7th Cir. 1968) ..............................33

*United States v. Gullo*, 502 F.2d 759 (3d Cir. 1974) ................................................40, 41

*United States v. Hakim*, 344 F.3d 324 (3d Cir. 2003)...............................................40, 42

*United States v. Hernandez*, 330 F.3d 964 (7th Cir. 2003) ............................................. 31

*United States v. Humphrey*, 34 F.3d 551 (7th Cir. 1994) ......................................... 38, 39

*United States v. Lynn*, 851 F.3d 786 (7th Cir. 2017) ...................................................... 22

*United States v. Reed*, 227 F.3d 763 (7th Cir. 2000) ..................................................... 27

*United States v. Scott*, 19 F.3d 1238 (7th Cir. 1994) ..................................................... 39

*United States v. Telfair*, 507 Fed. Appx. 164 (3d Cir. 2012) ................................... 40, 42

*United States v. Tolliver*, 454 F.3d 660 (7th Cir. 2006) .................................................. 21

*United States v. Walker*, 673 F.3d 649 (7th Cir. 2012) ................................................... 26

*United States v. Watson*, 525 F.3d 583 (7th Cir. 2008) .................................................. 21

*Wilson v. Groaning*, 25 F.3d 581 (7th Cir. 1994) ..................................................... 39, 40

## Constitutional Provisions

U.S. Const. amend. VI ..................................................................................................... 20

## Statutes

18 U.S.C. § 1591 .............................................................................................................. 1

18 U.S.C. § 1594 .............................................................................................................. 1

18 U.S.C. § 2421 .............................................................................................................. 1

18 U.S.C. § 3231 .............................................................................................................. 1

28 U.S.C. § 1291 .............................................................................................................. 1

## Other Authorities

*Kidnap,* BLACK'S LAW DICTIONARY (11th ed. 2019) ..................................................... 36

*Kidnap*, MERRIAM-WEBSTER ONLINE DICTIONARY ........................................................ 36

*Pimp,* BLACK'S LAW DICTIONARY (11th ed. 2019) ......................................................... 36

*Pimp*, MERRIAM-WEBSTER ONLINE DICTIONARY ......................................................... 36

# JURISDICTIONAL STATEMENT

1. The jurisdiction of the United States District Court for the Western District of Wisconsin is founded upon 18 U.S.C. § 3231.

2. On January 30, 2019, Mr. Graham, in a second superseding indictment, was indicted for one count of conspiracy to commit sex trafficking, in violation of 18 U.S.C. §§ 1591(a)(1) and 1594(c); three counts of sex trafficking, in violation of 18 U.S.C. § 1591(a)(1) and (b)(1); one count of attempted sex trafficking, in violation of 18 U.S.C. § 1591(a)(1) and (b)(1); and two counts of knowingly transporting individuals in interstate commerce with intent that they engage in prostitution, in violation of 18 U.S.C. § 2421.

3. On April 12, 2019, following a jury trial, Mr. Graham was convicted of all of the counts in the indictment. On July 11, 2019, the district court sentenced Mr. Graham to a 300-month sentence.

4. The jurisdiction of the United States Court of Appeals for the Seventh Circuit is founded upon 28 U.S.C. § 1291.

5. The jurisdiction of the United States Court of Appeals for the Seventh Circuit is further based upon the following particulars:

   a. Date of entry sought to be reviewed: Judgment signed and entered on July 18, 2019, and amended for clerical error on July 19, 2019.

   b. Filing date of notice of appeal: July 18, 2019.

c. Filing date of post-judgment motion: N/A

d. Disposition of post-judgment motion: N/A

## ISSUES PRESENTED FOR REVIEW

I. The Government showed the jury videos of Mr. Graham's co-defendant accusing him of kidnapping and "pimping" women and had a law enforcement officer repeat those statements. The Government did not call the co-defendant to the stand, despite having acquired immunity for her and indicating it would be calling her to testify. Was the district court correct to determine that introduction of these testimonial statements from an available declarant violated Mr. Graham's constitutional rights to confrontation?

II. The Supreme Court has ruled that a jury instruction cannot cure a Confrontation Clause violation when a co-defendant's testimonial statements directly implicated the defendant in joint criminal conduct and therefore created a substantial risk of a jury still considering the information. Mr. Graham's co-defendant directly accused him of engaging in prostitution and kidnapping. Was the district court able to cure the Confrontation Clause violation by a jury instruction?

III. The legal sufficiency of a curing jury instruction is based on the timeliness of the delivery and effectiveness of the wording used. Nearly 24 hours passed between the Confrontation Clause violation and the curing instruction in this case. The instruction also only addressed the videos, and not the live testimony that repeated the statements. Was the district court's curing instruction insufficient to remedy the constitutional violation and, therefore, mistrial was the only appropriate remedy?

# STATEMENT OF THE CASE[1]

The district court recognized that the Government had committed "potentially a confrontation clause violation." (Trial Tr. 4A-9:1-7; App. A-18.)[2] Indeed, the Government had shown jurors police body camera footage in which an alleged co-defendant, who was also a co-conspirator, claimed that the defendant, Erin Graham, had kidnapped and prostituted women. The Government presented the videos through testimony from an officer, who repeated those same allegations. The district court permitted this testimony, apparently anticipating that the co-defendant would later testify. But, at the last moment and only after showing the videos and having the officer repeat the prejudicial statements, the Government elected not to present the co-defendant.

The Government claimed that the testimony of the alleged co-conspirator, who was in federal custody, would be an unmitigated disaster. The Government informed the district court that no one could "control her in front of the jury" and that "to say she is a handful would be an understatement." (Trial Tr. 3P-9:21-22;

---

[1] The following abbreviations are used herein: Record on Appeal, cited by page: "R. __:__"; Required Attached Short Appendix: "App. A-__"; Separate Appendix: "App. B-__"; Sentencing Transcript: "Sent. Tr. __:__".

[2] Transcripts of the trial proceedings are cited by page and line as (Trial Tr. XY-__:__), with X being the day of trial, and Y being "A" for the morning session or "P" for the afternoon session. All other transcripts are cited by the nature of the hearing. For example, (Final Pre-Trial Conf. Tr. 38:2-10) is a citation to the final pretrial hearing.

App. A-7.) The statements relate to an altercation in Grand Chute, WI, when officers responded to a domestic violence call.

"[Erin Graham's] over here prostituting bitches! He kidnapped me from fucking New York," Patience Moore shouted over an officer. (Gov. Ex. 72 at 0:05.)[3] "He pimp me for fucking a year and a half." (Gov. Ex. 69 at 2:04.)

Ms. Moore had found herself in police custody outside the Red Roof Inn in Grand Chute, WI, after an altercation with Mr. Graham escalated to the point that she threw rocks at him. Ms. Moore is the type of person who doesn't let herself get pushed around. (Trial Tr. 4P-56:4-5.) On that day, with her back against the wall, hands cuffed behind her back, Ms. Moore chose to do what she'd done her whole life. She fought back. (Gov. Ex. 69 at 0:48-2:14.)

Despite the officer's composed requests for Ms. Moore to calm down and stop resisting while in custody, she continued to fight the officer's grip while screaming at her partner, "You don't give a fuck about your family! You don't give a fuck about me!" (Gov. Ex. 72 at 0:24.)

Later, an officer tried to calmly remind a more reserved Ms. Moore that the officers, and not her, were in control of the situation. (Gov. Ex. 69 at 0:16.)

---

[3] The Government showed three body camera videos as a part of this testimony. The exhibits, marked Government Exhibits 69, 70, and 72, were made a part of the record on appeal, (R. 272), and are cited by time of the video as (Gov. Ex. X at __:__.)

"No, you're not," she replied. (Gov. Ex. 69 at 0:18.) As an officer explained the situation to another officer who just arrived, Ms. Moore shouts at her partner again for all the police officers to hear. "He's a pimp. He's got a 19-year-old prostitute, and he took her from New York … your name is Erin Graham." (Gov. Ex. 69 at 0:49-1:00.)

Mr. Graham met Ms. Moore in Florida a few years prior to the incident at the Red Roof Inn while both were living at another hotel. (Trial Tr. 4P-53:14-54:1.) Mr. Graham became friends with Ms. Moore and her friend, Diamond. (Trial Tr. 4P-54:12-23.) As their friendship grew, there were multiple times when Ms. Moore and Diamond asked for Mr. Graham's help removing men from their rooms at the hotel. (Trial Tr. 4P-55:1-11.) Eventually, Ms. Moore and Diamond told Mr. Graham, who had no prior experience in the commercial sex industry, they were prostitutes. (Trial Tr. 4P-55:10-11.) Ms. Moore and Diamond eventually convinced Mr. Graham to drive them to and from "dates" with their customers. Ms. Moore and Diamond agreed to pay Mr. Graham for his driving services. (Trial Tr. 4P-56:22-25, 4P-57:1.) They also showed him how to post ads for the "dates" online. (Trial Tr. 4P-58:20-21.) A few months later, the relationship moved beyond just business to a more intimate level between all three members. (Trial Tr. 4P-57:4-6.)

In 2015, Mr. Graham, Ms. Moore, and Diamond moved to Wisconsin, where Mr. Graham is from originally. (Trial Tr. 4P-51:25-52:1; 4P-59:13-14.) Diamond did not take to Wisconsin and quickly moved to New York. (Trial Tr. 4P-59:16-22.)

With Diamond out of the picture, Mr. Graham and Ms. Moore's relationship became more profound and more intimate, even though he served as her driver to and from "dates" for the next few years. (Trial Tr. 4P-59:23 - 60:8.)

Cinderria Harwell, Krystle Jischkowsky, and Kelsey Lannert entered Mr. Graham and Ms. Moore's lives during this time period. Mr. Graham and Ms. Harwell met when she approached him at a mall, (Trial Tr. 2A-99:16-20), after moving to Wisconsin when she was 18. (Trial Tr. 2A-94:21-23.) She was in her late teens during their relationship and the events leading to this case. (Trial Tr. 2P-94:21-95:3.) Ms. Harwell spoke at length about how Mr. Graham and Ms. Moore told her about "dates," with Ms. Moore taking the lead on Ms. Harwell's prostitution. (Trial Tr. 2A-130:6.)

Mr. Graham met Ms. Jischkowsky when a mutual acquaintance brought her along to purchase cocaine from him, (Trial Tr. 3P-56:2-14), and several months later Ms. Jischkowsky asked her acquaintance for Mr. Graham's number so she could contact him. (Trial Tr. 3P-59:24-25.) Mr. Graham met Ms. Lannert at a mutual friend's wedding. (Trial Tr. 3P-139:14-19.) Ms. Lannert later obtained his phone number to contact him to buy cocaine. (Trial Tr. 3P-140:23-25.)

During this period from 2015 up until Mr. Graham was arrested leading to this case, he similarly worked with Ms. Harwell, Ms. Jischkowsky, and Ms. Lannert. He ensured they remained safe while on "dates" with their clients. (Trial Tr. 2A-18:24-25.) They would text Mr. Graham to confirm they were safe ten

minutes after entering a room with a client. (Trial Tr. 2A-42:15-16.) It was this work that formed the basis of Mr. Graham's human trafficking and commercial sex charges.

The defense freely admitted from the outset of the trial that "[p]rostitution occurred in this case." (Trial Tr. 1P-26:11.) There was no question that commercial sex activity was ongoing, and the record is replete with such examples. However, the dynamic between the individuals evolved over time, with each relationship adding new layers of emotion and intrigue to the group. Ms. Harwell saw herself, Mr. Graham, and Ms. Moore as a family. (Trial Tr. 2P-128:3-5.) But the relationship between the three involved a complex sexual dynamic. (Trial Tr. 2P-147:21-25; Trial Tr. 2A-115:1-2.) Mr. Graham also had consensual sexual relations with Ms. Jischkowsky before she became directly involved in any commercial sex activity. (Trial Tr. 3P-72:9-11.) Ms. Moore was jealous of Ms. Jischkowsky and Mr. Graham's relationship. (Trial Tr. 2P-20:14-15.) Although Ms. Lannert initially befriended Mr. Graham as a means to acquire cocaine, their relationship also turned consensually sexual. (Trial Tr. 3P-147:1-7.) Ms. Lannert engaged in a sexual relationship with Mr. Graham despite knowing he had "another girlfriend." (Trial Tr. 3P-147:10-14.) The complications spiraling out of this web of people, their emotions, and their relationships ultimately led to this case.

On January 30, 2019, Mr. Graham and Ms. Moore were named co-conspirators in Count 1 of a second superseding indictment, allegedly conspiring

to cause adult females to engage in a commercial sex act, in violation of 18 U.S.C. § 1591(a)(1). (R.123.) In addition, they were named co-defendants in Counts 2, 3, and 5, of the same indictment for knowingly causing "Known Victim 1" (Cinderria Harwell) (Trial Tr. 5A-94:7-8), "Known Victim 2" (Krystle Jischkowsky) (Trial Tr. 5A-94:17-18), and "Known Victim 4" (Kelsey Lannert) (Trial Tr. 5A-95:11-12) to engage in a commercial sex act. Mr. Graham and Ms. Moore were also named co-defendants in Count 4 for knowingly attempting to cause "Known Victim 3" (Cynthia Selenka) (Trial Tr. 5A-95:1-2) to engage in a commercial sex act.[4]

Mr. Graham's trial commenced on April 8, 2019. Throughout the litigation, including right before the jury selection and first witness, the Government repeatedly expressed its intentions to call Ms. Moore as a witness. During the final pre-trial conference on March 27, 2019, the Government reported it had filed a request to the Department of Justice's Office of Enforcement Requests (OEO) for immunity for Ms. Moore. (Final Pre-Trial Conf. Tr. 38:2-10.) The first morning of the trial during the final hearing, the attorneys for the Government advised the district court that their request for immunity for Ms. Moore was approved, but that the situation was "dynamic" and that they did not know if Ms. Moore would

---

[4] The Grand Jury indicted Mr. Graham with one count in violation of 18 U.S.C. § 1594(c); three counts in violation of 18 U.S.C. § 1591(a)(1) and (b)(1); one count of knowingly attempting to violate 18 U.S.C. § 1591(a)(1) and (b)(1); and two counts in violation of 18 U.S.C. § 2421. (R.123.)

testify pursuant to a proffer agreement or whether they would have to issue immunity and ask the district court to compel her to testify. (Trial Tr. 1A-7:1-7.)[5] However, at no point did the Government indicate there was a chance it would not call her. During *voir dire*, the district court asked the Government to read its witness list to the jury, skipping anyone it did not plan to call. (Trial Tr. 1A-45:16-46:2.) The Government read Ms. Moore's name among its witness list. (Trial Tr. 1A-46:5.) During its opening statements to the jury, the Government repeatedly referenced Ms. Moore as a co-conspirator. (*See* Trial Tr. 1P-5:4-25:6.) The indictment, provided to the jury, also lists Ms. Moore as a named co-defendant and co-conspirator. (Trial Tr. 1A-16:8-9.) Despite all this discussion, the opening statements and initial Government witnesses proceeded without further record of any position with regard to whether the Government would call Ms. Moore.

During the morning session of the third day of trial, the Government played videos marked as Government's Exhibits 69, 70, and 72, that law enforcement body cameras had captured following the altercation between Mr. Graham and Ms. Moore at the Red Roof Inn in Grand Chute. (Trial Tr. 3A-130:21-142:5; App. B-3-15.) The Government played the videos while its witness, Grand Chute Police Department Officer Travis Waas, was on the stand. (Trial Tr. 3A-131:19-21; App.

---

[5] There are two different transcripts of the morning session of the first day of trial: one without *voir dire* transcribed and one with *voir dire* transcribed. The citations herein are to the complete transcript of the first morning, with both the final hearing and *voir dire* transcribed.

B-4.) The Government called Officer Waas to testify about what transpired after the altercation between Ms. Moore and Mr. Graham at the Red Roof Inn, as he was one of the responding officers. (Trial Tr. 3A-129:7-23; App. B-2.) While the video played, Officer Waas stated that it was kind of hard to understand what was going on in the videos and what the various parties were saying. (Trial Tr. 3A-131:23-132:6; App. B-4-5.) When he asked for part of a video to be replayed, the Government provided him with transcripts it had created. (Trial Tr. 3A-133:18-25; App. B-6.)

The Government directed Officer Waas to highlight several allegations Ms. Moore made against Mr. Graham, including the allegation that "he's got a 19-year-old-prostitute and that he had taken her from New York." (Trial Tr. 3A-134:21-22; App. B-7.) Officer Waas testified that Ms. Moore said Mr. Graham "had been pimping her for a year and a half," and "it was the worst year and a half of her life." (Trial Tr. 3A-135:16-19; App. B-8.) When Ms. Moore continued yelling in the video, the Government once again directed Officer Waas to repeat what Ms. Moore was saying, and he asserted "that he's prostituting." (Trial Tr. 3A-138:23-24; App. B-11.)

Officer Waas also testified about the outcome of the Grand Chute altercation. Responding officers had separated Ms. Moore and Mr. Graham; Ms. Moore was in the parking lot, (Trial Tr. 3A-138:1-2; App. B-11), while Mr. Graham walked upstairs with another officer to answer questions and provide

identification. (Trial Tr. 3A-134:24-25; App. B-7.) Mr. Graham and the officer interviewing him stood outside of his room and the officer could see two women inside, one aged about 19. (Trial Tr. 3A-136:1-7; App. B-9.) The officers ultimately arrested Ms. Moore for domestic disorderly conduct because one of them had observed her throwing rocks at Mr. Graham. (Trial Tr. 3A-140:8-12; App. B-13.) Meanwhile, Officer Waas had asked Mr. Graham to complete a domestic violence packet for victims, but Mr. Graham refused. (Trial Tr. 3A-145:10-17.) After the Government played the Grand Chute videos and Officer Waas had left the stand, trial recessed for a mid-day break. (Trial Tr. 3A-146:20-25.)

Following the break, shortly after the Government played the Grand Chute videos and used Officer Waas to highlight Ms. Moore's statements, the defense and the district court discovered for the first time that the Government was unsure that it would call Ms. Moore as a witness. (Trial Tr. 3P-2:22-5:5; App. A-1-3.) Although the Government said it could make sure Ms. Moore was transported to the district court from the Dane County Jail, it might not call her as a witness. (Trial Tr. 3P-5:15-17; App. A-3.) The Government asserted that it did not want to call Ms. Moore because she was "going to be a highly problematic witness," for the Government. (Trial Tr. 3P-9:2-22; App. A-7.) The Government suggested that if it called Ms. Moore there could be a mistrial and asserted "to say she is a handful would be an understatement." (Trial Tr. 3P-9:21-22; App. A-7.) The Government concluded, without elaboration, that putting Ms. Moore on the stand through

immunity and compulsion would "jeopardize the trial itself." (Trial Tr. 3P-10:11; App. A-8.)

Having found out the Government might no longer call Ms. Moore to testify, the defense raised a Confrontation Clause objection. (Trial Tr. 3P-2:22-5:5; App. A-1-3.) The defense argued that Ms. Moore's statements were testimonial (Trial Tr. 3P-6:12-25; App. A-4), and that Mr. Graham had a right to cross-examine her. (Trial Tr. 3P-7:1-21; App. A-5.) The defense noted that only the Government had the ability to grant Ms. Moore immunity and compel her to testify. (Trial Tr. 3P-7:3-6; App. A-5.) Otherwise, the defense pointed out, she would be unavailable to the defense without a prior or current opportunity to cross-examine her. (Trial Tr. 3P-7:3-6; App. A-5.) The defense reasoned if Mr. Graham called Ms. Moore, she would invoke her Fifth Amendment right to remain silent. (Trial Tr. 3P-7:1-7; App. A-5.) To remedy the violation, the defense initially requested that the district court strike all of Officer Waas's testimony and the videos, otherwise the case was "in mistrial territory." (Trial Tr. 3P-5:1-5; App. A-3.)

The district court did not initially overrule the defense's objection or decline to issue a curing instruction. (Trial Tr. 3P-4:13-24; App. A-2.) Rather, it asked the defense to point out the specific problematic statements so that the court could give an instruction to the jury to "give no credence or consideration," to any of the prejudicial testimonial statements. (Trial Tr. 3P-11:4-10; App. A-9.) However, the

district court reserved judgment on when to give the instruction and the full scope of the instruction. (Trial Tr. 3P-13:1-4; App. A-11.)

When trial reconvened later on the third day, the district court had not yet issued its instructions to the jury regarding Ms. Moore's statements. (Trial Tr. 3P-13:1-13.) The jury was not made aware there had been a potential Confrontation Clause violation or any other issue with Officer Waas's statements or the videos. (Trial Tr. 3P-13:1-13.)

Having highlighted Ms. Moore's statements that Mr. Graham was prostituting her and other women, including apparently a 19-year-old from New York, the Government immediately called the witnesses it had designated as other "known victims" to testify about their encounters with Mr. Graham. (Trial Tr. 3P-13-155.) Ms. Jischkowsky testified that she had picked up drugs from Mr. Graham, (Trial Tr. 3P-56:12-13), he suggested she should go on "dates," (Trial Tr. 3P-72:15-17), and that he had posted an ad for her. (Trial Tr. 3P-73-6.) Similarly, Ms. Lannert testified how she had learned from Ms. Moore, Mr. Graham, and Ms. Harwell that they were engaging in prostitution, (Trial Tr. 4A-24:16-24), that Ms. Moore told her she needs to "pull her weight," (Trial Tr. 4A-35:6-16), and that her first "date" was April 4th or 5th. (Trial Tr. 4A-38:7-11.)

After that testimony from the "known victims," late in the afternoon on the third day of trial, the defense renewed its Confrontation Clause objection. (Trial Tr. 3P-89:11-17; App. A-12.) The defense sought clarification on when the district

court would like the defense to highlight the specific problematic statements, and when the court would issue its instruction to the jury to disregard those specific portions of the video. (*Id.*) The district court replied that the issue would be raised at the instruction conference. (Trial Tr. 3P-89:23-24; App. A-12.)

On the last full day of trial, the Government declared it had made the final decision not to call Ms. Moore as a witness. (Trial Tr. 4A-11:15-19; App. A-21.) It reiterated its core concern that it did not think it could "control her in front of the jury." (Trial Tr. 4A-17:19-20; App. A-27.)

The defense asked the district court to reconsider its ruling about the potential Confrontation Clause violation. (Trial Tr. 4A-3:11-14; App. A-13.) It also reasoned that, even if Ms. Moore's statements were not testimonial, her statements were inadmissible hearsay and should be stricken since the significantly prejudicial nature of false statements about kidnapping outweighed any probative value the statements might have had. (Trial Tr. 4A-6:16-24; App. A-16.) To cure the issue, the defense asked for a mistrial if the Government would not call Ms. Moore. (Trial Tr. 4A-7:12-14; App. A-17.) Alternatively, the defense asked the district court to reconsider the scope of the intended instruction and strike both Officer Waas's testimony and the videos in their entirety. (Trial Tr. 4A-13:24-25; App. A-23.)

The district court declined to grant a mistrial. (Trial Tr. 4A-11:14-15; App. A-21.) It did indicate it would broaden the scope of the instruction and would instruct the jury to disregard everything Ms. Moore said in the videos. (Trial Tr.

4A-14:11-12; App. A-24.) However, it did not mention completely striking Officer Waas's testimony. (Trial Tr. 4A-14:9-16; App. A-24.)

The district court and parties then turned from the scope of the instruction to the timing of delivery. (Trial Tr. 4A-19:22-20:24; App. A-29-30.) The Government was concerned about giving the impression it had engaged in any misconduct by playing the videos when it planned not to call Ms. Moore; it was "more worried about the effect on the jury to draw such a significant highlight to it," than about giving the curing instruction as soon as possible. (Trial Tr. 4A-20:3-7; App. A-30.) The defense requested a timelier curing instruction. (Trial Tr. 4A-8-12; App. A-18-22.) The district court decided not to instruct the jury on Ms. Moore's statements until it was certain that Ms. Moore would not testify, even though the Government said it would not be calling her to testify. (Trial Tr. 4A-20:21-25; App. A-30.)

Finally, after the morning session of the last full day of trial, about 24 hours after Officer Waas had testified, the videos were shown, and the other "known victims" were called, the district court instructed the jury as follows:

> Yesterday we watched a video in which Patience Moore made statements during an incident at the hotel in Grand Chute. We have now been informed that Ms. Moore will not be testifying. Accordingly, you can't consider anything that Ms. Moore said in that video because Ms. Moore can't be cross-examined about those statements. You can consider the video itself and statements made by other participants. *This instruction is specific to the video that we saw yesterday, and it doesn't relate to your consideration of any other evidence or testimony in the case.*

(Trial Tr. 4A-160:4-12; App. A-34.) (emphasis added). The instruction was limited in scope to Ms. Moore's statements in the Grand Chute videos. (Trial Tr. 4A-160:4-12; App. A-34.) The district court did not instruct the jury to disregard any aspect of Officer Waas's testimony that had highlighted and repeated Ms. Moore's statements from the videos. (Trial Tr. 4A-160:4-12; App. A-34.) The district court issued the instruction once and did not renew its curing instruction after the trial ended during the final instructions to the jury. (Trial Tr. 5A-91-109.) However, the jury was reminded of the videos. The Government, in its closing, pointed the jury back to those same videos for consideration during its deliberations. (Trial Tr. 5A-122:21-25.)

The jury convicted Mr. Graham of all counts. (Trial Tr. 5A-176:22-177:17.) The district court sentenced him to incarceration for 25 years, followed by a 20-year supervised release term for each count. (Sent. Tr. 48:12-16.)

This appeal follows.

# SUMMARY OF THE ARGUMENT

At the heart of this case, there was an abuse of the judicial process which caused an egregious violation of a man's constitutional rights. Due to the inability to provide an effective remedy, this violation serves as the basis for this appeal.

The first question to clarify is whether the district court correctly determined the Government violated Mr. Graham's constitutional right to confront and cross-examine witnesses against him. At trial, the Government introduced testimonial statements about Mr. Graham's alleged involvement in prostitution as a "pimp" and kidnapping. The statements were introduced both through video evidence and the testimony of a law enforcement officer. When it chose to introduce these statements, the Government had a constitutional obligation to provide Mr. Graham the opportunity to cross-examine the declarant, his co-defendant, Patience Moore. Instead, the Government refused to call her, essentially expressing a preference that she not testify, despite having the sole means of effectively doing so, immunity. Prior to the introduction of these statements, there was no opportunity for Mr. Graham to cross examine his co-defendant. Therefore, under *Crawford v. Washington*, 541 U.S. 36 (2004), these testimonial statements constitute a violation of Mr. Graham's Sixth Amendment confrontation rights.

The second question in this case is whether the district court could remedy this violation, and if it could, did it do so effectively. The district court attempted to instruct the jury to disregard the testimonial statements. This was problematic

on two fronts. First, given the extremely prejudicial and inflammatory nature of the statements by a named co-defendant, any such instruction is inadequate to remedy the matter. Second, in the instruction that was given, the district court only addressed the statements made by the co-defendant in the videos and failed to discuss those same statements that had been reiterated almost word-for-word by the officer's testimony. Thus, there was a substantial risk that the jury still used the impermissible statements against Mr. Graham. When such a risk is present, no curing instruction is sufficient to remedy the probable prejudice.

Additionally, the district court abused its discretion denying Mr. Graham's motion for a mistrial because the curing instruction provided was both ineffective and untimely. The district court was unable to fully erase the prejudice caused by the inadmissible testimony. The instruction failed to address the officer's testimony and came nearly 24 hours after the jury heard the improper statements and further testimony from those identified as "known victims" in the indictment. This left an overwhelming probability that the jury would not be able to follow the district court's instruction in a way that would cure the constitutional violation, resulting in a fundamentally unfair trial for Mr. Graham.

# ARGUMENT

This Court should vacate Mr. Graham's convictions and remand his case for a new trial because he was denied a fair trial when the Government violated his Sixth Amendment Confrontation Rights. Specifically, the Government introduced prejudicial, testimonial statements made by a co-defendant and refused to call her to testify at trial, when it had, in fact, the sole means to make the individual available. Furthermore, the district court's curing instruction could not and did not sufficiently remedy the prejudice caused by introduction of the damaging and prejudicial testimonial statements with regard to alleged sex trafficking.

## I.     The Government Violated Mr. Graham's Confrontation Rights Guaranteed by the Sixth Amendment.

As an initial matter, clarification of the violation is needed to define the potential scope of any remedy available. The Government violated Mr. Graham's confrontation rights when it introduced testimonial statements and refused to call the declarant to testify. "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Sixth Amendment bars testimonial statements by witnesses who are not subject to cross-examination at trial unless two conditions are met. The Government must prove the witness was unavailable *and* the defendant had a prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 59. Statements are testimonial when they are "made under circumstances which

would lead an objective witness reasonably to believe that the statements would be available for use at a later trial." *United States v. Watson*, 525 F.3d 583, 589 (7th Cir. 2008) (quoting *Crawford*, 541 U.S. at 52).

In this case, the Government presented testimonial statements Ms. Moore made to police officers with regard to Mr. Graham kidnapping and prostituting women. The Government then refused to call Ms. Moore as a witness and subject her to cross-examination. The Government failed to meet its burden for admitting Ms. Moore's testimonial statements because she was not unavailable to the Government, the only party with the means and obligation to call her, and the defense did not have a prior opportunity to cross-examine Ms. Moore.

"*Crawford* only covers testimonial statements offered to establish the truth of the matter asserted." *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2006). The only apparent purpose for showing the videos was using Ms. Moore's statements for their truth, that Mr. Graham is a pimp and he was kidnapping women to prostitute them. These allegations are consistent with the charged sex trafficking counts, especially the broad conspiracy between Mr. Graham and Ms. Moore. The Government proffered that the videos were for "context," but the district court instructed the jury to disregard the statements because Ms. Moore was not going to be called and cross-examined. (Trial Tr. 4A-160:4-12; App. A-34.) This shows the district court based its instruction on a determination of a Confrontation Clause violation resulting from a testimonial, hearsay statement.

In fact, the district court seemed to agree with defense counsel's concern that there was a significant issue on appeal, whether it be the "prejudicial testimonial statements" (Trial Tr. 3P-11:6-10; App. A-9) or the fact they are inadmissible hearsay. (Trial Tr. 4A-6:16-20; App. A-16.) The district court recognized that this was "potentially a confrontation clause violation," and if the Government knew it was not going to call Ms. Moore, "[the court] shouldn't have shown the video[s]." (Trial Tr. 4A-9:1-7; App. A-19.) However, the videos were shown, the jury heard the statements by Ms. Moore, then heard them again by a live law enforcement witness, and the efforts to mitigate the harm were insufficient.

## A. Standard of Review

This Court reviews a preserved challenge to the admissibility of evidence under the Confrontation Clause *de novo*. *United States v. Lynn*, 851 F.3d 786, 791 (7th Cir. 2017).

## B. Ms. Moore's Statements in the Grand Chute Videos Were Testimonial.

The Sixth Amendment's Confrontation Clause covers only testimonial statements. *See Davis v. Washington,* 547 U.S. 813, 821 (2006) (The Supreme Court consolidated two cases for decision, *Davis v. Washington* and *Hammon v. Indiana*, cited further as *Davis*). Statements are testimonial when they are "made under circumstances which could lead an objective witness reasonably to believe that the statements would be available for use at a later trial." *Watson*, 525 F.3d at 589

(quoting *Crawford*, 541 U.S. at 52). Furthermore, statements made during police interrogations are testimonial when the circumstances objectively indicate there is no ongoing emergency, and the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *Davis*, 547 U.S. at 822.

The Supreme Court has adopted an objective test to determine whether the primary purpose of an interrogation is to enable police to meet an ongoing emergency. *Michigan v. Bryant*, 562 U.S. 344, 359 (2011). The Court "objectively evaluate[s] the circumstances in which the encounter occurs and the statements and actions of the parties." *Id.* In *Hammon*, the Supreme Court held that a police officer's testimony and victim's affidavit were testimonial, and therefore violated the defendant's Sixth Amendment right to confront witnesses against him. *Davis*, 547 U.S. at 820. The police responded to a reported domestic disturbance at Amy and Hershel Hammon's home. *Id.* at 819-20. After investigating the incident and hearing Amy's story, the officer had her fill out and sign an affidavit. *Id.* Amy did not testify at trial. *Id.* Instead, the State called the officer who had questioned Amy, and asked him to recount what Amy told him and to authenticate the affidavit. *Id.* The Supreme Court determined that Amy's statements to the officer and the affidavit were testimonial because the circumstances surrounding the statements objectively indicated there was no ongoing emergency. *Id.* at 829–31. The Court held that, objectively, the primary purpose of the police questioning in *Hammon*

was to discover what happened to assist in the prosecution of a crime, just as it was here. *Id.*

At Mr. Graham's trial, the Government offered statements made in a similar situation, after the parties were separated and law enforcement was investigating the nature of the alleged crimes. This evidence, Government Exhibits 69 through 72, contained police body camera footage showing Ms. Moore detained in handcuffs with two officers. Ms. Moore appears to be in handcuffs throughout the majority of the footage. Ms. Moore begins by claiming "he kidnapped [her] from fucking New York." (Gov. Ex. 72 at 0:05-0:10.) Later on, Mr. Graham can be seen standing with another officer on the second story balcony of the hotel. By this point, the parties were separated, and one of the officers was upstairs with Mr. Graham investigating the situation that preceded the police response. (Gov. Ex. 70 at 1:24.) The officer with Mr. Graham was taking notes on his notepad about the events that led up to the call. (*Id.*) Meanwhile, Ms. Moore, detained, in handcuffs, and surrounded by two officers is seen and heard shouting accusations about how "[Mr. Graham's] got a 19-year-old prostitute" and he "took [her] from New York." (Gov. Ex. 69 at 0:50.)

She had also made these accusations in response to police questioning. Ms. Moore told the officers "he bring me all the way from fucking New York." (Gov. Ex. 69 at 1:56.) In response to her statement about Mr. Graham taking her from New York, the officer asked, "[i]s he pimping you?" (Gov. Ex. 69 at 2:00.) Ms.

Moore says that "he pimped me for fucking year and a half . . . the worst year and a half of my life." (Gov. Ex. 69 at 2:04.)

Ms. Moore first made these statements while she was restrained, and other officers were arriving on the scene. The officers had the situation under control and were in the process of separating the parties. Mr. Graham was compliant with officer commands. When the officer told him to "stand by [his] car" he followed the officer's direction. (Gov. Ex. 72 at 0:23.) Ms. Moore repeated her allegations after the two were separated during the officers' investigation. There was no threat to the officers or any bystanders, the questions asked and answered concerned past events, and the formality of the police encounter objectively show there was no ongoing emergency. The context of Ms. Moore's statements is essentially identical to the situation in *Hammon*; therefore, Ms. Moore's statements were testimonial, as the district court indicated below.

## C. The Government Did Not Meet Its Burden Before It Introduced the Testimonial Statements.

Once the statements are deemed to be testimonial, the Government bears a burden in order to introduce such statements without the declarant on the stand. The Confrontation Clause imposes a burden on the government, not on the defendant, to present its witnesses for cross-examination when the testimony will

involve testimonial statements adverse to the defendant. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009).[6]

When the government is seeking to admit a testimonial statement, the government must either (1) produce the witness at trial or (2) establish the witness is unavailable *and* that the defendant had a prior opportunity to cross-examine the witness. *United States v. Walker*, 673 F.3d 649, 657 (7th Cir. 2012). The Government did not establish that Ms. Moore was unavailable to testify. In fact, the Government had the sole means to make her available, immunity, but simply chose not to use it. Additionally, the defense did not have a prior opportunity to cross-examine Ms. Moore. The district court instructed the jury to disregard Ms. Moore's statements precisely because Ms. Moore could not be cross-examined. (Trial Tr. 4A-160:4-12; App. A-34.)

---

[6] This Court established this burden long before *Melendez-Diaz*, discussing the nature of the confrontation right.

> It seems to us, however, that where an extrajudicial declaration is used under circumstances such that the opportunity to cross-examine the declarant is essential to a defendant's right to confrontation, it must be the government's burden to produce the declarant. Mere availability, in the sense that the defendant could have subpoenaed him, does not, in our opinion, suffice.

*Simmons v. United States*, 440 F.2d 890, 891 (7th Cir. 1971).

### i. Ms. Moore Was Not Unavailable as a Witness.

The Government did not meet its burden to establish Ms. Moore was unavailable. Whether the prosecution has done enough to produce a witness is a question of reasonableness. *Hardy v. Cross*, 565 U.S. 65, 70 (2011) (quoting *Ohio v. Roberts*, 448 U.S. 56, 74 (1980)). The Government must undertake good-faith efforts prior to trial to locate and present that witness. *United States v. Reed*, 227 F.3d 763, 767 (7th Cir. 2000) (quoting *Roberts*, 448 U.S. at 74).

Here, the Government's actions were patently unreasonable. It failed to fulfill its duty to the defendant and the district court in terms of presenting Ms. Moore as a witness or providing sufficient opportunity to address the matter before introducing this testimony. It was the Government's burden to produce Ms. Moore to testify. The Government and the district court asserted that Ms. Moore was "available" to the defense if it wanted to call her. (Trial Tr. 4A-12:7-12; App. A-22.) Rather, any such "availability" was merely in the physical sense, her being nearby at the jail. Further, the Government stated that it had procured immunity for Ms. Moore and even suggested that it would have Ms. Moore ready if the defense decided to call her. (Trial Tr. 4A-11:17-13:20; App. A-21-23.) Upon deciding that Ms. Moore would not be a helpful witness for its case, the Government instead insisted that the defense should call Ms. Moore if Mr. Graham

wished to cross-examine her in direct contravention of established constitutional precedent. (Trial Tr. 4A-11:17-12:3; App. A-21-22.)

This insistence on the part of the Government impermissibly shifted its responsibility onto the defense. Ms. Moore was not the defense's witness and it was not Mr. Graham's burden to cure the Government's violation of Mr. Graham's constitutional rights. Further demonstrating the impossibility of the defense's ability to cure the Government's violation, counsel noted that Ms. Moore would be likely to invoke her right to remain silent, a position the Government recognized as well. (Trial Tr. 3P-7:2-3; 4A-11:23-4; App. A-5, A-21.)

The Government clearly had the ability to call Ms. Moore as a witness and present her for cross-examination. It had Ms. Moore ready to come to the court, and, in fact, because she was a co-defendant, had the sole ability to do so through immunity it had already acquired from the United States Department of Justice. (Trial Tr. 4A-12:7; App. A-22.) However, the Government would not extend that immunity so that she could be questioned by the defense. (Trial Tr. 4A-13:9-10; App. A-23.) There was no motion *in limine* from the Government to introduce the evidence, because the Government acted as if Ms. Moore would be made available, until it singlehandedly made her unavailable and alerted the defense and district court to that fact only after showing the prejudicial videos. Although physically available at the Dane County Jail, there was no way Mr. Graham could have cross-examined Ms. Moore about the statements in the videos.

### ii. Mr. Graham Did Not Have A Prior Opportunity to Cross-Examine Ms. Moore.

Mr. Graham did not have a prior opportunity to cross-examine because he did not have the ability to directly question Ms. Moore under oath and obtain immediate answers during trial or any related proceeding. Meaningful and effective cross-examination is the essential purpose of the right to confront witnesses under the Sixth Amendment. *See Davis v. Alaska*, 415 U.S. 308 (1974). Cross-examination is the primary tool used to determine the credibility and the truthfulness of a witness's statement. *Davis*, 415 U.S. at 316. *Davis* holds meaningful and effective cross-examination is the thorough process of putting direct and personal questions to witnesses and obtaining immediate answers. *Id.* at 316 (citing 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)). *See also United States ex rel Ashford v. Director of Illinois Department of Corrections*, 871 F.2d 680, 683 (7th Cir. 1989) (holding *Davis* stands for the right of cross-examination in the form of literal confrontation and effective cross-examination under oath). Therefore, the opportunity to cross-examine means the opportunity to directly question the witnesses under oath and obtain immediate answers. *See Davis*, 415 U.S. at 315-16; *Ashford*, 871 F.2d at 683; *Jones v. Basinger*, 635 F.3d 1030, 1040 (7th Cir. 2011).

The Government failed to show Mr. Graham had the prior opportunity to cross-examine Ms. Moore because she was never called to the stand to testify under oath in this trial, and the Government failed to provide any information that

the defense had the opportunity to cross-examine Ms. Moore in any other related proceeding. Therefore, the defense did not have the prior opportunity to cross-examine Ms. Moore.

### D. The Confrontation Clause Violation Was Not Harmless Beyond a Reasonable Doubt.

Once the Court determines that a Confrontation Clause violation exists, it reviews the matter for harmlessness. The Government has the burden of proving that the violation was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986); *United States v. Castelan*, 219 F.3d 690, 696 (7th Cir. 2000). "The test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been 'significantly less persuasive' had the improper evidence been excluded." *United States v. Eskridge*, 164 F.3d 1042, 1044 (7th Cir. 1988) (quoting *Schneble v. Florida*, 405 U.S. 427, 432 (1972)). As discussed in greater detail below in Sec. II, the Government cannot meet its "formidable burden" in this case given the prejudicial statements made by Mr. Graham's co-defendant that are prototypical examples of human trafficking above and beyond what was alleged in this case. *Van Arsdall*, 475 U.S. at 688 (Marshall, J., dissenting).

The testimonial statements were allegations of a supposed co-conspirator in pimping and prostitution of several women, including the declarant. Further, Ms. Moore alleged that she and another 19-year-old woman, matching the description of the first "known victim," Ms. Harwell, were kidnapped. These two, highly-

inflammatory statements both (1) provided the most concrete statements of human trafficking in this case and (2) buttressed the other statements of alleged physical violence that formed the Government's theory with regard to the use or fear of force in the offence in order to conduct the alleged trafficking. Despite the fact that the jury was not reinstructed to disregard the statements in the videos in closing instructions, the Government reminded the jury in its closing argument to consider the videos from the Grand Chute arrest in its deliberations. (Trial Tr. 5A-122:21-25.) As a result of the likely harm of the statements and Government's reminder just before the deliberations, the Government cannot meet its burden to prove these highly prejudicial statements did not impact the jury beyond a reasonable doubt.

## II.    A Curing Instruction Could Not Remedy a Testimonial Statement Made by a Known Co-Defendant.

### A. Standard of Review

This Court reviews evidentiary rulings that impact the defendant's Sixth Amendment right to confront witnesses *de novo. United States v. Hernandez*, 330 F.3d 964, 972 (7th Cir. 2003).

## B. No Curing Instruction is Sufficient to Cure the Prejudice Against Mr. Graham.

The prejudice created by the Government's failure to call Ms. Moore for cross-examination could not be mitigated by a curing instruction. When Ms. Moore was not called, the district court should have granted the defendant's request for a mistrial because Ms. Moore's statements—heard by the jury through Officer Waas's testimony and the Grand Chute videos—were powerfully incriminating, their credibility was suspect, and they were unfairly prejudicial. Therefore, a substantial risk that the jury considered the statements, notwithstanding the curing instruction, existed. When a substantial risk is present, no curing instruction is sufficient to cure the prejudice that taints the trial. *See Bruton v. United States*, 391 U.S. 123, 137 (1968).

In *Bruton*, a defendant and co-defendant were prosecuted for armed postal robbery. *Id.* at 124. A witness was called to testify against the defendant and co-defendant. *Id.* at 127. The witness's testimony consisted of the co-defendant's confession implicating the defendant in the criminal conspiracy. *Id.* The co-defendant did not testify. *Id.* at 128. The judge gave a clear and concise curing instruction to the jury to disregard the witness's inadmissible testimony. *Id.* at 137. However, the Supreme Court determined the prejudice of a co-defendant's confession, directly implicating the defendant in a criminal act heard by the jury through hearsay evidence, was too great for a curing instruction to substitute for

the right to cross-examination. *Id.* at 137. The Supreme Court reasoned a co-defendant's confession in a joint trial created a substantial risk because the co-defendant's statements were powerfully incriminating, and the credibility of the statements was inevitably suspect. *Id.* at 136-37.

This Court has broadly applied *Bruton's* reasoning. *See United States v. Guajardo-Melendez,* 401 F.2d 35, 38 (7th Cir. 1968); *See also Simmons v United States,* 440 F.2d 890, 891-92 (7th Cir. 1971) (applying the *Bruton* holding to a case where a co-defendant pled guilty prior to the conclusion of trial). Accordingly, this Court has found a *Bruton* error where the defense had the opportunity to cross-examine the declarant, but chose not to, and where the co-defendant plead out before the jury deliberated on the guilt of the defendant/appellant.

In *Guajardo-Melendez,* the Court held a defendant was denied a fair trial, despite a judge's warning and curing instruction, when the defendant's attorney declined to cross-examine the co-defendant that made the incriminating hearsay statements. *Guarjardo-Melendez,* 401 F.2d at 38-39 ("The confrontation rationale of *Bruton,* although persuasive, would not seem to be literally applicable . . . But irrespective of the literal application of *Bruton* we find reversible error occurred in admitting Agent Azzam's hearsay testimony . . . ."). Thus, this Court has found error, under reasoning similar to *Bruton,* but in broader contexts.

In *Simmons,* this Court held a *Bruton* error existed where the co-defendant—declarant of the incriminating statement—pled guilty before the jury deliberated

on the guilt of the defendant. *Simmons*, 440 F.2d at 891-92. The co-defendant's extrajudicial statement directly incriminating the defendant was introduced to the jury. *Id.* at 890-91. The co-defendant pled guilty during the trial process before the jury deliberated on the guilt of the defendant. *Id.* at 891. The government and the defense never called the co-defendant to testify after he had pled guilty. *Id.* This Court reasoned,

> the jury was not presented with the exact dilemma present in *Bruton*. But we think that there was still one of those 'contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.'

*Id.* (quoting the reasoning found in *Bruton*.) Therefore, this Court has found a substantial risk the jury would consider the inadmissible evidence was present when the defendant and co-defendant were not side-by-side at the time the jury deliberated on the guilt of the defendant.

The same factors that created the substantial risk in *Bruton* are present in Mr. Graham's case, even more so than in *Guajardo-Melendez* and *Simmons*. Ms. Moore was a co-defendant and co-conspirator whose testimonial statements were powerfully incriminating. The co-defendant made statements and used terminology that likely resonated with the jury to accuse Mr. Graham of kidnapping and pimping, and the credibility of her testimony to Officer Waas in Grand Chute was suspect. (R.123:1; Gov. Ex. 69 at 0:50; Gov. Ex. 69 at 2:04; Gov.

Ex. 72 at 0:05-0:10; Trial Tr. 133-37.) The testimonial statements made by Ms. Moore and heard by the jury through Officer Waas's testimony were powerfully incriminating. They had this effect because the jury knew Ms. Moore was a co-conspirator and co-defendant, (*see, e.g.,* Trial Tr. 1P-9:12-15) with an apparent first-hand knowledge of any criminal activity. She told police that Mr. Graham took a 19-year-old girl from New York for prostitution, Mr. Graham was a pimp, and Mr. Graham kidnapped Ms. Moore from New York. The reference to a 19-year-old girl could easily be confused as a reference to Ms. Harwell because she was around 19 years old during most of the alleged conspiracy. (Gov. Ex. 69 at 0:50; Gov. Ex. 69 at 2:04; Gov. Ex. 72 at 0:05-0:10; Trial Tr. 2P-95.) Ms. Moore was also repeatedly referenced in testimony as an actor in the conspiracy. (*See, e.g.,* Trial Tr. 2A-99; 2A-100; 2A-103:11-15; 2A-114:16-21.) The Grand Chute videos and Officer Waas's testimony, introduced right before three of the "known victims" testified, resulted in the jury hearing a known co-conspirator directly incriminate the defendant in the quintessential components of human trafficking, kidnapping and pimping. (Trial. Tr. 3A-133-13; Gov. Ex. 69 at 0:50; Gov. Ex. 69 at 2:04; Gov. Ex. 72 at 0:05-0:10.)

Ms. Moore's statements accuse Mr. Graham of conduct using terminology typically understood by the public and jury to describe a human trafficker. The word "pimp" is understood to mean a criminal associated with, who usually exerts control over, and lives off the earnings of one or more prostitutes. *See Pimp,*

MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/pimp (last visited Dec. 9, 2019).[7] "Kidnap" is commonly used to mean seizing, detaining, or taking away by unlawful force or fraud. *See Kidnap*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/kidnap (last visited Dec 9, 2019).[8] Ms. Moore's testimonial statements directly accused Mr. Graham of taking a 19-year-old girl, a description that matched Ms. Harwell, who was in the room at the Grand Chute hotel, from New York, and acting as Ms. Moore's pimp after using force and/or fraud to take her. (Trial Tr. 2P-10:19-21; Trial Tr. 3A-134-35; App. A-7-8; Gov. Ex. 72 at 0:05-0:10.) These are classic examples of actions associated with a human trafficker. Therefore, the statements accusing Mr. Graham of kidnapping Mrs. Moore, taking a 19-year-old from New York, and pimping women, were powerfully incriminating to Mr. Graham.

The testimonial statements' credibility is inevitably suspect. In *Bruton,* the Court reasoned the co-defendant's statements' credibility were suspect because the co-defendant was under pressure to shift blame to the other party. 391 U.S. at

---

[7] *See also Pimp*: someone who solicits customers for a prostitute, in return of a share of the prostitute's earnings. *Pimp,* BLACK'S LAW DICTIONARY (11th ed. 2019) (Additional citation is provided to demonstrate the level of congruency in the term's meaning).

[8] *See also Kidnap*: to seize and take away (a person) by force or fraud, often with a demand for money. *Kidnap,* BLACK'S LAW DICTIONARY (11th ed. 2019) (Additional citation is provided to demonstrate the level of congruency in the term's meaning).

136. The arrest at Grand Chute was context for the same pressure to shift the blame. Ms. Moore was in handcuffs and detained by police. Ms. Moore was upset and felt Mr. Graham should have been the one arrested. (Trial Tr. 3A-129:21-23; App. A-2.) Thus, she accuses Mr. Graham of kidnapping her, taking a 19-year-old girl form New York, and pimping her and others to shift blame to Mr. Graham. "The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed." *Bruton*, 391 U.S. at 136 (citing *Pointer v. Texas,* 380 U.S. 400 (1965)).

In sum, no curing instruction is sufficient to cure the prejudice when there is a substantial risk that the jury will still consider the inadmissible evidence of a co-defendant's testimonial statements notwithstanding the instruction. There was a substantial risk the jury would consider the statements because they were powerfully incriminating against Mr. Graham. The prejudice of those statements was exacerbated because Ms. Moore was not cross-examined by the defense. Thus, the district court should have granted the Mr. Graham's request for a mistrial, and this Court should vacate Mr. Graham's convictions and remand for a new trial.

III.    **The Court Abused its Discretion Denying Mr. Graham's Motion for a Mistrial Because the Curing Instruction Given was Untimely, Ineffective, and Left an Overwhelming Probability that the Jury Would be Unable to Follow the Instruction.**

Even if the district court could cure the violation by instruction, the district court still abused its discretion denying Mr. Graham's motion for a mistrial. By relying on an untimely, ineffective curing instruction, the district court was unable to fully erase the prejudice discussed above, leaving an overwhelming probability that the jury would not be able to follow the court's instruction. The high probability that the jury was not able to follow the district court's instruction resulted in a fundamentally unfair trial for Mr. Graham.

A trial judge may grant a motion for a mistrial when there is a "high degree" of necessity for a new trial. *Arizona v. Washington*, 434 U.S. 497, 506 (1978). The decision to declare a mistrial is left to the "sound discretion" of the judge, but "the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Renico v. Lett*, 559 U.S. 766, 774 (2010) (quoting *United States v. Perez*, 22 U.S. 579, 580 (1824)).

This Court reviews a district court's denial of a mistrial for abuse of discretion, assuming the trial judge is in the best position to determine whether an incident was serious enough to warrant a mistrial. *United States v. Humphrey*, 34 F.3d 551, 556 (7th Cir. 1994). The ultimate inquiry is whether the defendant was deprived of a fair trial. *United States v. Clarke*, 227 F.3d 874, 881 (7th Cir. 2000).

Courts "presume[] that the jury will follow an instruction to disregard inadmissible evidence unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence will be 'devastating' to the defendant." *Humphrey,* 34 F.3d at 556-57 (quoting *United States v. Soria*, 965 F.2d 436, 441 (7th Cir. 1992)). A court does not abuse its discretion if a curative instruction given after improper testimony adequately addresses the aspect of the testimony which was improper or permitted an improper inference. *United States v. Scott*, 19 F.3d 1238, 1244 (7th Cir. 1994). The reviewing court should evaluate the timeliness and effectiveness of the instruction, and the entire record, in determining if prejudice was alleviated. *Wilson v. Groaning*, 25 F.3d 581, 587-88 (7th Cir. 1994).

Promptly delivered, effective curing instructions do not create a "high degree" of necessity for a mistrial in this Circuit. Even though the district court's instruction to the jury in *Clarke* was not as clear or as appropriately worded as possible, it was delivered immediately and, "in context," did not create an "overwhelming probability" of confusion for the jury. 227 F.3d at 882-83. Similarly, in *Scott*, the admission of inadmissible past drug activity was quickly stricken from the record by the district court, and it issued a prompt curing instruction telling the jurors to disregard the improper question and answer. 19 F.3d at 1244. Since any improper inference of the statement was adequately addressed by the timely instruction, the defendant's motion for a mistrial was properly denied. *Id.* In

*Wilson*, a civil suit, the district court's prompt corrective action to cure potential prejudice from inflammatory, irrelevant testimony was deemed appropriate and not an abuse of discretion. 25 F.3d at 587.

While the Court has not thoroughly explored the appropriate range of time between an improper occurrence at trial and when the district court gives a curative instruction, the Third Circuit offers additional insight. Similar to this Circuit, the Third Circuit presumes that juries follow instructions *even if there is a delay between the error and when the instruction is given*. *United States v. Hakim*, 344 F.3d 324, 328-30 (3d Cir. 2003) (*see Humphrey*, 34 F.3d at 556–57 (presuming juries follow instructions from the court without considering whether a delay transpired before the instruction was given)). Whether a delayed instruction overcomes this presumption depends on the circumstances of the case. *Hakim*, 344 F.3d at 330. The immediacy with which a trial judge issues an instruction is an important factor in determining if any prejudice has been cured. *United States v. Telfair*, 507 Fed. Appx. 164, 178 (3d Cir. 2012) (citing *United States v. Sotomayor-Vazquez*, 249 F.3d 1, 18 (1st Cir. 2001)) (unpublished). If the evidence against the defendant is strong, it is more likely that any erroneously admitted evidence can be cured. *Telfair*, 507 Fed. Appx. at 178. However, an adequate instruction may fail to cure prejudice and result in a mistrial if the instruction is given too long after the error occurs. *United States v. Gullo*, 502 F.2d 759, 762 (3d Cir. 1974).

In *Gullo*, the prosecution asked a witness an improper question, revealing that a co-conspirator named in the indictment, but not involved with that particular trial, had pled guilty. *Id.* at 760. To avoid a mistrial, the prosecutor offered to call the co-conspirator to testify to allow for cross-examination. *Id.* However, the government rested its case the next day without calling the witness as promised, leading the judge to *sua sponte* issue a detailed curing instruction to the jury. *Id.* at 761. The defense did not want to call this witness, but did anyway, attempting to combat the government's error. *Id.* The result was "unimpressive." *Id.* On appeal, the Third Circuit vacated the convictions and remanded the case for a new trial, reasoning:

> [w]hile the curative instructions … were adequate, they came some twenty-four hours after the inadmissible question had been injected into the case. The delay was induced by the prosecution's representation that [the co-conspirator] would be called to testify. Whatever efficacy curative instructions possess cannot help but be weakened by the lapse of time. In addition, the incident was thus recalled to the attention of the jurors, and its import emphasized … the total effect of the improper question, the delay in giving proper curative instructions, and the failure to call the witness as promised, thus pressuring the defense to produce an unwanted and questionably credible witness, combined to make the trial unsatisfactory.

*Id.* at 762.

Conversely, in *Hakim*, the curative instruction was issued after only a thirty-minute recess for the jury, which was insufficient to overcome the presumption

that the jury would follow the instruction. 344 F.3d at 15-16. Similarly, an immediate and forceful curative instruction "alleviated any risk of prejudice" following improper, unprovoked statements by a witness about a defendant's history with domestic violence. *Telfair*, 507 Fed. Appx. at 178.

What happened in Mr. Graham's case closely parallels the events in *Gullo* and demonstrates that the district court abused its discretion in denying his motion for a mistrial and issuing an ineffective curing instruction. The improper testimonial statements, admitted through the Government's exhibits and, most importantly, repeated by the Government's law enforcement witness on the stand, were heard by the jury on the morning of the third day of the trial. (Trial Tr. 3A-132:16-142:3; App. A-5-15.) These prejudicial, devastating statements included "he's got a 19-year-old prostitute" he had "taken from New York," (Trial Tr. 3A-134:21-22; App. A-7) and "he's been pimping [me] for a year and a half" (Trial Tr. 3A-135:16-17; App. A-8), among others.

The district court did not offer a curing instruction to the jury until the afternoon of the fourth day of the trial. (Trial Tr. 4A-160:4-12; App. A-34.) This delay of nearly 24 hours between the improper testimony and the curing instruction allowed the prejudicial statements to set that stage for the jury while they watched five additional witnesses take the stand. Among these witnesses were three "known victims"—Cynthia Selenka, Krystle Jischkowsky, and Kelsey

Lannert—whose testimony spanned over 5,500 lines of the trial transcript.[9] The testimony of these critical witnesses was thus infected by the prejudice of the improperly admitted, uncured testimonial statements.

Following the improper testimony, the Government could not say with certainty whether it would call Ms. Moore to testify, but asserted that the "defense is certainly free to call her." (Trial Tr. 3P-5:15-16; App. A-3.) After further discussion about the need for a curing instruction or mistrial, the Government described Ms. Moore in the following fashion: "to say she is a handful would be an understatement." (Trial Tr. 3P-9:21-22; App. A-7.) On the morning of the fourth day, the Government admitted it did not wish to call Ms. Moore because, as the district court explained, "nobody knows what she's going to say." (Trial Tr. 4A-18:2; App. A-28.) This put the district court in a difficult position, as it did not want "to give the instruction and then find out that she's actually going to testify." (Trial Tr. 4A-20:21-23; App. A-30.) During the morning recess of the fourth day, even if it was their duty to remedy the Government's violation, counsel for the defendant explained they were not going to call Ms. Moore because it had "been made abundantly clear that she would be taking the Fifth." (Trial Tr. 4A-83:7-8; 4A-82:23-

_____

[9] For reference, Ms. Selenka's testimony started at (Trial Tr. 3P-13:12) and ended at (Trial Tr. 3P-53:18), Ms. Jischkowsky's started at (Trial Tr. 3P-54:22) and ended at (Trial Tr. 3P-136:5), and Ms. Lannert's started at (Trial Tr. 3P-136:11) and concluded at (Trial Tr. 4A-121:17). These three witnesses span 5,541 lines of the transcript.

25; App. A-33, A-32.) Finally, prior to the lunch recess, nearly 24 hours after the jury first heard the "devastating" testimonial evidence, *Humphrey*, 34 F.3d at 557 (citations omitted), the district court gave the following curing instruction:

> [y]esterday we watched a video in which Patience Moore made statements during an incident at the hotel in Grand Chute. We have now been informed that Ms. Moore will not be testifying. Accordingly, you can't consider anything that Ms. Moore said in that video because Ms. Moore can't be cross-examined about those statements. You can consider the video itself and statements made by other participants. *This instruction is specific to the video that we saw yesterday, and it doesn't relate to your consideration of any other evidence or testimony in the case.*

(Trial Tr. 4A-160:4-12; App. A-34) (*emphasis added*.) However, the district court did not repeat this instruction in its final instructions to the jury. Rather, it issued a potentially contradictory instruction that told the jury to consider recorded conversations the same way it would consider other evidence. (Trial Tr. 5A-92:21-24.)

The concluding phrase of curing instruction draws attention to perhaps the most significant limitation of the instruction. While the district court was careful to be specific about the improper remarks made by Ms. Moore in the videos, the district court failed to address a critical part of the testimony from that period of the trial—the inadmissible testimonial statements repeated on the stand by Officer Waas. Officer Waas repeated the majority of the videos' statements, and especially the critical allegations of pimping, kidnapping, and other items that effectively

alleged Mr. Graham was a trafficker. Even if the jury could disregard Ms. Moore's own words, it is abundantly clear the jury would have difficulty not considering those statements from the stand spoken by a sworn law enforcement officer. Thus, with the instruction itself failing to adequately address the full scope of the improper testimony and improper inferences, the inherent prejudice from this incident could live on in the minds of the jurors.

The circumstances of the case put the district court in a truly unenviable position of possibly having to "close this can of worms only to reopen it later," (Trial Tr. 4A-21:3-4; App. A-31), which led in part to Mr. Graham's unfair trial. However, between the untimely nature of the instruction (a roughly 24-hour delay), the failure of the Government to call Ms. Moore as required, and the ineffective nature of the instruction itself (not addressing Officer Waas's repeating of Ms. Moore's statements), there was an overwhelming probability that the prejudice was unable to be cured in the minds of the jury. Because of the overwhelming potential that this prejudice infected this five-day trial from the morning of day three onward, the district court abused its discretion in denying Mr. Graham's motion for a mistrial and issuing an insufficient instruction, ultimately denying him a fundamentally fair trial.

## CONCLUSION

Mr. Graham did not receive a fair trial. The Government violated Mr. Graham's confrontation rights when it presented Ms. Moore's testimonial statements through videos and had Officer Waas repeat them. This all occurred despite the Government never calling Ms. Moore to testify. Although the district court attempted to cure this prejudice by instructing the jury to disregard the statements made in the videos, instruction in such a case is unable to cure the violation. Even if an instruction could remedy such a violation, the instruction below was not sufficient enough to remedy the harm that had already been done.

As a result of the unfair trial, we ask this Court to vacate Mr. Graham's sentence and convictions and remand for a new trial.

Dated: December 12, 2019

Respectfully Submitted,

*/s/ Adam Stevenson*
Adam Stevenson,
Clinical Associate Professor

*/s/ Michael Doering*  */s/ Natalia Gess*
Michael Doering      Natalia Gess
Law Student          Law Student

*/s/ Carol English*   */s/ Trenton Piltz*
Carol English         Trenton Piltz
Law Student           Law Student

*/s/ Alex Gelhar*     */s/ Jordan Vassel*
Alex Gelhar           Jordan Vassel
Law Student           Law Student

Frank J. Remington Center
University of Wisconsin Law School

Attorney for Defendant-Appellant,
ERIN F. GRAHAM, JR.

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

The undersigned certifies that this brief complies with the volume limitations of Federal Rule of Appellate Procedure 32(a)(7) and Circuit Rule 32 in that it contains 10,877 words as shown by Microsoft Word for Mac, Version 16.31.

Dated: December 12, 2019       */s/ Adam Stevenson*
Adam Stevenson

Counsel for Defendant-Appellant,
ERIN F. GRAHAM, JR.

## CIRCUIT RULE 31(e) CERTIFICATION

The undersigned hereby certifies that he has filed electronically, pursuant to Circuit Rule 31(e), versions of the brief and all of the appendix items that are available in non-scanned PDF format.

Dated: December 12, 2019            */s/ Adam Stevenson*
                                        Adam Stevenson

                                        Counsel for Defendant-Appellant,
                                        ERIN F. GRAHAM, JR.

No. 19-2373

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

Appeal from the United States District Court
for the Western District of Wisconsin.

vs.

ERIN F. GRAHAM, JR.,
a/k/a Sonny,
*Defendant-Appellant.*

Case No. 18-CR-043
Honorable Judge James D. Peterson

**REQUIRED SHORT APPENDIX OF
DEFENDANT-APPELLANT, ERIN F. GRAHAM, JR.**

Adam Stevenson
Clinical Associate Professor

Michael Doering          Natalia Gess
Law Student              Law Student

Carol English            Trenton Piltz
Law Student              Law Student

Alex Gelhar              Jordan Vassel
Law Student              Law Student

Frank J. Remington Center
University of Wisconsin Law School
975 Bascom Mall
Madison, WI 53706
Telephone:   608.262.9233
Fax:         608.263.3380
Email:       adam.stevenson@wisc.edu

Attorney for Defendant-Appellant,
ERIN F. GRAHAM, JR.

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

The undersigned, counsel for Erin F. Graham, Jr., hereby states that all the materials required by Circuit Rule 30(a) and 30(b) are included in the Appendix attached to this brief or filed separately.

Date: December 12, 2019          */s/ Adam Stevenson*
                                 Adam Stevenson

                                 Counsel for Defendant-Appellant,
                                 ERIN F. GRAHAM, JR.

# APPENDIX TABLE OF CONTENTS

Portions of Trial Transcripts Containing Discussion and District Court Resolution of the Confrontation Clause Objection...................................App. A-1

Judgment in Mr. Graham's Case ..................................................................App. A-35

Separate Appendix - Direct Examination of Officer Travis Waas ...........App. B-1

i

1          THE COURT:  Do you want to sit down?

2          MR. CORNIA:  So, Your Honor, counsel and I were

3    talking and we have some concerns.

4          THE COURT:  Pull your microphone over toward you.

5          MR. CORNIA:  It's pointing in the opposite

6    direction.  They played the video of Patience Moore being

7    arrested and in that video clearly there are many times

8    she called my client or our client a pimp.

9          THE COURT:  Mm-mm.

10         MR. CORNIA:  I don't know whether or not the

11   government is intending on calling Ms. Moore.  I got the

12   impression, speaking with them at break at lunch, that

13   that may not be the case.  They didn't say one way or

14   another.

15       But if they are going to call her, I think we're

16   facing a pretty serious confrontation issue under *Crawford*

17   because we don't have a chance to deal with she calling

18   him a pimp.  She made lots of allegations that we should

19   be able to --

20         THE COURT:  What are the other allegations that

21   she alleges?

22         MR. CORNIA:  Well, that she was kidnapped from

23   New York, that he kidnapped a 19-year-old from New York.

24         THE COURT:  That wasn't clear to me.

25         MR. CORNIA:  That was in there, yeah.

1          MR. GANSNER:  Your Honor, if I may.

2          THE COURT:  The kidnapping of her from New York,

3     that's clearly there.  In your opening statement you said

4     that you weren't going to shy away from the fact that

5     prostitution was going on here, so that doesn't concern me

6     so much because you haven't resisted that fact.

7          MR. CORNIA:  No, but this isn't about

8     prostitution; this is about her calling him a pimp and

9     that's -- we're saying he's not a pimp.  He was a driver

10    and it was a group of individuals.

11         THE COURT:  Even if he were a pimp, that's not

12    enough to establish sex trafficking.

13         MR. CORNIA:  No, and I understand that.  But we

14    should be able to -- it's a *Crawford* issue that we should

15    be able to address --

16         THE COURT:  Okay.

17         MR. CORNIA:  -- because she made some allegations

18    in there that are quite culpatory.  And if we're not able

19    to cross-examine her on those, then --

20         THE COURT:  I think I understand your point.  And

21    there are enough allegations that go beyond just the

22    soliciting prostitution issues to put it in play.  So

23    let's find out what the government has to say.  Do you

24    have a proposal?

25         MR. CORNIA:  Well, I think, you know, I think we

1  have a couple options.  One is that we strike that

2  testimony completely, along with the video, including the

3  officer's testimony, and then we get a pretty strong

4  instruction in regards to that, otherwise I think we're in

5  mistrial territory.

6          THE COURT:  Ms. Pfluger.

7          MS. PFLUGER:  Your Honor, we provided this to

8  defense, transcripts of what we were intending to

9  introduce, months ago --

10          THE COURT:  I know.

11          MS. PFLUGER:  -- provided it to the Court.  If

12  there was any objection, we could have dealt with it then.

13  And that's why we submitted it in a document to the Court

14  and to the defense.

15      At this point I don't know if we'll call Ms. Moore,

16  but defense is certainly free to call her.  We will make

17  sure she's transported from the jail.

18          One of the main reasons we called these witnesses,

19  it's partly for what's going on, but partly, as Cinderria

20  testified, she is very scared because Erin Graham has now

21  beat Patience Moore and she sees him not get arrested and

22  she sees what happens.  So it goes to the climate of fear,

23  this whole screaming and yelling and him getting away with

24  this and her being arrested.

25          So we're not so concerned with whether -- if you want

1 an instruction there's no evidence that he kidnapped

2 Ms. Moore from New York, there's no evidence he -- I mean,

3 that doesn't concern me.  We were more getting it in for

4 its effect on Ms. Harwell.

5        THE COURT:  Well, let me put it to you this way:

6 If you want to call Ms. Moore, you can call her, so

7 doesn't that resolve your issue?

8        MR. CORNIA:  No.

9        THE COURT:  Do you want to call her?

10        MR. GANSNER:  May I address that, Your Honor?

11        THE COURT:  Yes.

12        MR. GANSNER:  Okay.  I don't think it does, Your

13 Honor.  The government doesn't have a Sixth Amendment

14 confrontation right; my client does.  They've introduced

15 the video.  I understand why they introduced the video.  I

16 don't quibble about it, I understand.  But those are

17 unequivocal testimonial statements that were -- some of

18 them certainly were uttered by Ms. Moore in that video.

19 They played that video.

20        THE COURT:  Why do you say they're testimonial?

21        MR. GANSNER:  Well, when she's uttering in front

22 of five police officers in an effort to get him in

23 trouble, calling him a pimp and calling him a kidnapper, I

24 think those are certain testimonial statements.  I think

25 they're required to call her at this point.

3-P-7

1    We don't actually have the ability to call her.  We

2  could call her as a witness, but she can invoke and my

3  expectation is that she would invoke.  The government has

4  the ability, in fact my understanding of the posture of

5  this case is they absolutely have the ability, to compel

6  her testimony.

7    And so we do not have the ability to cure.  It's not

8  our problem to cure in the first place.  We're not

9  obligated to call any witnesses at all, we're not

10  obligated to call a witness, and he's got the

11  confrontation right.  They've created this problem; they

12  have to cure it.  It's been our expectation all along that

13  they would call her and so we didn't think that was going

14  to be a problem.

15    Now, I think the beginning of our inkling that the

16  tide may be changing on that point is that we received a

17  report from the government on I think Monday indicating

18  that Ms. Moore made a variety of inconsistent statements

19  during their preparation with her on Sunday night.  And

20  that would be fertile impeachment territory I think for

21  both sides.  I expect --

22        THE COURT:  Again that goes to Ms. Pfluger's

23  point that you knew about this before the videos were

24  coming in.

25        MR. GANSNER:  Well, sure, but then we also knew

1 that we expected them to call her as a witness.  So the

2 videos aren't a problem if in fact they then follow

3 through and call her as a witness, which was always our

4 expectation.

5     The complaint right now is not with the playing the

6 videos.  The complaint is with playing the videos and then

7 not following through on what had been our expectation all

8 along that they would then call Patience Moore as a live

9 witness.

10     MR. CORNIA:  As was discussed in the final

11 hearing and then the final pretrial in front of Judge

12 Crocker in regards to getting the immunity where the

13 government was seeking immunity for Ms. Moore.

14     THE COURT:  Well, I understand there was always a

15 possibility that she would get called.  So, Ms. Pfluger.

16     MS. PFLUGER:  Your Honor, we never put forth that

17 we would call her.  In fact I told Mr. Cornia several

18 times, "Do not rely on us to call any witness.  If you

19 want to call a witness, please tell me.  I will make sure

20 they are here, whoever it is."  We never put forth we

21 would call her.

22     THE COURT:  You made Ms. Moore available, but Mr.

23 Gansner's point is that they don't have the ability to

24 compel her testimony, so even if she were available as a

25 witness that they wouldn't have the ability to

1  cross-examine her.

2      MR. BURKE:  Yeah.  And I can address some of

3  that, Judge.  So on Sunday, pursuant to a proffer

4  agreement, Ms. Moore sat down with us, with her attorney,

5  and we did a proffer.  And at the conclusion of that, I

6  turned over -- I actually alerted Mr. Cornia by email,

7  "There's a report coming and it's got a ton of *Brady*.  I

8  don't want to hide it.  It's not a needle in a haystack,

9  essentially."  I didn't use those exact words, but that's

10  essentially what I meant.  And then we sent it over.

11      They were well on notice that she was then going to

12  be a highly problematic witness for us.  There's really --

13  I haven't had a full discussion with management, but it

14  looks rather impossible that I would be able to call her

15  under the auspices of the proffer.  When I get a moment, I

16  can talk with management, but it seems doubtful.

17      And then obviously with all her *Brady*, clearly she's

18  a treacherous witness for anyone.  If she's put on the

19  stand, I can't say she wouldn't say all kinds of stuff

20  that would just create the potential for a mistrial just

21  because she's -- to say she is a handful would be an

22  understatement.

23      THE COURT:  So you --

24      MR. BURKE:  If I may add, that's the first time I

25  got a chance to talk to her and there's never been a

1  substantive interview of her in this investigation prior

2  to our proffer Sunday before trial.

3         THE COURT:  All right.  So I'm getting the

4  inkling that you're not going to call her.  I mean, I

5  don't --

6         MR. BURKE:  I've had one brief discussion with

7  our first assistant saying "I don't think option one under

8  the proffer is possible.  I want to talk to you further

9  about it," and that I shared my concerns about putting her

10  on the stand even through immunity and compulsion, just

11  how it would jeopardize the trial itself.

12     So yes, I'd say I'm leaning at this point to not

13  calling her and that was always a possibility.  And that's

14  why laying in wait until now to raise this issue when

15  they've had the videos for so long just doesn't seem to

16  make any sense.

17         THE COURT:  That concerns me greatly.

18         MR. CORNIA:  First off, we weren't laying in

19  wait, Your Honor.  In regards to a lot of this stuff --

20         THE COURT:  You knew about the possibility of

21  this issue coming up because you knew about the videos and

22  so that's the issue.

23     So here's the solution we're going to have, because I

24  don't see them as all that damning:  So I want you to

25  identify the statements that you find objectionable in the

1  video and then I will give an instruction that the jury is

2  to ignore those.  And you've immediately got the

3  transcripts and so you can highlight them.

4      And so those statements about the kidnapping from New

5  York, I will give an instruction to the jury as to

6  disregard those and give no credence or consideration to

7  any of the statements made by Ms. Moore.  And I think that

8  will be adequate to address any prejudice that you might

9  have from not being able to cross-examine Ms. Moore about

10  any of the prejudicial testimonial statements.

11      So that's how we'll handle that.  We'll wait to see.

12  Maybe Ms. Moore will actually show up as a witness.  It

13  sounds very unlikely, if I'm reading the tea leaves

14  correctly.  But identify the statements that you find

15  objectionable and that I'll instruct them on.

16          MR. CORNIA:  Are we able to call somebody else

17  who could testify in regards to what she testified on

18  Sunday?

19          THE COURT:  Explain what you mean.

20          MR. CORNIA:  Well, someone who was at the

21  interview, who was there and heard what she said in her

22  statements in furtherance of the conspiracy.

23          THE COURT:  You mean the statements that she made

24  to the government?

25          MR. CORNIA:  Yes.

1          THE COURT:  What's your response to that?

2          MR. BURKE:  Well, so I'll tell you that a central

3    piece, showpiece, of that interview includes her

4    stipulation of facts.  There would be no effective way to

5    do it without the stipulation of facts also being brought

6    in.  So the defense --

7          THE COURT:  Is this in the stipulation that was

8    after the plea?

9          MR. BURKE:  Stipulation as part of the plea

10   because we used that, for a good portion of it, as a road

11   map.  There was definitely an introduction before we got

12   to it, but we anchored the tail end of that interview to

13   that.  And there were parts where she was going off of

14   that and so it somewhat rehabilitated back to some of

15   those statements.  That is a centerpiece of the interview,

16   just to put parties on notice.

17         THE COURT:  And you have no intent of trying to

18   use that --

19         MR. BURKE:  I was never going -- without her on

20   the stand, I can't use it.

21         THE COURT:  Yeah.

22         MR. BURKE:  But if there's going to be what

23   they're proposing, I don't know how that isn't used.

24         THE COURT:  Yeah.  It sounds to me like if that's

25   what you're after, the cure is worse than the disease.

CYNTHIA SELENKA - DIRECT

1      All right.  So I'll handle it with an instruction.

2  You can identify the statements that you want me to

3  instruct about from among those made at the -- during the

4  video.  Okay.

5      With that, are we ready for the jury?  Okay.  All

6  right.  Let's bring them back.

7          (Jury in at 1:55 p.m.)

8          THE COURT:  All right.  Thank you for your

9  patience.  And with that, let's have our next witness.

10          MR. BURKE:  Yes, Your Honor.  The government

11  calls Cynthia Selenka.

12      **CYNTHIA SELENKA, GOVERNMENT'S WITNESS, SWORN**

13                    <u>DIRECT EXAMINATION</u>

14  BY MR. BURKE:

15  Q.  Good afternoon, ma'am.

16  A.  Good afternoon.

17  Q.  Would you please tell us your name?

18  A.  Cynthia Selenka.

19  Q.  Could you please spell your first name?

20  A.  C-Y-N-T-H-I-A.

21  Q.  And please spell your last name.

22  A.  Selenka, S-E-L-E-N-K-A.

23  Q.  How old are you?

24  A.  22.

25  Q.  In what town do you currently live?

CYNTHIA SELENKA - DIRECT

1    that?

2           THE COURT:  No, no.  So that's my plan, where

3    we'll get to jury instructions.  I don't know if you'll

4    have a case, but it sounds like there's a good chance that

5    this goes to the jury tomorrow.

6           MS. PFLUGER:  Yes.

7           THE COURT:  And so lunchtime is really our time

8    to work out the instructions.  I think if we have a half

9    an hour, we can do what we need to do.

10          MS. PFLUGER:  Yeah.

11          MR. GANSNER:  Judge, what I understood from our

12   last conversation about the video and *Crawford* and all

13   that was that you would instruct the jury to disregard or

14   strike portions of the video that we identified to you as

15   problematic.

16          THE COURT:  Yes.

17          MR. GANSNER:  When would you like us to do that?

18          THE COURT:  I would love to have that when we

19   have our instruction conference.  That gives you tonight

20   to do it, but we can't really deal with it --

21          MR. GANSNER:  Thank you.

22          THE COURT:  -- in the morning.  You guys can do

23   it overnight.  At the instruction conference we'll raise

24   that.  And then we've got a couple of additional proposed

25   instructions from the government.

KRYSTLE JISCHKOWSKY - DIRECT

1    in person with Attorney Reed Cornia from Cornia Law and Nick

2    Gansner from Nicholson, Gansner & Otis.

3         THE COURT:  Good morning to you.

4      I understand we have no question from the jury this morning,

5    but there was an issue that one side or the other needed to

6    address before we bring the jury in?

7         MR. GANSNER:  Your Honor, I just wanted -- if I may,

8    I'm asking permission to make a bit more of a record about what

9    transpired yesterday with the video that was played.

10        THE COURT:  Yes.

11        MR. GANSNER:  Okay.  I think what I'm actually asking

12   Your Honor to do is to reconsider your ruling from yesterday

13   regarding what we consider to be, well, a potential *Crawford*

14   violation at this point.

15        THE COURT:  Uh-huh.

16        MR. GANSNER:  I guess what I'd like to do is start by

17   recounting my understanding of the basic facts of what

18   transpired yesterday.  The government called Travis Waas, who is

19   a detective from the Grand Chute, Wisconsin, Police Department,

20   and essentially the function of his testimony was to introduce a

21   number of lapel videos from police officers from the Grand Chute

22   Police Department on a certain day in the summer of, I believe,

23   2016 that capture Patience Moore, the co-defendant in this case,

24   in handcuffs making a number of allegations and statements

25   concerning Mr. Graham.  Those videos all came in through

1    Detective Waas.

2         The statement that is -- or the statements that are most

3    concerning are those by Ms. Moore alleging that Mr. Graham

4    committed some kind of kidnapping against someone, and I

5    actually think that it's quite unclear from the video itself

6    what she said, but that was clarified by having Detective Waas

7    read from a transcript of those videos.  The government played

8    the video, paused the video, rewound the video, asked the

9    detective what was said at that point, asked the detective to

10   tell the jury what was said on the video at that point.  We did

11   object at that point and said he shouldn't be allowed to do

12   that; the video speaks for itself.  At that point he said -- my

13   memory is that he said, "I don't know," or it wasn't clear to

14   him what was said, and so the government had him read from a

15   transcript or refresh his recollection by the use of a

16   transcript of what was said at that point in the video.  So he

17   at that point clearly told the jury -- read the line or conveyed

18   the line to them about an alleged kidnapping.  I'm not aware

19   that there is any truth to that assertion.  I'm not aware that

20   there is any truth to any notion of Mr. Graham kidnapping

21   anybody.

22        Now, the government's purported reason for wanting to

23   introduce those videos, as Ms. Pfluger articulated yesterday,

24   was to give some context or to explain what they -- their

25   theory -- part of their theory of the case, which is that there

1     was sort of a feeling of fear surrounding the women associated

2     with Mr. Graham, that even if they did report him to the police,

3     that nothing would come of it and that he would, you know, sort

4     of not be held accountable.  I don't know what -- that's hard

5     for me to take seriously, given that Ms. Pfluger went out of her

6     way to highlight these words about kidnapping.  I don't know

7     what kidnapping or what highlighting these words about

8     kidnapping, these lines about kidnapping, has to do with that

9     theory or that purpose for offering the evidence.

10     Moving on to specifics of the *Crawford* issue, I believe

11     those statements by Ms. Moore are testimonial.  She's making

12     accusations about Mr. Moore (sic) while she is in custody.

13     She's handcuffed.  She's being controlled and constrained by law

14     enforcement officers.  She's making accusations about him in

15     front of law enforcement --

16     THE COURT:  Do you have authority that's close on point

17     that tells me whether those are testimonial?

18     MR. GANSNER:  I don't as I sit here right now, Your

19     Honor.  Certainly I can work on that.

20     THE COURT:  All right.  I'm not confident they're

21     testimonial, but there's a good argument that they are.

22     MR. GANSNER:  I'm with you.  I understand.

23     THE COURT:  Okay.

24     MR. GANSNER:  So I believe they are testimonial.

25     Certainly her interests at that moment in time and still are

1   adverse to Mr. Graham's.  So it is my view that if the
2   government chose to play that video, then they are also making a
3   decision that they will call Ms. Moore.  I think those two
4   things -- they go together, one direction or the other.  They
5   chose to play the video.  I think they're obligated to call Ms.
6   Moore.

7       If they made a change in their strategy Sunday night after
8   Ms. Moore made a variety of problematic statements to them in
9   witness preparation Sunday night, then I think it's incumbent on
10  them to change their strategy regarding playing that video.
11  Certainly we're not -- I have no say in what evidence they
12  attempt to put on or what witnesses they choose to call.  That
13  is up to them, but it's also not their constitutional right --
14  it's Mr. Moore's [sic] constitutional right that needs to be
15  protected here.

16      So I'm certainly concerned that there's a significant issue
17  here on appeal.  Even if it's not testimonial -- I think it
18  is -- but even if it's not, then this bit about kidnapping would
19  be inadmissible hearsay.  Any probative value that --

20          THE COURT:  I agree with --

21          MR. GANSNER:  -- that statement may have had I think is
22  overwhelmed by this remarkably prejudicial nature of a false
23  statement about kidnapping, because let's talk about what human
24  trafficking is.  There's four --

25          THE COURT:  I agree.

1          MR. GANSNER:  Okay.  All right.

2          THE COURT:  I know you're -- one of the things you're

3     doing is to make a record here, but I agree with you.  It goes

4     to an element of the crime.

5          MR. GANSNER:  Yes.

6          THE COURT:  It's a hearsay statement, and it is -- it's

7     very problematic, so I get that, but what you're asking me this

8     morning is that I change my ruling from thinking the remedy is

9     an instruction to disregard her statements while she's in

10    custody.  It's to order the government to call Ms. Moore as a

11    witness.  That's what you're asking me to do.

12         MR. GANSNER:  Well, I'm asking for a mistrial if they

13    don't call the witness.  I think a *Crawford* violation is grounds

14    for a mistrial.  That's the first thing I'm asking for, so I'm

15    asking you to reconsider your decision.  Now, do I think you can

16    force them to call a witness?  I don't think you can, but I

17    think you can declare a mistrial if they do not call a witness.

18         THE COURT:  All right.  Ms. Pfluger?  Mr. Burke?

19         MR. BURKE:  Yes.  First of all, I think Mr. Gansner

20    started with Mr. Waas taking the stand, and that's not the

21    correct starting point.  The correct starting point is actually

22    months ago when this was provided.  It's weeks ago when the

23    transcript --

24         THE COURT:  Pull the microphone over.

25         MR. BURKE:  Yeah.  It's weeks ago when the transcripts

1   were provided as well.  The statement about kidnapping, the

2   government does not in any way allege that she actually -- that

3   she actually was kidnapped.  She could have yelled, "There's a

4   body in the trunk."  The impact is that she could make whatever

5   allegations she wanted, and the impact on the women up there

6   listening to all of this -- all these allegations is that he

7   still is not arrested no matter what --

8       THE COURT:  I understand why you want to put the

9   evidence in, but the problem that we have is that she made those

10  allegations against Mr. Graham, and the jury has heard them.

11      MR. BURKE:  And I, for the life of me, don't know why

12  we weren't alerted to the objection weeks and weeks ago, and

13  neither of those attorneys can represent to the Court that Ms.

14  Pfluger or I ever said we were calling Ms. Moore.  We said

15  that --

16      THE COURT:  And I take that point, so here's my

17  overarching concern:  One, on the part of the defense, they

18  should have raised this issue earlier.

19      MR. BURKE:  They've lain in wait.

20      THE COURT:  Yes.  On the other hand, if you were

21  entertaining doubts that you were going to call Ms. Moore, and,

22  of course, the Court had no idea that Ms. Moore was not being

23  called, and so if you weren't going to -- entertaining doubts

24  about her being a witness to introduce her statements that would

25  be not -- when she's not subject to cross-examination, that is

1    on you, and it is a very serious confrontation clause --

2    potentially a confrontation clause violation, and so on review

3    it might not matter -- it may not be something they can waive by

4    not objecting to it.  And so it really is very serious, and so

5    if you knew yesterday that you weren't going to call Ms. Moore

6    or you were entertaining serious doubts about it, we shouldn't

7    have shown the video.

8         MR. BURKE:  For all I know, they have their own reasons

9    for wanting that played.  You know, "Hey, you've heard things

10   from a statement of a co-conspirator.  She's not reliable.

11   Look, she's making these ludicrous allegations."  There are

12   probably plenty of reasons why they want this played as well

13   because there's clearly no evidence of kidnapping.  The jury

14   doesn't think that there's evidence of kidnapping at this point,

15   and we are absolutely fine with saying there is no evidence of

16   kidnapping in this case because there isn't.  It goes to the

17   effect on -- that she could have said, like I said, "There's a

18   body in the trunk," and he talks his way out of it.  That's the

19   effect on the victim.

20        MR. GANSNER:  Your Honor, may I?

21        THE COURT:  Go ahead.

22        MR. GANSNER:  I just -- I don't think it's fair to say

23   that anyone laid in wait.  We did, in fact, object when the

24   government attempted to draw the jury's attention to something

25   that I don't think anyone had heard at that point in time.  The

1    part about the kidnapping we did object and --

2            THE COURT:  But you had the transcripts before.

3            MR. GANSNER:  Right, and that's the point at which

4    we -- an objection was lodged, when the government attempted and

5    succeeded in drawing the jury's attention to specifically the

6    part about kidnapping.

7            THE COURT:  No, you had the transcripts before trial

8    yesterday.

9            MR. GANSNER:  Yes.

10           THE COURT:  And so you could have alerted me to the

11   issue that the video was going to be played and it had

12   information in there that included unproven allegations against

13   Mr. Graham that went to an element of the crime.

14           MR. GANSNER:  That's true, Your Honor.  That could have

15   been brought to your attention.

16           THE COURT:  And the objection was that the video speaks

17   for itself, and that was not true because the video is, as you

18   said, was unclear, and so we had the transcript, which you -- I

19   asked you specifically if there was any concern with the

20   accuracy of the transcript --

21           MR. GANSNER:  Right.

22           THE COURT:  -- and --

23           MR. GANSNER:  And so the objection was not to the

24   content.  It was to --

25           THE COURT:  Exactly.

1    MR. GANSNER:  I understand what you're saying, Your

2  Honor.

3    THE COURT:  Yes.  So that objection didn't go to the

4  issue that we're dealing with now.

5    MR. GANSNER:  Not directly.  I mean, I think by seeking

6  to avoid having the detective testify about what was otherwise,

7  to my ears at least, inaudible, I think indirectly we attempted

8  to keep out at that point but --

9    THE COURT:  No.

10    MR. GANSNER:  I agree with you, did we say to you,

11  "Your Honor, what they're about to do is introduce something

12  that's highly prejudicial"?  Did we bring to you a substantive

13  objection?  I agree with you -- regarding the content, I agree.

14    THE COURT:  Yes, yes.  So I still think -- I'm not

15  going to grant a mistrial.  I'm inferring, although I haven't

16  heard it, is are you going to call Ms. Moore?

17    MR. BURKE:  No.  I've talked it over with other

18  management last night and this morning, and we made the decision

19  that we don't want to call her.  However, we have asked the

20  marshals to go ahead and bring her as the original plan and to

21  have her here by around lunchtime.  Assuming that we wrap up and

22  the defense did want to call her -- I don't know what her status

23  is.  In fact, I don't know -- I just assumed she would

24  potentially invoke, and I didn't want to wait, so that's why I

25  obtained the immunity because I didn't want to wait until she

1    got on the stand for her to invoke, and I don't know what her

2    status is right now on her Fifth Amendment assertion. I just

3    don't.

4              THE COURT: About whether she would invoke.

5              MR. BURKE: Whether she would. She could.

6              THE COURT: But you've gotten the immunity.

7              MR. BURKE: We've got immunity, and she's here. I've

8    talked it over with the office. No, we would not be granting

9    immunity for the purpose of the defense. But I don't know if --

10   to call her and conduct a direct examination, but she's here.

11   If the defense thinks she will testify for her, she will be

12   here, from my understanding, around noon.

13             THE COURT: Okay. Now, this is a wrinkle that I

14   haven't researched, so I don't know quite how it is. Now, if

15   she were here, I'd be prepared to order her to testify had you

16   called her.

17             MR. BURKE: Sure.

18             THE COURT: Now, I don't know whether -- because I

19   think if she invokes, she's still unavailable --

20             MR. BURKE: Absolutely.

21             THE COURT: -- for the purposes of our *Crawford*

22   analysis.

23             MR. BURKE: Absolutely.

24             THE COURT: But I don't know if I can order her --

25   you've granted her immunity, but I don't know that I can order

1    her to testify --

2            MR. BURKE:  I have been authorized to extend immunity

3    from DOJ --

4            THE COURT:  Okay.  So now --

5            MR. BURKE:  -- for the purposes of her testifying for

6    us.  I rather suspect if I have to -- well, we wouldn't -- I

7    already have the answer from management, no, we're not going to

8    be -- from my management, and that's one layer in the approval

9    process, so we're not going to be extending it for -- so that

10   she can be examined by the defense, because I believe we'd have

11   to go all the way back to main Justice.

12           THE COURT:  Okay.

13           MR. BURKE:  They take a while.  They let us know the

14   afternoon of Friday that they were actually going to authorize

15   us to extend immunity, knowing that trial was beginning Monday,

16   so the notion that we could go up and get approval to even do it

17   is sort of out of the question I think in any -- and still

18   maintain any sort of trial schedule, but as a starting matter, I

19   don't think my office would authorize that, and they're one

20   layer of the approval process.

21           THE COURT:  Okay.  So, Mr. Gansner.

22           MR. GANSNER:  Yes, Your Honor.  I understand what you

23   said, you're not going to declare a mistrial.  My next request

24   would be that Detective Waas's testimony and that video be

25   stricken in their entirety and the jury be instructed to

1    disregard everything that came in through that witness, and let

2    me tell you why, Your Honor.  As opposed to what you ruled on

3    yesterday, which was that you would tell them to disregard or

4    strike or what have you in some form whatever parts we found

5    objectionable, my concern --

6            THE COURT:  And I will tell you this:  I'll go a little

7    further than that.

8            MR. GANSNER:  Okay.

9            THE COURT:  I would tell -- the instruction that I

10   would give, having thought about this a little bit, is I would

11   just instruct that they are to disregard everything that Ms.

12   Moore says on the video.

13           MR. GANSNER:  Okay.

14           THE COURT:  So I wouldn't ask you to parse it to find

15   out the objectionable ones.  I would just tell them to disregard

16   everything that Ms. Moore said.

17           MR. GANSNER:  Thank you, Your Honor.  I think that's

18   getting closer to what I'm asking you to do this morning, so I

19   think we're having some --

20           THE COURT:  You want the whole video out.

21           MR. GANSNER:  And here's why I was concerned about your

22   ruling yesterday, Your Honor, is that I felt if you said, "Jury,

23   disregard the following specific utterances," then all we're

24   doing is directing their attention once again back to those

25   highly prejudicial utterances.  So what you're proposing today

1    is closer to what my second request was, so I appreciate that.

2              THE COURT:  Yeah.

3              MR. BURKE:  I just want to understand.  You're going to

4    say disregard the video or disregard -- because a concern that

5    we have is our position -- there's been this suggestion of some

6    sort of misconduct by the government, let's face it.  And

7    they've had this for so long and had their own reasons --

8              THE COURT:  I get that, and that's on them.

9              MR. BURKE:  And an instruction that looks to the jury

10   like, oh, the government played dirty --

11             THE COURT:  Well, I don't want to do that.

12             MR. CORNIA:  Hold on a second.

13             THE COURT:  We talk one at a time here, and if I'm

14   talking, it's me.

15         And so how we craft the instruction is something I want to

16   be fair about, and so my thought is that I would say something

17   along the lines, and I'm open to input on this, but something

18   along the lines of, "We've learned that Ms. Moore is not going

19   to testify, and as a result, I'm going to inform the jury that

20   the video that we saw yesterday can be considered, but the jury

21   cannot consider any of Ms. Moore's statement in that video

22   because she's not going to be here to be cross-examined."

23             MR. BURKE:  I think that sounds good to me, Your Honor,

24   to us, to the government.

25             THE COURT:  And it covers everything, so we won't

1    highlight any particular instruction -- or any particular

2    statement by repeating it, and it offers an explanation that I

3    think -- my understanding of what the research shows and just

4    common sense is the jury is better at following instructions if

5    you tell them why you're giving them the instructions and it's

6    not just some arbitrary set of rules.

7         MR. GANSNER:  Yes, Your Honor, and --

8         THE COURT:  So that's the instruction that I would be

9    inclined to give.  Yes?

10        MR. GANSNER:  So I'm certainly more comfortable with

11   that explanation that you just provided than the one I think

12   that we were talking about yesterday, and just to be clear, I'm

13   not suggesting misconduct by anyone.  If that was an inference

14   that you folks were drawing from my comments, that is not what I

15   intend.

16        MR. BURKE:  Okay.

17        MR. CORNIA:  We had absolutely no intention --

18        THE COURT:  Okay.

19        MR. CORNIA:  And just for the record, I mean, when this

20   was all agreed upon, Ms. Moore, if my recollection is correct,

21   was still a co-defendant, and these would have been her own

22   words.  That's changed the map and then --

23        THE COURT:  Yeah.  So they're not co-conspirator

24   statements.  There's no question about that and so --

25        MR. CORNIA:  So things changed as of Sunday, and with

1    the amount of paperwork going on, you know.

2            THE COURT:  Okay.  So that's the resolution that I

3    think -- I don't think that we can cure the *Crawford* situation

4    by having her here to testify.  Now, if she were to testify, I

5    don't know what it would mean, and maybe we should finish this

6    line here.

7            MR. BURKE:  Okay.

8            THE COURT:  So Ms. Moore is available to testify.  The

9    defendants -- the defendant can call her if they want, and she,

10   I'm going to guess, is likely to invoke, but I don't know

11   whether she would.  And so whether her availability is for -- to

12   being called is enough to give them the opportunity to

13   cross-examine her, I don't know, and so that's a wrinkle in this

14   confrontation clause situation that I have not looked at so --

15           MR. BURKE:  And may I share something about Ms. Moore

16   that might be helpful to the defense and sort of a caution?

17           THE COURT:  Yeah.

18           MR. BURKE:  I really believe that if we were to call

19   Ms. Moore, we risk a mistrial because I don't think I can

20   control her in front of the jury.  I'll just be honest.  I mean,

21   that's -- so she's a proceed-with-caution sort of witness, and

22   just -- I just want to put that out there.

23           THE COURT:  Well --

24           MR. BURKE:  And I think that's evident from what we

25   submitted.

1        THE COURT:  My guess is nobody wants to call her

2   because nobody knows what she's going to say, and so that is one

3   of the reasons why her proffer at her plea hearing was nailed

4   down in writing.

5        MR. BURKE:  Uh-huh.

6        THE COURT:  And so -- and even though you have that,

7   you're still not willing to call her because you don't know what

8   else she's going to say.

9        MR. BURKE:  Everything is, "Yes, but let me tell you

10  ten other things that might or might not even be consistent with

11  the first clause."

12       THE COURT:  That is exactly my sense of what we would

13  get.

14      And so what else do we need to do to make a record of

15  exactly where we are with this because I don't know -- if she

16  really is unavailable to you, I don't know if -- you know,

17  because you can call her and cross-examine her -- you can at

18  least call her.  Whether you can cross-examine her, I don't

19  know.  She may invoke her Fifth Amendment right, and she's not

20  immunized for testimony if you call her.  So do we need to get

21  her in here and establish that or do you -- is that a step you

22  do not want to take?

23       MR. GANSNER:  Your Honor, I don't -- I don't know that

24  that addresses anything from the *Crawford* perspective.  My

25  position would be that the government played the video of her

1    statements; the government, therefore, is obligated to call her.

2    The government has the ability to do so, and the government has

3    the ability to compel the statements, so the cure for the

4    *Crawford* issue comes in through them.  We're not required to

5    call anybody at all.

6              THE COURT:  I understand.

7              MR. GANSNER:  And even if we did, we do not have the

8    ability to compel her testimony, and it is our understanding

9    from speaking with her counsel that she would invoke were she

10   called by the defense.

11             THE COURT:  Okay.

12             MR. GANSNER:  That's our understanding.

13             THE COURT:  I will give you the opportunity -- let's

14   just be clear:  You can call her if you want.  She's available.

15   You can call her.  I don't know whether she would invoke her

16   rights under the Fifth Amendment.

17             MR. GANSNER:  Understood.

18             THE COURT:  But we would give you the chance to get her

19   into the courtroom outside of the presence of the jury to find

20   out if she would.

21             MR. GANSNER:  Understood.

22             THE COURT:  Okay.  All right.  So that's -- then the

23   next question I have is do we just take the instruction about

24   the video -- about her statements in the video and just add them

25   to the final jury instructions or do you want those instructions

1    to begin the day?

2            MR. BURKE:  I do -- I am a bit worried, although I take

3    it at absolute face value that this is not an allegation of

4    government misconduct, I'm more worried about the effect on the

5    jury to draw such a significant highlight to it.  I think we put

6    it at the end -- the defense can hammer it on close as well --

7    rather than draw attention to it.

8            MR. GANSNER:  Your Honor, I would prefer it be read now

9    when it's more timely.  I mean, the jury heard it yesterday.

10   I'd prefer that they be told that now.  I understand what

11   counsel is saying, but my preference would be that it be heard

12   now more timely.

13           MR. BURKE:  Except that we don't know that she's not

14   available yet because we're still going to make that record.

15   They're still getting the opportunity to make the record.

16           MR. GANSNER:  Right.

17           THE COURT:  That's true.

18           MR. GANSNER:  Yeah.  I mean, my position on that is

19   it's not our obligation; it's the government's.  But I

20   understand.

21           THE COURT:  I know.  I know.  But I don't want to give

22   this instruction and then find out that she's actually going to

23   testify, if that unfolds.  So I'm going to forestall on giving

24   the instructions.  If not for that contingency, I would give

25   them now because I don't like to identify particular pieces of

1    evidence in the final instructions, but given the fact that I

2    don't know for a dead certainty that she's not going to testify,

3    I do not want to open this -- I don't want to close this can of

4    worms only to reopen it later if she does testify.

5            MR. GANSNER:  Your Honor, may I make one additional

6    request about that?

7            THE COURT:  Yes.

8            MR. GANSNER:  I would ask then that Your Honor

9    instructs the jury on that at the point in time -- if we do

10   discover that she will not testify, then the jury be --

11           THE COURT:  I'm willing to do that, yeah, so we'll do

12   it as soon as that's resolved.  Okay.

13           MR. CORNIA:  Thank you, Your Honor.

14           THE COURT:  Late-breaking news:  Sharon Foley, who is

15   Juror No. 7, second from the end on the left in the back row, is

16   out.  So here is the note that Teresita, our jury clerk,

17   received by email.  This is Sharon Foley, a member of the

18   current jury panel:  "I apologize, but I have been getting

19   sicker every day and just can't make it today or tomorrow.  Is

20   there a special process that I need to follow?  If so, please

21   let me know.  Once again, I am so sorry, and please give the

22   other jurors my apologies," and that's from Sharon Foley.

23       So I think our -- it's pretty clear what we're going to do.

24   We're going to press on because we've got two alternates -- or

25   we had two.  Now we have one.  So all right.

1          THE COURT:  Okay.  Cross-examination.  Let's get

2     started with it anyway.  We're getting into the zone for a

3     morning break but --

4          MR. CORNIA:  What time do you think we'll break for

5     that?

6          THE COURT:  Usually like to take the break about 10:30,

7     so how much time do you have?  It's going to be more than ten

8     minutes I'm going to guess.

9          MR. CORNIA:  You know how I go.

10         THE COURT:  I'm afraid I do.  Why don't we take our

11    break now, and we'll reconvene at 10:35.  All right?

12         MR. CORNIA:  Thank you, Your Honor.

13    (Jury exits the courtroom at 10:20 a.m.)

14    (Recess at 10:20 a.m. until 10:44 a.m.)

15         THE COURT:  All right.  Before we bring the jury back,

16    I want to just cover the logistics that we've got here.  So the

17    marshals will bring Patience Moore over sometime after 11:00, if

18    she's needed, but I want to hear from the defense that you want

19    her here so that you can ask whether she will take the Fifth.

20    If you have no intention of calling her either way, then we

21    don't have to bother with it but --

22    (Discussion held off the record between counsel.)

23         MR. CORNIA:  Your Honor, having spoken with counsel for

24    Ms. Moore, it's been made abundantly clear that she would be

25    taking the Fifth.  I think we would be just kind of spinning in

1    a circle there.

2         THE COURT:  Well, I'm going to get it on the record

3    that she's taking the Fifth, so I'm not going to take your word

4    for it.  I want her here if you want -- but I'm asking you to

5    make the decision that you would attempt to call her if she

6    would testify.

7         MR. CORNIA:  And the answer is, no, we don't want to

8    call her.

9         THE COURT:  Okay.

10        MR. CORNIA:  And it's not our burden to call so --

11        THE COURT:  I understand that, and that be may of no

12   consequence, but I want the record to be clear that you would

13   not call her even if she did not assert her rights on the Fifth

14   Amendment.

15        MR. CORNIA:  That's correct.

16        THE COURT:  Okay.  Then we don't need to have her here.

17   Go ahead.

18        MS. PFLUGER:  I just had a few administrative issues I

19   wanted to address --

20        THE COURT:  Okay.

21        MR. BURKE:  I'll let the marshals know --

22        THE COURT:  That's okay.  People are listening, and

23   they will let the marshals know that we won't need Ms. Moore.

24        MS. PFLUGER:  Okay.  Okay.  So Sherice Murray has

25   returned from Jamaica.

1    that you have heard is something that you should disregard, and

2    I have an instruction about that kind of thing for you right

3    now.

4         Yesterday we watched a video in which Patience Moore made

5    statements during an incident at the hotel in Grand Chute.  We

6    have now been informed that Ms. Moore will not be testifying.

7    Accordingly, you can't consider anything that Ms. Moore said in

8    that video because Ms. Moore can't be cross-examined about those

9    statements.  You can consider the video itself and statements

10   made by other participants.  This instruction is specific to the

11   video that we saw yesterday, and it doesn't relate to your

12   consideration of any other evidence or testimony in the case.

13        All right.  We'll see you at 1:45.

14        (Jury exits the courtroom at 12:28 p.m.)

15             THE COURT:  All right.  So let's -- if we can, we can

16   divide up.  We don't need everybody here, but I want to work

17   through the draft jury instructions and see if there are

18   additional changes to be made.  So I've got a couple of

19   proposals from the government.

20        Would it be useful to take a break and reconvene in five

21   minutes?

22             MR. BURKE:  That would be great, Your Honor.

23             THE COURT:  Why don't we.  We've been going for a

24   while.  Let's reconvene in five minutes.  We'll go through the

25   jury instructions, and then we'll take our lunch.  Okay.

# United States District Court
## Western District of Wisconsin

| | |
|---|---|
| UNITED STATES OF AMERICA | **AMENDED JUDGMENT IN A CRIMINAL CASE**<br>(for offenses committed on or after November 1, 1987) |
| V. | **Case Number:**   0758 3:18CR00043-001 |
| Erin F. Graham, Jr.<br>a/k/a Sonny | **Defendant's Attorney:**   Reed Cornia |

The defendant, Erin F. Graham, Jr., was found guilty on Counts 1 through 7 of the second superseding indictment.

The defendant has been advised of his right to appeal.

**ACCORDINGLY**, the Court has adjudicated the defendant guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. §§ 1591(a)(1) and 1954(c) | Conspiracy to Commit Sex Trafficking by Force, Class A felony | May 2017 | 1 |
| 18 U.S.C. § 1591(a)(1) and (b)(1) | Sex Trafficking by Force, Class A felony | April 29, 2017<br>December 2016<br>May 12, 2017 | 2<br>3<br>5 |
| 18 U.S.C. § 1591(a)(1) and (b)(1) | Attempted Sex Trafficking by Force, Class A felony | December 10, 2016 | 4 |
| 18 U.S.C. § 2421 | Transporting a Person in Interstate Commerce to Engage in a Commercial Sex Act, Class C felony | June 8, 2016<br>June 12, 2016 | 6<br>7 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment.   The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.   If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.**

| | | |
|---|---|---|
| **Defendant's Date of Birth:** | October 26, 1981 | July 11, 2019 |
| | | Date of Imposition of Judgment |
| **Defendant's USM No.:** | 16615-089 | |
| **Defendant's Residence Address:** | 116 Treeland Court, #F<br>Newport News, VA   23608 | /s/ James D. Peterson |
| | | |
| **Defendant's Mailing Address:** | c/o Dane County Jail<br>115 West Doty Street<br>Madison, WI   53703 | James D. Peterson<br>District Judge |
| | | July 18, 2019 |
| | | Date Signed: |

# IMPRISONMENT

As to Counts 1 through 5 of the second superseding indictment, it is adjudged that the defendant is committed to the custody of the Bureau of Prisons for a term of 300 months.   As to Counts 6 and 7, it is adjudged the defendant is committed to the custody of the Bureau of Prisons for a term of 120 months. All counts are to run concurrently with one another.

I recommend the defendant receive: educational and vocational training; and a substance abuse evaluation and appropriate treatment while incarcerated. I also recommend that defendant be housed in an institution close to his family in Newport News, Virginia, subject to his security and programming requirements.

It is further recommended the defendant be afforded prerelease placement in a residential reentry center with work release privileges.

The U.S. Probation Office is to notify local law enforcement agencies, and the state attorney general, of defendant's release to the community.

# RETURN

**I have executed this judgment as follows:**

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
United States Marshal

By _____
Deputy Marshal

# SUPERVISED RELEASE/PROBATION

Based on the serious nature of the offenses, the terms of imprisonment are to be followed by a 20-year term of supervised release on each count.   The terms are to run concurrently with one another.   In light of the nature of the offense and the defendant's personal history, I adopt condition numbers 1 through 21 as proposed and justified in the presentence report. Neither party has raised any objections to the proposals.

If, when the defendant is released from confinement to begin his term of supervised release, either the defendant or the supervising probation officer believes that any of the conditions imposed today are no longer appropriate, either one may petition the Court for review.

The defendant has a history of drug use.   Therefore, the mandatory testing requirements at 18 U.S.C. § 3583(d) are not waived.   The defendant will be subject to at least 15 drug tests while on supervised release.

Defendant is to abide by the statutory mandatory conditions.

## Statutory Mandatory Conditions

Defendant shall not commit another federal, state, or local crime. [Note: Any defendant that has been convicted of a felony offense, or is a prohibited person, shall not possess a firearm, ammunition, or destructive device pursuant to 18 U.S.C. §§ 921 and 922.]

Defendant shall not illegally possess a controlled substance. The defendant is subject to drug testing according to 18 U.S.C. §§ 3563(a)(5) and 3583(d).

Defendant shall cooperate with the collection of DNA by the U.S. Justice Department and/or the U.S. Probation and Pretrial Services Office as required by Public Law 108-405.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Financial Penalties sheet of this judgment.

Defendant shall comply with the standard and special conditions that have been adopted by this court.

## Standard Conditions of Supervision

1) Defendant shall not knowingly leave the judicial district in which defendant is being supervised without the permission of the Court or probation officer;

2) Defendant is to report to the probation office as directed by the Court or probation officer and shall submit a complete written report within the first five days of each month, answer inquiries by the probation officer, and follow the officer's instructions.   The monthly report and the answer to inquiries shall be truthful in all respects unless a fully truthful statement would tend to incriminate defendant, in violation of defendant's constitutional rights, in which case defendant has the right to remain silent;

3) Defendant shall maintain lawful employment, seek lawful employment, or enroll and participate in a course of study or vocational training that will equip defendant for suitable employment, unless excused by the probation officer or the Court;

4) Defendant shall notify the probation officer within seventy-two hours of any change in residence, employer, or any change in job classification;

5) Defendant shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician.   Defendant shall not use any product containing cannabidiol (CBD) or tetrahydrocannabinol (THC), except as prescribed by a physician.

6) Defendant shall not visit places where defendant knows or has reason to believe controlled substances are illegally sold, used, distributed, or administered;

7) Defendant shall not meet, communicate, or spend time with any persons defendant knows to be engaged in criminal activity or planning to engage in criminal activity;

8) Defendant shall permit a probation officer to visit defendant at home, work, or at some other mutually convenient location designated by the probation officer at any reasonable time and shall permit confiscation of any contraband observed in plain view by the probation officer;

9) Defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

10) Defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court;

11) Defendant shall report to the probation office in the district to which defendant is released within 72 hours of release from the custody of the Bureau of Prisons, unless instructed by a U.S. probation officer to report within a different time frame;

12) Defendant shall not possess a firearm, ammunition, destructive device, or dangerous weapon;

13) As directed by the probation officer, defendant shall notify employers and third parties providing volunteer opportunities and educational opportunities; organizations to which defendant belongs; and neighbors and family members with minor children, of defendant's criminal record based on risk associated with his offense, his obligations to register as a sexual offender, and the legal requirements under the Sex Offender Notification Act. The probation officer may also take steps to confirm defendant's compliance with this notification requirement or provide such notifications directly.

## Special Conditions of Release

14) Provide the supervising U.S. Probation Officer any and all requested financial information, including copies of state and federal tax returns.

15) Submit person, property, residence, papers, vehicle, computers [as defined in 18 U.S.C. § 1030(e)(1), or other electronic communications, data storage device, or media], or office to a search conducted by a U.S. Probation Officer at a reasonable time and manner, whenever the probation officer has reasonable suspicion of contraband or of the violation of a condition of release relating to substance abuse or illegal activities; failure to submit to a search may be a ground for revocation; defendant shall warn any other residents that the premises defendant is occupying may be subject to searches pursuant to this condition.

16) Not enter any establishment involved in the sex industry, including stores, massage parlors, and strip clubs. Defendant shall not utilize any sex-related adult services. The supervising U.S. Probation Officer is authorized to monitor compliance in this area by obtaining telephone records, credit card bills, and credit reports.

17) Participate in mental health referral, assessment, and treatment as approved by the supervising U.S. Probation Officer and comply with all rules, regulations, and recommendations of the mental health agency or its representative to the extent approved by the supervising U.S. Probation Officer. If defendant is eligible for funding from any source to cover the cost of treatment, defendant is to make reasonable efforts to obtain such funding. Participation in treatment does not require payment by defendant unless it is clear defendant can afford it.

18) Comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C §20913, et seq.) as directed by the probation officer; the Bureau of Prisons; or any state sex offender registration agency in which defendant

resides, works, is a student, or was convicted of a qualifying offense.

19) As approved by the supervising U.S. Probation Officer, undergo psychosexual evaluations which may involve use of polygraph examinations. Defendant shall participate in an outpatient sex offender counseling program if recommended by the evaluator, which may involve the continued use of polygraph examinations. Defendant's answers to questions by the treatment provider, probation officer and polygraph examiner shall be truthful in all respects unless a fully truthful statement would tend to incriminate defendant, in violation of defendant's constitutional rights, in which case defendant has the right to remain silent. Defendant shall follow all treatment requirements and restrictions. If defendant is eligible for funding from any source to cover the cost of treatment, defendant is to make reasonable efforts to obtain such funding. Participation in treatment does not require payment by defendant unless it is clear defendant can afford it. Defendant shall allow reciprocal release of information between the supervising U.S. Probation Officer and the treatment provider.

20) Defendant shall provide the supervising U.S. Probation Officer advance notification of any devices associated with or falling within the general category of information technology (IT) that produce, manipulate, store, communicate or disseminate information used by defendant. This includes external and portable hard drives. The probation office is authorized to install applications to monitor any such devices owned or operated by defendant. Defendant is required to comply with the monitoring agreement and may not disable or circumvent any applications. Defendant shall consent to and cooperate with unannounced examinations of any technological equipment owned or used by defendant, including but not limited to retrieval and copying of all data from all information technology devices and any internal or external peripherals based on reasonable suspicion of contraband or illegal activity. The examinations may involve removal of such equipment for the purpose of conducting examination.

21) Have no contact with the victims or their families, or Danielle Miller or her family, in person, through written or electronic communication, or through a third party, unless authorized by the supervising U.S. Probation Officer. Defendant shall not enter the premises or loiter within 1,000 feet of the victim's residence or place of employment.

ACKNOWLEDGMENT OF CONDITIONS

I have read or have had read to me the conditions of supervision set forth in this judgment, and I fully understand them. I have been provided a copy of them.   I understand that upon finding a violation of probation or supervised release, the Court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.


_____        _____
Defendant                                                              Date


_____        _____
U.S. Probation Officer                                            Date

# CRIMINAL MONETARY PENALTIES

Defendant shall pay the following total financial penalties in accordance with the schedule of payments set forth below.

| Count | Assessment | Fine | Restitution |
|-------|-----------|------|-------------|
| 1 | $100.00 | $0.00 | $0.00 |
| 2 | $100.00 | | |
| 3 | $100.00 | | |
| 4 | $100.00 | | |
| 5 | $100.00 | | |
| 6 | $100.00 | | |
| 7 | $100.00 | | |
| **Total** | $700.00 | $0.00 | $0.00 |

It is adjudged that the defendant is to pay a $100.00 criminal assessment penalty on each count ($700.00 total) to the Clerk of Court for the Western District of Wisconsin immediately following sentencing.

None of the identified victims requested restitution, so no restitution is ordered.

The defendant does not have the means to pay a fine under § 5E1.2(c) without impairing his ability to support himself and his family upon release from custody, so I will impose no fine.

Based on the offense of conviction, the defendant is required to pay a $5,000.00 assessment under the Justice for Victims of Trafficking Act of 2015, unless he is indigent.   I find the defendant is indigent and the assessment is waived.

# SCHEDULE OF PAYMENTS

Payments shall be applied in the following order:

(1) assessment;
(2) restitution;
(3) fine principal;
(4) cost of prosecution;
(5) interest;
(6) penalties.

The total fine and other monetary penalties shall be due in full immediately unless otherwise stated elsewhere.

Unless the court has expressly ordered otherwise in the special instructions above, if the judgment imposes a period of imprisonment, payment of monetary penalties shall be due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of court, unless otherwise directed by the court, the probation officer, or the United States Attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

In the event of a civil settlement between victim and defendant, defendant must provide evidence of such payments or settlement to the Court, U.S. Probation office, and U.S. Attorney's office so that defendant's account can be credited.

No. 19-2373

_____

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,                Appeal from the United States District Court
*Plaintiff-Appellee,*                    for the Western District of Wisconsin

vs.

ERIN F. GRAHAM, JR.,
a/k/a Sonny,                             Case No. 18-CR-043
*Defendant-Appellant.*                   Honorable Judge James D. Peterson

_____

**CERTIFICATE OF SERVICE**
_____

PLEASE TAKE NOTICE that on December 12, 2019, the undersigned attorney filed the

preceding with the Clerk of the United States Court of Appeals for the Seventh Circuit

through the CM/ECF system. I certify that all participants in the case are registered

CM/ECF users and that service will be accomplished by the CM/ECF system to:

Tovah R. Calderon                    Barbara Schwabauer
United States Department of Justice  United States Department
Civil Rights Division, Appellate Sec. Civil Division
PO Box 14403                         Room 3724
Ben Franklin Station                 950 Pennsylvania, Ave NW
Washington, DC 20044                 Washington, DC 20530

Dated in Madison, Wisconsin, December 12, 2019

*/s/ Adam Stevenson*
Adam Stevenson

Counsel for Defendant-Appellant,
ERIN F. GRAHAM, JR.