IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

ERIN GRAHAM, JR.,

Defendant-Appellant
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
Case No. 3:18-cr-00043-JDP-1
The Honorable Judge James D. Peterson
_____

BRIEF FOR THE UNITED STATES AS APPELLEE
_____

SCOTT C. BLADER
  United States Attorney

JULIE PFLUGER
  Assistant United States Attorney
  222 West Washington Avenue
  Suite 700
  Madison, WI 53703
  (608) 250-5449

ERIC S. DREIBAND
  Assistant Attorney General

ALEXANDER V. MAUGERI
  Deputy Assistant Attorney General

TOVAH R. CALDERON
BARBARA SCHWABAUER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C. 20044-4403
  (202) 305-3034

**TABLE OF CONTENTS**

**PAGE**

JURISDICTIONAL STATEMENT ............................................................. 1

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF THE CASE ............................................................. 2

    *1.*   *Procedural History* ............................................................. 2

    *2.*   *Factual Background* ............................................................. 3

        *a.*   *Graham's Sex Trafficking Activities And Conspiracy With Moore Between October 2015 And May 2017* ............................... 3

        *b.*   *The Violent Incident At The Red Roof Inn In May 2016 And Its Effect On Cinderria's State Of Mind* ............................... 6

        *c.*   *The Introduction At Trial Of Moore's Statements In The Police Videos From Her Arrest* ...................................... 7

SUMMARY OF ARGUMENT ............................................................. 10

ARGUMENT

  I    THE INTRODUCTION OF MOORE'S STATEMENTS DID NOT VIOLATE GRAHAM'S SIXTH AMENDMENT RIGHT TO CONFRONTATION ...................................... 11

    *A.*   *Standard Of Review* ............................................................. 11

    *B.*   *The Introduction Of Moore's Out-Of-Court Statements Did Not Violate The Confrontation Clause Because They Are Neither Hearsay Nor Testimonial* ...................... 12

        *1.*   *Moore's Out-Of-Court Statements Were Not Hearsay Because They Were Introduced For Their Effect On Cinderria's State Of Mind, Not For Their Truth* ...................................... 13

2. *Moore's Out-Of-Court Statements Were Not Testimonial Because They Were Not Made With The Primary Purpose Of Creating Evidence For Use Against Graham At A Later Trial* ............................ 16

    a. *A Statement Is Testimonial If Made In Circumstances Objectively Indicating A Primary Purpose To Establish Past Events For Later Use At Trial Against The Accused* ........ 17

    b. *Moore's Statements Before The Arrival Of Additional Officers Were Not Testimonial Because They Were Made During The Existence Of An Ongoing Emergency* ..................... 18

    c. *Moore's Statements After The Arrival Of More Officers Were Not Testimonial Because They Did Not Reflect A Primary Purpose To Create Or Produce Evidence Against Graham At A Later Trial* ....................................... 22

C. *Any Error Arising From The Introduction Of Moore's Statements Was Harmless Beyond A Reasonable Doubt* ............ 27

    1. *The Introduction Of Moore's Statements Was Harmless Because The District Court Cured Any Error With An Instruction* ................................ 27

    2. *Moore's Statements About Kidnapping Did Not Incriminate Graham On Any Charge And Were Otherwise Harmless In Light Of Overwhelming Evidence Regarding The Use Of Force* ............................ 29

    3. *Moore's Statements About Prostitution And Pimping Are Harmless In Light Of Graham's Admissions That He Engaged In Prostitution Activities* ........................................................... 32

II   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING GRAHAM'S MOTION FOR A MISTRIAL ................... 35

A. *Standard Of Review* ................................................... 35

B.    *The District Court Did Not Abuse Its Discretion Because Any Error Was Harmless Beyond A Reasonable Doubt And Sufficiently Cured With A Jury Instruction* ........................ 35

CONCLUSION ......................................................................................... 41

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:**                                                                      **PAGE**

*Bruton* v. *United States*, 391 U.S. 123 (1968) .................................................. 11, 36-38

*Crawford* v. *Washington*, 541 U.S. 36 (2004) ......................................... 12, 13, 17, 26

*Davis* v. *Washington*, 547 U.S. 813 (2006)............................................................*passim*

*Gaines* v. *Thieret*, 846 F.2d 402 (7th Cir. 1988)........................................................ 37

*Michigan* v. *Bryant*, 562 U.S. 344 (2011)..............................................................*passim*

*Ohio* v. *Clark*, 135 S. Ct. 2173 (2015) ....................................................................... 23

*Simmons* v. *United States*, 440 F.2d 890 (7th Cir. 1971)......................................... 37

*Thomas* v. *United States*, 530 F. App'x 584 (7th Cir. 2013)...................................... 38

*United States* v. *Amaya*, 828 F.3d 518 (7th Cir. 2016).................................. 13, 16, 18

*United States* v. *Bermea-Boone*, 563 F.3d 621 (7th Cir.),
     cert. denied, 558 U.S. 958 (2009).................................................................... 35-36

*United States* v. *Carter*, 530 F.3d 565 (7th Cir.),
     cert. denied, 555 U.S. 977 (2008)....................................................................... 28

*United States* v. *Castelan*, 219 F.3d 690 (7th Cir. 2000).............................. 27, 32, 35

*United States* v. *Clarke*, 227 F.3d 874 (7th Cir. 2000),
     cert. denied, 531 U.S. 1182 (2001)...................................................................... 36

*United States* v. *Cornett*, 232 F.3d 570 (7th Cir. 2000) ............................................ 27

*United States* v. *Danford*, 435 F.3d 682 (7th Cir. 2006)........................................... 35

*United States* v. *Del Valle*, 674 F.3d 696 (7th Cir. 2012),
     cert. denied, 568 U.S. 1085 (2013)...................................................................... 29

*United States* v. *Guajardo-Melendez*, 401 F.2d 35 (7th Cir. 1968) ........................... 37

*United States* v. *Gullo*, 502 F.2d 759 (3d Cir. 1974)................................................. 39

**CASES (continued):**                                                      **PAGE**

*United States* v. *Hanson*, 994 F.2d 403 (7th Cir. 1993) ............................................. 13

*United States* v. *Hortman*, 82 F. App'x 476 (7th Cir. 2003),
    cert. denied, 541 U.S. 952 (2004) ................................................................ 27-28

*United States* v. *Jackson*, 940 F.3d 347 (7th Cir. 2019) ............................................. 13

*United States* v. *Jett*, 908 F.3d 252 (7th Cir. 2018) ................................................... 37

*United States* v. *Montez*, 858 F.3d 1085 (7th Cir. 2017),
    cert. denied, 138 S. Ct. 1986 (2018)................................................................ 15

*United States* v. *Polidore*, 690 F.3d 705 (5th Cir. 2012),
    cert. denied, 568 U.S. 1232 (2013)................................................................ 18

*United States* v. *Smith*, 308 F.3d 726 (7th Cir. 2002) ........................................ 29, 31

*United States* v. *Van Sach*, 458 F.3d 694 (7th Cir. 2006),
    cert. denied, 549 U.S. 1174 (2007)................................................................ 11

*United States* v. *Volpendesto*, 746 F.3d 273 (7th Cir.),............................................. 36-38
    cert. denied, 574 U.S. 936 (2014)

*United States* v. *Walker*, 673 F.3d 649 (7th Cir. 2012)........................................ 12, 27

*United States* v. *Warner*, 498 F.3d 666 (7th Cir. 2007),
    cert. denied, 553 U.S. 1064 (2008)................................................................ 38

*Woods* v. *Etherton*, 136 S. Ct. 1149 (2016) (per curiam) ........................................... 12

**CONSTITUTION AND STATUTES:**

U.S. Const. Amend. VI................................................................................... 12

18 U.S.C. 1591(a)(1)................................................................................ 2, 13

18 U.S.C. 1591(b)(1).................................................................................... 2

18 U.S.C. 1591(e)(2)(B) ............................................................................... 14

18 U.S.C. 1591(e)(5)................................................................................... 14

**STATUTES (continued):**                                                                    **PAGE**

18 U.S.C. 1594(c)................................................................................................ 2, 13

18 U.S.C. 2421 ...................................................................................................... 2

**RULE:**

Seventh Circuit Rule 28(b) ..................................................................................... 1

**MISCELLANEOUS:**

Black's Law Dictionary (11th ed. 2019) ................................................................ 33

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————

No. 19-2373

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

ERIN GRAHAM, JR.,

Defendant-Appellant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
Case No. 3:18-cr-00043-JDP-1
The Honorable Judge James D. Peterson

———————————

BRIEF FOR THE UNITED STATES AS APPELLEE

———————————

**JURISDICTIONAL STATEMENT**

Pursuant to Circuit Rule 28(b), the United States agrees that the

jurisdictional summary in the Appellant's opening brief (Br. 1-2) is complete and

correct.[1]

---

[1] "R.__, at __" refers to the document recorded on the district court docket
sheet and page number. "__A Tr.__" and "__P Tr.__" refer, respectively, to the
morning or afternoon volume and page number of the trial transcript (there is only
one session for Volume 5 of the trial transcript). "Br. __" refers to the Appellant's
opening brief by page number. The video exhibits in this case are cited as "Ex. __,
at 17:__:__," referring to the time-stamp in the upper left corner of the video rather
than to the duration of the video. Compare Br. 5 n.3 (citing "by time of the video"
rather than by time-stamp). "App. A_" and "App. B_" refer, respectively, to
Appellant's Short Appendix and Separate Appendix by page number.

## STATEMENT OF THE ISSUES

1.  Whether the introduction at trial of out-of-court statements made by Graham's co-defendant during an arrest for an unrelated domestic dispute offered for their effect on his trafficking victim's state of mind violated Graham's rights under the Confrontation Clause of the Sixth Amendment, and if so, whether the introduction of these statements was harmless beyond a reasonable doubt.

2.  Whether the district court was within its discretion to deny a mistrial and give a curative instruction concerning the out-of-court statements.

## STATEMENT OF THE CASE

*1.    Procedural History*

The grand jury charged Erin Graham on seven counts, including conspiracy under 18 U.S.C. 1594(c) to commit a violation of 18 U.S.C. 1591(a)(1) (Count 1); sex trafficking by force, fraud, or coercion under 18 U.S.C. 1591(a)(1) and (b)(1) involving Cinderria (Count 2), Krystle (Count 3), and Kelsey (Count 5); attempted sex trafficking by force, fraud, or coercion under 18 U.S.C. 1591(a)(1) and (b)(1) involving Cynthia (Count 4); and interstate transportation of individuals for prostitution under 18 U.S.C. 2421 involving Cinderria and Krystle (Counts 6-7).[2] R.123. The second superseding indictment also charged Patience Moore as a co-defendant in Counts 1, 2, 4, and 5. R.123. Moore subsequently pleaded guilty to

---

[2]  While the superseding indictment did not identify the known victims by name, they were identified at trial. However, to protect the privacy of the known victims involved in this case, the government's brief refers to them by their first names only.

Count 1 (conspiracy) before trial, and counts 2, 4, and 5 were dismissed as to Moore. R.153; R.235.

After a five-day trial, a jury convicted Graham on all seven counts. R.211/5 Tr. 176-178. The district court sentenced Graham to a term of 300 months' imprisonment for Counts 1-5 and a term of 120 months' imprisonment for Counts 6-7, with the sentences to run concurrently. R.251, at 2. Graham filed a timely notice of appeal. R.248.

2.    *Factual Background*

The Confrontation Clause issues presented in this appeal stem from statements made by Patience Moore during an encounter with police at a Red Roof Inn in May 2016. This incident occurred in the middle of Graham and Moore's sex trafficking conspiracy between October 2015 and May 2017, and had a significant impact on the state of mind of Cinderria, one of Graham's known trafficking victims. The police videos capturing Moore's statements were played at trial during the testimony of one of the responding officers. These statements and the district court's handling of Graham's objection are the subject of his challenge on appeal.

a.    *Graham's Sex Trafficking Activities And Conspiracy With Moore Between October 2015 And May 2017*

The charges against Graham stem from his commercial sex trafficking activities with his co-defendant Patience Moore in the Madison, Wisconsin area between approximately October 2015 and May 2017. R.123. When Cinderria was around 18, she met Graham and Moore at a mall kiosk after she moved to Wisconsin. R.208/2A Tr. 94, 99-101. Shortly thereafter, Cinderria began

performing commercial sex acts or "dates" that Graham and Moore posted on backpage.com. See *e.g.*, R.208/2A Tr. 16-19, 25-26, 106-108, 114, 116-117; R.215/2P Tr. 7-12, 56-59. Graham and Moore used the term "date" to refer to an appointment to have sex with a client in exchange for money. *E.g.*, R.208/2A Tr. 21, 105-107, 122-125. Graham had promised Cinderria that they would split her earnings "50/50" (R.208/2A Tr. 102-105) and that she would have a car, an apartment, and the opportunity to finish her education (R.208/2A Tr. 112). Instead, Graham did not give Cinderria her share of the earnings (*e.g.*, R.208/2A Tr. 31, 112, 117, 126; R.215/2P Tr. 9-10, 17), and they mostly lived out of hotels when they were together (*e.g.*, R.208/2A Tr. 119; R.215/2P Tr. 8, 74, 94). Though Cinderria enrolled in school, she ultimately was not able to attend because she was working for Graham and Moore all the time, and because Graham would not give her money for books. R.208/2A Tr. 136-138; R.215/2P Tr. 43, 67, 112-113.

Graham and Moore used violence and other tactics to force Cinderria to perform dates. See, *e.g.,* R.208/2A Tr. 121-122, 125-126; R.215/2P Tr. 59-60, 86-87. Graham was violent with Cinderria when she did not comply with his demands, including choking her and pulling out her hair. R.215/2P Tr. 79-81, 101-102. In one incident, Graham left Cinderria by the side of the road in freezing weather without proper clothing after an argument. R.215/2P Tr. 59-61. When Cinderria did not want to perform dates, Graham and Moore tracked Cinderria's whereabouts via her phone and used the information to bring her back to them. See, *e.g.*, R.215/2P Tr.

29-33, 61-62.  Cinderria also witnessed physical violence between Graham and Moore.  *E.g.*, R.208/2A Tr. 126-128; R.215/2P Tr. 11-14, 86-87.

Graham forced other woman to perform dates, including Krystle and Kelsey, by using drugs and violence.  For example, Graham plied them with drugs and made them believe that they had no other means to provide financially for their young children.  *E.g.*, R.216/3P Tr. 70-71, 73-75; R.210/4A Tr. 34-38.  In one instance, Graham pushed Krystle into a television during an argument over a date.  R.216/3P Tr. 83-84.  Kelsey also witnessed Graham's violence towards others and heard about it from Moore and Cinderria.  R.210/4A Tr. 50-54, 60-64.

Graham and Moore also attempted to traffick Cynthia, who rejected Graham's offer that she come work for him and be "his bitch."  R.216/3P Tr. 28, 30-31.  After she rejected Graham's offer, Cynthia feared Graham and Moore, and Moore ultimately physically assaulted Cynthia while Cinderria and Graham listened by phone.  R.215/2P Tr. 45-46; R.216/3P Tr. 30-31.

Cinderria tried to leave Graham and Moore in April 2017.  R.215/2P Tr. 102-108.  Graham choked Cinderria until she blacked out and physically assaulted her in his hotel room when she tried to leave.  R.215/2P Tr. 106-107.  Cinderria then fled the hotel room and sought refuge from a hotel clerk, who called 911.  R.215/2P Tr. 107-108.  Kelsey also witnessed this attack.  R.210/4A Tr. 58-65.  Graham was arrested and taken into custody by the police.  R.215/2P Tr. 109-110.

While Graham was in jail in May 2017, he contacted Moore about trying to get Cinderria and Kelsey to perform more dates.  R.210/4A Tr. 73-74; R.215/2P Tr.

109-110. Graham also asked Moore to influence Cinderria with respect to the charges against him, but cautioned Moore not to "put the fuckin' hammer on her like [he] would." R.217/4P Tr. 19-20. See also R.215/2P Tr. 111.

b. *The Violent Incident At The Red Roof Inn In May 2016 And Its Effect On Cinderria's State Of Mind*

At trial, Cinderria testified that Graham and Moore's behavior made her fearful and hopeless about getting away from them. *E.g.*, R.215/2P Tr. 29-35, 46-47. For example, Cinderria testified that when she tried to leave once for Chicago, she feared that Graham and Moore would tell her family what she was doing for them, and so she returned. R.215/2P Tr. 32-35. At one point, she hid from Moore and Graham at her grandfather's house. R.215/2P Tr. 29-31. But she returned to Graham and Moore because she feared what they might do to her younger sisters, who also lived with her grandfather. R.215/2P Tr. 31. Cinderria testified that she felt "paranoid" and "scared for [herself], scared for [her] sisters, scared for everybody else." R.215/2P Tr. 31. Cinderria also felt that Moore and Graham were able to "dodg[e] the police," and, as a result, she was "scared that [she] wasn't getting out of this situation." R.215/2P Tr. 46-47. In particular, she worried that "even if [she] d[id] call the police, ain't nothing going to happen * * * [b]ecause they can talk their way out of it." R.215/2P Tr. 47.

Cinderria also testified about a violent incident that she had observed between Graham and Moore at a Red Roof Inn in Grand Chute, Wisconsin, in May 2016. R.215/2P Tr. 10-14; App. B2. Cinderria testified that when Moore tried to wake Graham from his sleep, Graham was "crazy," and he and Moore got into an

argument. R.215/2P Tr. 12. Moore "nudged" Graham's face, and Cinderria watched as Graham then threw Moore into the bathroom. R.215/2P Tr. 12. Cinderria heard a "couple booms" coming from the bathroom. R.215/2P Tr. 12. She also observed that Moore was "bleeding a lot." R.215/2P Tr. 13. Cinderria watched as the fight moved outside of the hotel room. R.215/2P Tr. 12-13. Moore yelled at Graham, and Graham told her to come back inside before someone called the police. R.215/2P Tr. 13. Moore began to throw rocks at Graham, and Cinderria believed that some bystanders called the police. R.215/2P Tr. 13. The police arrived, arrested Moore, and took her into custody; Graham stayed behind at the hotel with Cinderria. R.215/2P Tr. 13-14.

Cinderria testified that this encounter with police had an effect on her state of mind and feelings of hopelessness. R.215/2P Tr. 13-14. Having witnessed the police taking Moore rather than Graham into custody, Cinderria "felt like [there] was no getting out of this situation." R.215/2P Tr. 13. She thought it was "clear[ ]" that Graham had hit Moore, but "[h]e was not going to jail." R.215/2P Tr. 13-14. And promptly after Moore went to jail, Graham arranged a date for Cinderria to earn bail money for Moore. R.215/2P Tr. 15-16.

> c. *The Introduction At Trial Of Moore's Statements In The Police Videos From Her Arrest*

The arrest of Moore at the Red Roof Inn in May 2016 was captured on video by police body cameras. App. B15. During the testimony of Grand Chute Police Officer Travis Waas, the government introduced the videos as Exhibits 69, 70, and

72. App. B1-B13. Officer Waas testified that he went to the Red Roof Inn because of a report of an individual actively resisting arrest. App. B9.

The government played Exhibit 69 first. App. B5. The video showed Moore restrained in handcuffs while shouting up toward Graham on the hotel balcony that "[Graham] got a 19-year-old prostitute. And he took me from New York." Ex. 69, at 17:06:21-25. The government paused the video and asked Officer Waas what Moore said on the video, and he repeated her statement. App. B6-B7. The video also showed another officer trying to calm down Moore. Ex. 69, at 17:07:18-28. When asked by the officer if Graham was pimping her, Moore responded that Graham "pimp[ed] me for a fucking year and half * * * the worst year and a half of my life." Ex. 69, at 17:07:28-45. Officer Waas then again repeated this statement in response to government questioning about what he understood Moore to say on the video. App. B8.

Next, the government played Exhibit 70, which captured a conversation between Officer Waas and Graham while they walked upstairs to Graham's hotel room to retrieve his identification. See App. B8-B12; Ex. 70. On the video, Moore can be heard shouting from the ground below as Graham entered the hotel room. App. B11. The government asked Officer Waas what Moore was yelling in the video, and Officer Waas responded, "[t]hat he's prostituting." App. B8-B11. Two women can also be seen inside Graham's hotel room while Moore is screaming (Ex. 70, at 17:06:21-25; App. B8-B11), one of whom prior testimony established is Cinderria (R.215/2P Tr. 13-14).

The government played Exhibit 72 last. This video showed Officer Grier-Welch, the first officer on the scene, attempting to subdue Moore prior to the arrival of other officers. See App. B12; Ex. 72. Moore can be seen yelling and lunging away from Officer Grier-Welch in the direction of Graham. Ex. 72, at 17:01:02-07; App. B13. Officer Grier-Welch yelled at Moore to "stop resisting" and in response, Moore shouted that "[Graham]'s over here prostituting bitches. He kidnapped me from fucking New York." Ex. 72, at 17:01:02-07. Exhibit 72 was captioned, and in response to a question, Officer Waas confirmed that the caption accurately reflected what Moore said. App. B12.

Later that day, after Officer Waas's testimony, Graham became aware that the government might not call Moore to testify though she was on the government's witness list and raised concerns about a possible Confrontation Clause violation. App. A1-A2, A6. The government maintained that Moore's statements were not used for the truth of the matter asserted, but to demonstrate their effect on Cinderria's state of mind. App. A3-A4. Though the district court did not find Moore's statements "all that damning," it indicated that it would instruct the jury to disregard the statements, if in fact it was determined that Moore would not testify. App. A8-A9.

The next morning, Graham requested a mistrial if the government was not going to call Moore. App. A13, A16-A17. The district court declined to grant a mistrial (App. A21), but again stated that it would instruct the jury to disregard Moore's statements. App. A24. Later that morning, it was determined that neither

party would call Moore as a witness at trial. App. A33. Before the lunch break, the

district court gave the following instruction:

> Yesterday, we watched a video in which Patience Moore made statements
> during an incident at the hotel in Grand Chute. We have now been informed
> that Ms. Moore will not be testifying. Accordingly, you can't consider
> anything that Ms. Moore said in that video because Ms. Moore can't be cross-
> examined about those statements. You can consider the video itself and
> statements made by other participants. This instruction is specific to the
> video that we saw yesterday, and it doesn't relate to your consideration of any
> other evidence or testimony in the case.

App. A34.

## SUMMARY OF ARGUMENT

This Court should reject Graham's Confrontation Clause challenge and

affirm his conviction.

1. The introduction of Moore's out-of-court statements did not violate

Graham's Confrontation Clause rights under the Sixth Amendment because Moore's

statements were neither hearsay nor testimonial. The Sixth Amendment's

protections only extend to out-of-court statements that are used for the truth of the

matter asserted and are testimonial in nature. Here, the government did not

introduce Moore's statements for their truth but rather to demonstrate their effect

on Cinderria after witnessing Graham's violent attack on Moore at the Red Roof Inn

in May 2016. In addition, Moore's statements were not testimonial in nature

because they were not made with the primary purpose to establish or prove past

events potentially relevant to later criminal prosecution. Moore uttered the first

challenged statements during an ongoing emergency as the first police officer

arrived on the scene, which indicates a non-testimonial purpose. Moore

subsequently repeated her statements in quick succession as additional officers arrived under circumstances that objectively indicated a primary purpose other than to prove past events for use at a later trial. Because Moore's statements were not testimonial hearsay, this Court should conclude that Graham's Sixth Amendment right to confrontation was not violated. However, even if an error occurred below, it was harmless beyond a reasonable doubt in light of the district court's curative instruction and the strength of the evidence against Graham.

2. The district court did not abuse its discretion by denying Graham's motion for a mistrial, because any error was harmless beyond a reasonable doubt and sufficiently cured by the district court's jury instruction. Graham's arguments to the contrary fail because this case does not implicate the rule about the use of confessions in a joint trial set forth in *Bruton* v. *United States*, 391 U.S. 123 (1968), nor did any of the other purported errors Graham identifies with the curative instruction deny him a fair trial.

## ARGUMENT

## I

## THE INTRODUCTION OF MOORE'S STATEMENTS DID NOT VIOLATE GRAHAM'S SIXTH AMENDMENT RIGHT TO CONFRONTATION

*A.     Standard Of Review*

The "[i]nterpretation of the Confrontation Clause of the Sixth Amendment is a legal question that [this Court] review[s] *de novo*." *United States* v. *Van Sach*, 458 F.3d 694, 701 (7th Cir. 2006) cert. denied, 549 U.S. 1174 (2007). Violations of the

Confrontation Clause are also reviewed for harmless error. *United States* v. *Walker*, 673 F.3d 649, 658 (7th Cir. 2012) (citation omitted).

B.     *The Introduction Of Moore's Out-Of-Court Statements Did Not Violate The Confrontation Clause Because They Are Neither Hearsay Nor Testimonial*

The Sixth Amendment protects a criminal defendant's right to be "confronted with the witnesses against him." U.S. Const. Amend. VI. The "basic objective of the Confrontation Clause * * * is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial." *Michigan* v. *Bryant*, 562 U.S. 344, 358 (2011). To ensure this right, the Confrontation Clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford* v. *Washington*, 541 U.S. 36, 53-54 (2004). This protection applies to "an out-of-court statement only if it is admitted for its truth," and thus, does not apply to non-hearsay statements, even if they are testimonial. *Woods* v. *Etherton*, 136 S. Ct. 1149, 1152 (2016) (per curiam).

Graham's Confrontation Clause challenge arises from the statements made by Moore on the police videos captured during the incident at the Red Roof Inn that the government played at trial and that Officer Waas repeated in his testimony. See Br. 24-25. Moore did not testify at Graham's trial, and the district court ultimately instructed the jury to disregard Moore's statements on the videos. To determine whether the introduction of Moore's statements violated Graham's confrontation rights, this Court "must ask whether [Moore's] statement[s] w[ere]

offered for [their] truth," and, "if so, [the Court] must also ask whether [they were] testimonial." *United States* v. *Amaya*, 828 F.3d 518, 528 (7th Cir. 2016) (internal quotation marks omitted).  Because the challenged statements were not offered for their truth and were not testimonial, their introduction at trial did not violate Graham's Sixth Amendment right to confrontation.

1. *Moore's Out-Of-Court Statements Were Not Hearsay Because They Were Introduced For Their Effect On Cinderria's State Of Mind, Not For Their Truth*

Because the government offered Moore's challenged statements to show their ultimate effect on Cinderria's state of mind and not as hearsay, their introduction did not violate the Confrontation Clause.  The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *United States* v. *Jackson*, 940 F.3d 347, 352 (7th Cir. 2019) (quoting *Crawford*, 541 U.S. at 59 n.9).  A permissible non-hearsay use of an out-of-court statement includes its effect on the state of mind of the listener.  *United States* v. *Hanson*, 994 F.2d 403, 406 (7th Cir. 1993).  Here, the government used Moore's statements during the police encounter at the Red Roof Inn for their effect on Cinderria's state of mind.  See App. A3-A4 (government response to the objection at trial); App. A17-A18 (same).

Cinderria's state of mind is relevant to whether Graham trafficked her by "means of force, threats of force, fraud, [or] coercion" in violation of 18 U.S.C. 1591(a)(1) and 18 U.S.C. 1594(c).  Under the statute, coercion includes any "scheme, plan, or pattern intended to cause a person to believe that failure to perform an act

would result in serious harm."[3] 18 U.S.C. 1591(e)(2)(B). One way the government sought to demonstrate coercion was to establish that Graham created "an environment of compliance or consequences" that caused Cinderria to believe that failure to perform commercial sex acts would result in serious harm. R.211/5 Tr. 116. Part of this environment of "compliance or consequence" involved Cinderria's fear that she was helpless to leave Graham and Moore. R.211/5 Tr. 123.

At trial, Cinderria testified more than once about her fear that there "was no getting out of this situation" as a result of police encounters involving Graham and Moore. R.215/2P Tr. 13-14, 46-47. After Moore's assault on Cynthia, which she heard over the phone, Cinderria testified that Moore had lied to the police and that Moore and Graham were able to "dodge the polic[e]" and "talk their way out of it." R.215/2P Tr. 46-47. Cinderria said this contributed to her fear "nothing [was] going to happen" if she tried to seek police assistance. R.215/2P Tr. 46-47.

Likewise, Cinderria testified about this feeling of helplessness in relation to the incident at the Red Roof Inn. See R.215/2P Tr. 13-14. Moore's statements captured on the police videos help to corroborate this description of the effect on Cinderria's state of mind. Cinderria testified that she could hear Moore yelling after her fight with Graham moved outside of the hotel room. See R.215/2P Tr. 13.

---

[3] Under the statute, serious harm "means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. 1591(e)(5).

In the police video, Moore's voice can be heard from inside the hotel room when Graham returns to the hotel room to retrieve his identification. Ex. 70, at 17:06:21-25. Despite Moore yelling that Graham had a "19-year-old prostitute" and that he "kidnapped" Moore (Ex. 70, at 17:06:21-25; Ex. 69, at 17:06:21-25), the police did not intervene and remove Graham from the situation. Instead, they arrested Moore and took her into custody. R.215/2P Tr. 13-14; App. B13. The effect on Cinderria's state of mind from that incident was that nothing she could say or do would help her get out of her situation with Graham, and so she continued doing dates for Graham and Moore. See R.215/2P Tr. 14-15.

The effect of Moore's statements on Cinderria's state of mind is relevant whether or not Moore's statements about Graham are true. The ultimate inquiry in determining whether a statement is used for the truth of the matter asserted is "whether the declarant's statement is relevant only if it is true. If a statement is relevant irrespective of its veracity, then it is not hearsay." *United States* v. *Montez*, 858 F.3d 1085, 1090 (7th Cir. 2017), cert. denied, 138 S. Ct. 1986 (2018). The relevance of Moore's statements is that despite Moore having alerted the police to potential ongoing illegal activity, the police did not investigate or attempt to intervene in that activity, which contributed to Cinderria's sense of hopelessness. For example, whether or not Graham actually kidnapped Moore, Moore's statement that he did so should have prompted police to investigate Graham or even to

question the individuals in his hotel room.[4] Instead, Moore's statements, and the police response to them, contributed to Cinderria's sense that Graham was untouchable and that there was nothing she could do to change her situation. In short, because Moore's statements were used for their effect on Cinderria's state of mind and not for their truth, they do not implicate the Confrontation Clause, and this Court need not reach whether Moore's statements were testimonial. See *Amaya*, 828 F.3d at 528-529.

2.    *Moore's Out-Of-Court Statements Were Not Testimonial Because They Were Not Made With The Primary Purpose Of Creating Evidence For Use Against Graham At A Later Trial*

Although this Court need not reach the question if it concludes that Moore's statements were not hearsay, Moore's statements also were not testimonial. Some of Moore's statements were made just as the first officer responded to the scene and the remainder were made quickly thereafter when additional officers arrived and assisted in restraining Moore. When evaluating "all of the relevant circumstances," none of Moore's statements are testimonial because they do not reflect "a primary purpose of creating an out-of-court substitute for trial testimony" against Graham. *Bryant*, 562 U.S. at 358, 369. As the videos demonstrate, the police arrived in the midst of a chaotic scene involving an ongoing altercation between Moore and Graham, and the statements were uttered largely unprompted by an injured

_____

[4] As the government argued at trial, Moore could have said "'There's a body in the trunk,'" and the effect on Cinderria would be the same—"[Graham] can talk[ ] his way out" of it, so there was nothing she could do to escape. R. 210/4A Tr. 9.

declarant (Moore), who was highly emotional and continually resisting police efforts to bring her under control.

> a.  *A Statement Is Testimonial If Made In Circumstances Objectively Indicating A Primary Purpose To Establish Past Events For Later Use At Trial Against The Accused*

The protections of the Confrontation Clause extend to hearsay statements admitted at trial that are "testimonial" in nature. *Crawford*, 541 U.S. at 53-54. Testimonial statements include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial," as well as statements made during certain "police interrogations." *Id.* at 68; see also *Bryant*, 562 U.S. at 355.

Statements made to police are considered "testimonial" when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis* v. *Washington*, 547 U.S. 813, 822 (2006). In determining the "primary purpose" of statements made to police, courts must objectively evaluate all of the circumstances surrounding the statements, including "the statements and actions of both the declarant and interrogators." *Bryant*, 562 U.S. at 367-368 (explaining that "[i]n many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both questions and the answers"). The "subjective or actual purpose of the individuals involved" is not relevant; rather, the proper inquiry is "the purpose that reasonable participants would have had, as ascertained from [their] statements and actions and the circumstances in which the encounter occurred." *Id.* at 360.

An important consideration in this inquiry is "the existence of an 'ongoing emergency' at the time of an encounter between an individual and the police," because it focuses the participants on "something other than 'proving past events potentially relevant to later criminal prosecution.'" *Bryant*, 562 U.S. at 361 (quoting *Davis*, 547 U.S. at 822). However, the Supreme Court has also made clear that there are "*other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Bryant*, 562 U.S. at 358; see also *e.g.*, *United States* v. *Polidore*, 690 F.3d 705, 712-719 (5th Cir. 2012) (concluding that a report of ongoing criminal activity to police was non-testimonial), cert. denied, 568 U.S. 1232 (2013).

Here, the totality of circumstances surrounding Moore's challenged statements to police objectively indicates a purpose other than "to establish or prove past events" for later use at trial against Graham. *Amaya*, 828 F.3d at 529 (quoting *Davis*, 547 U.S. at 822). Moore's statements were not testimonial because they were either made during the existence of an ongoing emergency or because the statements and actions of Moore and police in no way reflected a primary purpose to create or produce evidence for use against Graham at a later trial.

> b. *Moore's Statements Before The Arrival Of Additional Officers Were Not Testimonial Because They Were Made During The Existence Of An Ongoing Emergency*

Moore's initial statements challenged by Graham occurred just as police arrived at the Red Roof Inn in the midst of an ongoing emergency. App. B12; Ex.

72. The video of this encounter (Exhibit 72) shows a "chaotic" scene in which Officer Grier-Welch, the first officer on the scene, attempted to restrain Moore. App. B2-B6. When Officer Grier-Welch shouted at Moore to "stop resisting," she yelled while lunging away: "[Graham]'s over here prostituting bitches. He kidnapped me from fucking New York." Ex. 72, at 17:01:02-07. After Moore made this statement, Officer Grier-Welch continued in his attempt to restrain her, telling other officers that he had "one resisting" and "need[s] help." Ex. 72, at 17:01:15-19. Meanwhile, Moore, who was not handcuffed, again lunged away from Officer Grier-Welch in the direction of Graham, who was walking toward them. Ex. 72, at 17:01:15-25. Officer Grier-Welch directed Graham to "go stand by [his] car," while Moore continued to lunge and yell in the direction of Graham. Ex. 72, at 17:01:15-25.

The question of "whether an emergency exists and is ongoing is a highly context-dependent inquiry." *Bryant*, 562 U.S. at 363. Courts must consider the "zone of potential victims," and whether there is a "continuing threat" to anyone within in that zone, even if some aspect of the threat "has been neutralized." *Id.* at 363. For example, in *Bryant*, though the immediate threat to the initial shooting victim had been neutralized by the victim's departure from the scene, the Court considered the emergency ongoing because the threat to police and the general public continued while the perpetrator remained at large with a deadly weapon. *Id.* at 375-376. Similarly, in *Davis*, the Court held that a domestic violence victim's "frantic" answers in response to a 911 operator's questions both during a domestic

disturbance and after the perpetrator fled the scene were not testimonial. 547 U.S. at 818-819, 827.

Here, the existence of an ongoing emergency is apparent on the video from the actions of both Moore and Officer Grier-Welch when considering the full "zone of potential victims." *Bryant*, 562 U.S. at 363. Officer Grier-Welch was attempting to gain control of Moore and requesting back up from his fellow officers, suggesting that he perceived a threat from Moore to himself. Meanwhile, Moore's frantic behavior and resistance reflect her experience of an ongoing threat, albeit one different from the one to which the officer is responding by restraining her. Just before his arrival, Graham violently assaulted Moore in the bathroom of their hotel room. R.215/2P Tr. 11-14. Moore fought back against Graham taking their fight out in public to the parking lot outside their hotel room, where Moore screamed and threw rocks at Graham as police arrived. R.215/2P Tr. 12-13; see also Ex. 69, at 17:05:59-17:06:08 (Officer Grier-Welch confirming this account). Though Graham had just assaulted Moore, he is walking around freely in her direction at the time she makes her statements that he "kidnapped" her and is "prostituting bitches." See Ex. 72, at 17:01:15-25. In addition, Moore believed that Graham called the police on her (Ex. 69, at 17:06:53-17:07:08), and, as a result, she may have perceived him as using the police to intimidate her. When viewing the full "zone of potential victims" in the context of the situation, Moore's statements are directed at the unresolved threat posed to her by Graham. See *Bryant*, 562 U.S. at 363.

In these circumstances, no reasonable participant in this encounter would view Moore's statements as having a *primary* purpose of creating evidence for future prosecution against Graham. When making statements to police, a victim of violence, like Moore, is "most likely to want the threat * * * to end" or for "the attacker to be incapacitated temporarily or rehabilitated," but that does not mean that she "envisions prosecution of the assailant." *Bryant*, 562 U.S. at 368. Moore may have been continuing her defense against Graham after his violent attack in the bathroom by hurling insults (instead of rocks) in an attempt to forestall further attack. Graham agrees with this explanation, claiming that her behavior and statements reflect that Moore "fought back." Br. 5. She may also have been trying to show Graham that she was not intimidated by his attempt to control her using the police. Or Moore's outbursts could have been an attempt to get the police to neutralize the threat to her (or the women in their hotel room) by incapacitating him temporarily. See *Bryant*, 562 U.S. at 368-369 (explaining that an injured victim "may have no purpose at all" and that any statements may simply be "reflexive").

Moreover, contrary to Graham's suggestion (Br. 24-25), the police were not investigating potential sex trafficking or anything else at this point, and they did not have the situation "under control." Officer Grier-Welch was the only officer on the scene. As Officer Waas described the circumstances of his arrival *after* this exchange occurred (App. B12), Moore was still resisting arrest, and he observed Officer Grier-Welch "trying to control a female that was very upset, yelling,

screaming, and resisting." App. B2. She was not handcuffed until after Officer Waas arrived and assisted Officer Grier-Welch in doing so. App. B2-B3. Furthermore, Officer Grier-Welch had not even asked Moore a single question. Thus, the challenged statements made by Moore before the arrival of Officer Waas (and other officers) were made during an ongoing emergency, not a police investigation. As a result, neither Officer Grier-Welch nor Moore would have expected the "primary purpose" of Moore's statements to be "creating an out of-court substitute for trial testimony." *Bryant*, 562 U.S. at 358.

    c.    *Moore's Statements After The Arrival Of More Officers Were Not Testimonial Because They Did Not Reflect A Primary Purpose To Create Or Produce Evidence Against Graham At A Later Trial*

Moore's remaining statements after other police officers arrived were not testimonial when considering their timing, the lack of formality, the nature of the questions (when questioning was even involved) and answers, and Moore's continued, heightened state of agitation. On Exhibit 69, Moore shouts up toward Graham on the balcony above that "[h]e got a 19-year-old prostitute. And he took me from New York." Ex. 69, at 17:06:21-25. An officer then tries in vain to calm down Moore, but eventually asks her if Graham is pimping her, to which she responds that Graham "pimp[ed her] for a fucking year and a half." Ex. 69, at 17:07:28-45. Though other officers arrived and there was relatively greater control of the scene by this time,[5] these statements were not testimonial.

----

[5] Moore was handcuffed but continued to resist the officers' directions and disputed an officer's assertion that police were in charge. See Ex. 69.

As to timing, Moore made these challenged statements all within less than eight minutes of those she made while resisting Officer Grier-Welch upon his arrival on the scene. Compare Ex. 72, at 17:01:04-08 with Ex. 69, at 17:06:21-25 and Ex. 69, at 17:07:28-45. The quick succession of Moore's subsequent statements lacked any sense of formality to suggest that the participants were "focused * * * on the possible future prosecutorial use of [the] statements." *Bryant*, 562 U.S. at 377; see also *Davis*, 547 U.S. at 827 (considering the timing of the challenged statements in assessing whether they had a testimonial purpose). Just five minutes after she made the first challenged statement, Moore continued to shout in the direction of Graham from the parking lot while he retrieved his identification from the hotel room above her with Officer Waas. See Ex. 70 (showing Graham's location during the time period); Ex. 69, at 17:06:21-25. Moore screamed, "He got a 19-year-old prostitute. And he took me from New York." Ex. 69, at 17:06:21-25. At the time she made this statement, Graham was entering the hotel room with Officer Waas. Ex. 70, at 17:06:21-29. Moore did not shout these statements in response to police questioning; they appear unsolicited and directed toward Graham on the balcony above rather than to the officer standing next to her. See Ex. 70, at 17:06:21-29. These statements bear no resemblance to those made in a formal stationhouse interrogation, which is "more likely to provoke testimonial statements." *Ohio* v. *Clark*, 135 S. Ct. 2173, 2180 (2015).

After this outburst, the officer continued his efforts to calm down Moore, leading to the following exchange:

Officer:  So, Patience do you have ID in the room?

Moore:  [Interrupting the question] And he bring me all the way
from fucking New York.  You cold my  *  *  *  .

Officer:  So, is he pimping you?  Or is he pimping somebody?

Moore:  He pimp me for fucking a year and a half.  A year and
a half.  [Inaudible.] Worst year and a half of my life.

Officer:  Hey.  Hey.  Patience.

Moore:  And we having a child.

Ex. 69, at 17:07:28-45.  Though Moore's statements here involved police

questioning, the circumstances do no suggest that they were made for the primary

purpose of creating an out-of-court substitute for trial testimony.  Notably, the

officer's exchange with Moore does not begin with any probe into Graham's

potential criminality; indeed, he asked whether she had identification.  See Ex. 69,

at 17:06:36-17:07:45.  The officer only seems interested in asking about Graham's

pimping in order to keep Moore calm, as his question comes only after Moore, yet

again, raised the issue unsolicited in another emotional outburst.  That his question

was directed at calming Moore is further reflected in his final words to her on the

video, which are not follow-up questions into any potential criminality by Graham,

but soothing words to counter her agitation.  See Ex. 69, at 17:06:36-17:07:45.

Furthermore, while making these statements, Moore again was pacing,

facing away from the officer, and shouting in the direction of Graham's location in

the hotel room.  She was not directing her responses to the officer.  Moore did not

even appear to hear the officer's question about her identification, resulting in a

nonresponsive answer.  She also offers no details; she merely repeats the same allegations over and over again.  Given Moore's lack of focus on the officer questioning her, the interaction surrounding her statements seems more like a "harried 911 call" than a formal police interrogation.  See *Bryant*, 562 U.S. at 377.  Under these circumstances, Moore's statements were not made with a primary purpose to establish or prove past events potentially relevant to a later criminal prosecution of Graham.

In addition to the informality of the circumstances, Moore's physical and emotional state at the time of these statements further suggests a primary purpose other than to prove past events for later prosecution.  See *Bryant*, 562 U.S. at 364-365 (considering the physical and medical state of the declarant in determining whether statements were testimonial).  Moore was injured by Graham, eventually telling the officer that "[Graham] put [a] mark" on her face.  Ex. 69, at 17:07:06-08.  She also stated that she was pregnant.  Ex. 69, at 17:07:43-45.  Throughout the videos, Moore appears extremely agitated and upset, at one point refusing to sit in the patrol car and insisting that she be allowed to pace back and forth.  Ex. 69, at 17:05:32-55.  During this latter exchange, she seems almost irrational when the officer tells her that the police are "in charge here"; she responds, "[n]o you're not.  You're a human being.  Please don't tell me you're in charge."  Ex. 69, at 17:05:32-55.  These facts about Moore's physical and emotional state at the time of her challenged statements draw into question Moore's ability to have a primary

"purpose at all in responding to police questions" or "that any purpose formed would necessarily be a testimonial one." *Bryant*, 562 U.S. at 364-365.

Finally, Moore's statements did not prompt any action from the officers the first, second, or third time they were uttered. The police did not restrain, arrest, or question Graham in light of Moore's allegations. See Ex. 70. They did not even speak with the two women in his hotel room at the scene and "saw no reason to" do so. R.209/3A Tr. 144. For Graham, the encounter ended with the police asking him to fill out a domestic violence *victim*'s packet, which he ultimately declined to do. R.209/3A Tr. 145 (emphasis added). Meanwhile, police took Moore into custody on charges of domestic disorderly conduct and resisting arrest. App. B13.[6] And in fact, Graham's trafficking activities continued for nearly a full year after this incident. See R.123. As the police demonstrated no interest in investigating Graham after she made her initial allegation, no "objective witness" in Moore's position would have reasonably believed that her statements made after more police arrived on the scene "would be available for use at a later trial" against Graham. See *Crawford*, 541 U.S. at 52 (citation omitted).

---

[6] Officer Waas indicated that police were "concern[ed]" about Moore's allegations, but he was not aware if police actually followed up on any of them after the incident. R. 209/3A Tr. 144.

C.    *Any Error Arising From The Introduction Of Moore's Statements Was Harmless Beyond A Reasonable Doubt*

If any of Moore's statements were introduced in violation of the Confrontation Clause, any error was "harmless beyond a reasonable doubt." *Walker*, 673 F.3d at 658. In assessing whether an error is harmless, this Court "analyzes the trial as a whole placing great weight on the presence of curative instructions * * * as well as the strength of the evidence against the defendant." *United States* v. *Hortman*, 82 F. App'x 476, 479 (7th Cir. 2003) (citing *United States* v. *Cornett*, 232 F.3d 570, 575 (7th Cir. 2000)), cert. denied, 541 U.S. 952 (2004). Unless "in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded," the error is harmless beyond a reasonable doubt. *United States* v. *Castelan*, 219 F.3d 690, 696 (7th Cir. 2000) (internal quotation marks and citation omitted). In making this determination, this Court considers "factors such as the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of corroborating or contradictory evidence and the overall strength of the prosecution's case." *Walker*, 673 F.3d at 658 (citation omitted).

1.    *The Introduction Of Moore's Statements Was Harmless Because The District Court Cured Any Error With An Instruction*

After it became clear that Moore would not testify, the district court instructed the jury that it could not "consider anything Ms. Moore said" in the police videos "during [the] incident at the hotel in Grand Chute." App. A34. This Court has placed "great weight" on the presence of any curative instructions in

determining whether an error was harmless beyond a reasonable doubt. *Hortman*, 82 F. App'x at 479; see also *United States* v. *Carter*, 530 F.3d 565, 576 (7th Cir.) (giving "considerable weight" to curative instructions in harmless error analysis), cert. denied, 555 U.S. 977 (2008).

Graham argues (Br. 44-45) that the district court's instruction was not an effective cure because it addressed only the statements in the video and did not address Officer Waas's repetition of those statements. Though the district court did not explicitly direct the jury to disregard Officer Waas's testimony repeating Moore's statements, the circumstances of his testimony combined with the instruction made clear that the jury should do so. The district court specifically drew the jurors' attention to the time when they watched video of the incident at the Red Roof Inn in Grand Chute and stated that the jury "can't consider anything that Ms. Moore said in the video." App. A34. The government played the videos during Officer Waas's testimony and asked him to repeat Moore's statements from the videos. App. B6, B8, B11-B12. The government's questioning of Officer Waas was not a separate occasion at trial involving an additional inquiry into the events that occurred at the hotel in which Officer Waas recounted his own recollection of Moore's statements. Officer Waas was asked what Moore said on the video, and he repeated or confirmed the statements she made in response while the prosecution paused and replayed the video. See App. B6, B8, B11-B12. Given these circumstances, a reasonable juror would understand that Moore's statements on the

videos, including their repetition by Officer Waas, could not be considered in the jury's deliberations.

Furthermore, when the district court gives a curative instruction, as here, "jurors are presumed to follow" the instruction "unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds." *United States* v. *Smith*, 308 F.3d 726, 739 (7th Cir. 2002). To overcome this presumption, the evidence must show an "overwhelming probability" that the jurors were unable to follow the instruction. *United States* v. *Del Valle*, 674 F.3d 696, 704 (7th Cir. 2012), cert. denied, 568 U.S. 1085 (2013). As discussed below, a reasonable juror could be expected to disregard Moore's statements because they were not powerfully incriminating and were otherwise harmless in light of the other evidence at trial.

2.   *Moore's Statements About Kidnapping Did Not Incriminate Graham On Any Charge And Were Otherwise Harmless In Light Of Overwhelming Evidence Regarding The Use Of Force*

Moore's statements about Graham kidnapping her from New York were not so powerfully incriminating that a jury could not reasonably disregard them, because they were "unrelated to any of the other testimony at trial" and "unadorned with additional details." *Smith*, 308 F.3d at 739. No other evidence in the trial related to Graham kidnapping Moore, and the jury would not have expected any

since Graham was not charged with trafficking Moore (see R.123) and was not alleged to have "kidnapped" anyone.

Graham's argument (Br. 30-31, 35-36) that Moore's statements about kidnapping directly impacted his conviction for trafficking Cinderria mischaracterizes Moore's statements. Graham asserts that Moore "directly accused Mr. Graham of taking" Cinderria "from New York." Br. 36; see also Br. 30. When Moore stated that Graham had a "19-year-old prostitute" in Exhibit 69, Graham claims that Moore also said "and he took her [the 19-year-old prostitute] from New York." Br. 6. Yet, it is clear from the video that Moore's statement is in fact "and he took *me* from New York." Ex. 69, at 17:06:21-25 (emphasis added). Graham's own brief is inconsistent on this point, as he quotes the same line elsewhere, but places brackets around "her" because it does not occur in the original source. Br. 24. Moore's other statements about alleged "kidnapping" in the video further support that she was speaking of herself when making this statement. See Ex. 72, at 17:01:02-07 ("He kidnapped *me* from fucking New York.") (emphasis added); Ex. 69, at 17:07:28-45 ("And he bring *me* all the way from fucking New York.") (emphasis added). In addition, no evidence in the case connects any other person involved in the charges to New York except Moore, who Graham testified was "from there." R.217/4P Tr. 54.

In addition, the government's case with respect to the trafficking of Cinderria in no way related to kidnapping; if anything, the government explicitly emphasized that kidnapping was not used as a means of force with Cinderria. From the outset

of trial in its opening statement, the government made clear that during her time with Graham, Cinderria "came and went. She was not chained. She was not jailed. She was not confined." R.214/1P Tr. 16-17. And indeed, Cinderria testified that she did leave Graham and Moore at different points, sometimes going to her boyfriend's house (R.208/2A Tr. 116), to her grandfather's house (R.215/2P Tr. 29-30), or to Chicago where she was from originally (R.215/2P Tr. 32). Cinderria also testified that she met Graham at a mall kiosk in Wisconsin, and that initially, she voluntarily went with him and Moore after the meeting. R.208/2A Tr. 99-102.

Graham also argues (Br. 31) that Moore's statements about kidnapping provided some evidence of "force" relevant to the government's theory of the case that Graham used force or the fear of force as a means of trafficking. Even if this were the case, Moore's weak, "unadorned" allegation of kidnapping was still harmless beyond a reasonable doubt when compared to the accumulation of other, more detailed evidence of force in the case. See *Smith*, 308 F.3d at 739. Cinderria testified about numerous instances in which she was the victim of Graham's violence and about witnessing Graham or Moore use force during the conspiracy, including the incident at the Red Roof Inn when Graham assaulted Moore in the bathroom. R.215/2P Tr. 13-14. Cinderria testified about listening to Cynthia, another of Graham's known victims, screaming on the phone when Moore went to her hotel room "to beat this bitch ass." R.215/2P Tr. 45-46; see also R.216/3P Tr. 30-31 (Cynthia's testimony about the assault). Cinderria also testified about several other incidents, including Moore's head bleeding after an incident with Graham

(R.208/2A Tr. 127), Graham pulling out Cinderria's hair (R.215/2P Tr. 79-81),

Graham choking Cinderria at a Rodeway Inn (R.215/2P Tr. 101-102), and Graham

choking and assaulting Cinderria at the Grand Magnuson hotel. R.215/2P Tr. 106-

107; see also R.210/4A Tr. 58-64 (Kelsey's testimony about the assault on Cinderria,

including her account that Graham smashed Cinderria's head into a wall).

Graham's other known victims also testified about his use of force or threats

of force.  Krystle testified that Graham pushed her, causing her to hit her head on a

television (R.216/3P Tr. 83-84), and that he locked her out of their hotel room while

her son remained inside.  R.216/3P Tr. 96-97.  In addition, Kelsey testified that she

had seen Graham physically block Moore's path to prevent her from leaving during

an argument (R.210/4A Tr. 53-54) and that she feared Graham because Moore had

told her that Graham had pushed her down the stairs after Kelsey witnessed her

limping, and because Cinderria also told her that Graham had given Cinderria

bruises and scars.  R.210/4A Tr. 50-53.  All of this evidence coupled with the district

court's instruction not to consider Moore's statements on the police video ensures

that the government's case with respect to force would not have been "significantly

less persuasive" had her statements not been heard at trial.  *Castelan*, 219 F.3d at

696 (citation omitted).

3.     *Moore's Statements About Prostitution And Pimping Are Harmless In Light Of Graham's Admissions That He Engaged In Prostitution Activities*

Moore's statements characterizing Graham as "pimping," "prostituting," and

having a "19-year-old prostitute" were also harmless beyond a reasonable doubt.

Graham repeatedly conceded to the jury that he engaged in prostitution activities, including with Moore and Cinderria (see, *e.g.*, R.214/1P Tr. 26; R.217/4P Tr. 69-71), who was 19 years old during the relevant time period.  In his opening statement, Graham's counsel admitted that "[p]rostitution occurred in this case," and he would not "danc[e]" around it.  R.214/1P Tr. 26.  Graham himself testified that he posted ads for dates, drove to dates, and earned money from the dates performed by Moore and Cinderria.  See, *e.g.*, R.217/4P Tr. 69-71.  He also testified that he had previously "pled guilty to aiding and abetting prostitution" in connection with charges in Virginia involving Cinderria.  R.211/5 Tr. 75.

Moreover, Graham's counsel in closing asked the jury to understand that Graham, like his victims, was in a "crummy, crummy situation[ ]," and that prostitution was "the option that they saw" to make money.  R.211/5 Tr. 165.  Thus, Graham's entire defense was premised on the idea that while he participated in prostitution with Moore and Cinderria and other women, his actions did not amount to trafficking.  See also Br. 8.  Graham may never have conceded that he was a "pimp," but his own admissions corroborate that he was "someone who solicits customers for a prostitute, in return for a share of [their] earnings."  Br. 36 n.7 (citing Black's Law Dictionary (11th ed. 2019)).

Graham argues that Moore's use of the term "pimp" is particularly damaging because it is "typically understood by the public and jury to describe a human trafficker."  Br. 35-36.  If the jury did in fact have this association during the trial,

the government severed that connection in its closing argument before deliberations by noting that:

> Pimp is not a defined term. It's not a legal term. * * * [T]he government is not accusing [Graham] of being a pimp * * * He is not a pimp. He is a sex trafficker[.]

R.211/5 Tr. 139-140.

Even without the government's disavowal of this connection, the error is harmless because Moore's statements are duplicative of other similar statements about Graham that would have given rise to the same insinuations of which Graham complains. The jury heard several other witnesses refer to Graham as a "pimp" both before and after the government introduced Moore's statements. On the first day of trial, Marlene Johnson, a nurse who treated Cinderria after Graham choked and assaulted her in April 2017, testified that Cinderria said "her pimp * * * started hitting her" when describing how she obtained her injuries. R.214/1P Tr. 49. The jury heard similar testimony before the videos were played from Officer Steven Cooke, who arrested Graham and Cinderria in a prostitution sting in Virginia in 2016. R.209/3A Tr. 51-52. Officer Cooke testified that his interrogation of Graham reflected the approach the officer typically took with an individual he "deemed a pimp." R.209/3A Tr. 51-52. And after the videos were played, Cynthia testified that when she met Graham in November of 2016, she knew him as a "pimp" and that he "approached [her] as a pimp would." R.216/3P Tr. 18-19. Had the jury never heard Moore's statements, they still would have heard testimony that characterized Graham as a pimp.

Thus, nothing in the prosecution's case would have been "significantly less persuasive" to the average juror without Moore's statements alleging Graham was prostituting or pimping. *Castelan*, 219 F.3d at 696 (citation omitted). For these reasons, the introduction of Moore's statements at trial was harmless beyond a reasonable doubt.

## II

### THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING GRAHAM'S MOTION FOR A MISTRIAL

A.  *Standard Of Review*

This Court reviews the refusal of a district court to grant a mistrial for an abuse of discretion. *United States* v. *Bermea-Boone*, 563 F.3d 621, 625 (7th Cir.), cert. denied, 558 U.S. 958 (2009). The standard of review is "highly deferential because the trial judge is in the best position to determine the seriousness of the incident in question, particularly as it relates to what has transpired in the course of trial." *Ibid.* (quoting *United States* v. *Danford*, 435 F.3d 682, 686 (7th Cir. 2006). In determining whether an abuse of discretion occurred, the "essential inquiry is whether [the defendant] was deprived of a fair trial." *Bermea-Boone*, 563 F.3d at 625.

B.  *The District Court Did Not Abuse Its Discretion Because Any Error Was Harmless Beyond A Reasonable Doubt And Sufficiently Cured With A Jury Instruction*

The district court did not abuse its discretion by opting to give a curative instruction rather than grant a mistrial in response to Graham's Confrontation Clause objection. This Court has "long upheld a trial court's exercise of discretion in

issuing a cautionary instruction, rather than declaring a mistrial, to cure any potential prejudice." *United States* v. *Clarke*, 227 F.3d 874, 881 (7th Cir. 2000) (internal quotation marks and citation omitted), cert. denied, 531 U.S. 1182 (2001). As discussed above (Section I.B.), Graham's Confrontation Clause rights were not violated by the introduction of Moore's statements on the police videos at trial. Indeed, the district court was not convinced such a violation had occurred, noting only the presence of a "potential[ ]" violation (App. A19; see also App. A15 (questioning whether the statements were testimonial)), but nonetheless opted to give a curative instruction. Furthermore, any error resulting from Moore's statements was harmless beyond a reasonable doubt when viewed in light of the other evidence in this case, and thus, did not deprive Graham of a fair trial. See Section I.C., *supra*; *Bermea-Boone*, 563 F.3d at 625.

Graham argues that the district court abused its discretion in denying a mistrial because a jury instruction could not have cured the violation. Relying on *Bruton* v. *United States*, 391 U.S. 123 (1968), and similar cases, Graham argues (Br. 31-37) that a curative instruction cannot remedy the harm of a co-defendant's out-of-court statements if the co-defendant is not cross-examined, and thus, the district court was required to grant a mistrial. This misstates *Bruton*. *Bruton* held that "if a co-defendant makes an out-of-court *confession* that inculpates the defendant, and the co-defendant does not testify at their joint trial," then a jury instruction cannot cure the risk of prejudice to the defendant. *United States* v. *Volpendesto*, 746 F.3d 273, 290 (7th Cir.) (citing *Bruton* v. *United States*, 391 U.S. 123 (1968)) (emphasis

added), cert. denied, 574 U.S. 936 (2014). Each case Graham marshals (Br. 32-34)

to illustrate his point involves the use of a co-defendant's confession implicating the

defendant during a joint trial. *Bruton*, 391 U.S. at 124 (involving testimony of a

postal inspector recounting Evans's confession implicating Bruton at joint trial);

*United States* v. *Guajardo-Melendez*, 401 F.2d 35, 38-39 (7th Cir. 1968) (involving

testimony of undercover agent who elicited confession from co-defendant during

sting that implicated defendant at joint trial); *Simmons* v. *United States*, 440 F.2d

890, 891 (7th Cir. 1971) (involving testimony of confession made by co-defendant to

an undercover agent after arrest implicating defendant at joint trial).

The context of these cases raises distinct concerns. Such challenged

statements are "devastating to the defendant" in significant part because they arise

from a co-defendant's confession to the crime with which both are being tried

simultaneously. See *Bruton*, 391 U.S. at 136; *United States* v. *Jett*, 908 F.3d 252,

275 (7th Cir. 2018) (noting *Bruton* and its progeny involve confessions); see also

*Gaines* v. *Thieret*, 846 F.2d 402, 404 (7th Cir. 1988) (noting that the *Bruton* rule is

"based on concern that the jury will give special weight to a confession"). Under

these circumstances, a jury instruction at a joint trial is insufficient because no

reasonable juror is capable of crediting these statements with respect to the co-

defendant's guilt and "at the same time effectively ignor[ing] the inevitable

conclusion that [the defendant] has committed those same criminal acts with [the

co-defendant]." *Bruton*, 391 U.S. at 131 (citation omitted). As a result, this Court

has declined to extend *Bruton* to cases involving out-of-court statements of a co-

defendant that do not amount to a confession, even in a joint trial. See *Volpendesto*, 746 F.3d at 290-291 (not applying *Bruton* because statement did not amount to a confession of co-defendant); *United States* v. *Warner*, 498 F.3d 666, 701 (7th Cir. 2007) ("There was also no *Bruton* issue, because the statements admitted at trial  *  *  * did not amount to a confession from Ryan."), cert. denied, 553 U.S. 1064 (2008); *Thomas* v. *United States*, 530 F. App'x 584, 586 (7th Cir. 2013) (finding *Bruton* irrelevant when incriminating statements made by co-defendant "did not amount to a *confession*").

Here, Moore's statements were not a confession to trafficking or a trafficking conspiracy that implicated Graham—they were general accusations directed at Graham's activities alone. Furthermore, because Moore and Graham were not tried jointly,[7] a jury instruction about Moore's statements did not require the jury to segregate "the same evidence into separate intellectual boxes," one crediting it as an admission of Moore's guilt and one disregarding it with respect to Graham's. *Bruton*, 391 U.S. at 131 (citation omitted). Thus, there was no substantial risk that the jury could not follow the district court's instruction in their deliberations.

Graham also argues (Br. 39-44) that a mistrial should have been granted because the district court's curative instruction was given almost 24 hours after Moore's statements were played for the jury. Because the introduction of Moore's statements was harmless beyond a reasonable doubt even without the instruction, this argument is meritless. See I.C. above. Furthermore, as Graham concedes (Br.

---

[7] Moore pleaded guilty before trial. R.153.

40), this Court has not opined on how the timing of an instruction may impact the presumption that a jury follows instructions and has not cited any controlling law in which an instruction was deemed ineffective due to delay.

To make this argument, Graham instead relies on the Third Circuit's decision in *United States* v. *Gullo*, 502 F.2d 759 (1974), but that does not help him. See Br. 40-41. In *Gullo*, a prosecutor improperly introduced highly prejudicial evidence of a guilty plea of a coconspirator. *Gullo*, 503 F.2d at 760-761. The prosecutor represented to the district court that he would call the coconspirator to permit cross-examination and eliminate the error, but then closed his case without doing so, which prompted the late curative instruction to the jury. *Ibid.* The defendant decided to call the coconspirator, who gave problematic testimony for the defendant. *Id.* at 761. In ruling that a new trial was warranted, the Third Circuit found that the coconspirator's problematic testimony combined with the seriousness of the underlying error, the prosecutor's misconduct causing the delay, and the actual delay, warranted a new trial. *Id.* at 761-762. Contrary to Graham's argument, the delay alone was not the basis for the Third Circuit's decision. See *ibid.* Moreover, unlike in *Gullo*, although Moore initially appeared on the government's witness list, the government never affirmatively represented that it would call Moore to allow Graham to cross-examine her. See App. A6, A21-A22.

Finally, Graham faults (Br. 44) the district court's final jury instructions as justification for a mistrial. Yet, these purported errors are of his own making. First, Graham argues that the district court erred by failing to repeat the curative

instruction in its final jury instructions. But Graham never asked the district court

to do so. See App. A29-A31 (discussing timing of the instruction); R.210/4A Tr. 161-

184 (discussing the final jury instructions). Likewise, Graham's contention that the

district court gave a contradictory final jury instruction on how to consider recorded

conversations fails because Graham never raised any concerns about the recorded

conversation instruction when it was discussed after the curative instruction was

given.[8] See R.210/4A Tr. 170-173. For these reasons, the district court did not

abuse its discretion by denying Graham's motion for a mistrial.

---

[8] The district court instructed the jury that "recordings are proper evidence, and you should consider * * * them together with and in the same way that you consider other evidence." R.211/5 Tr. 92. The district court also instructed the jury on how to consider transcripts provided in connection with recordings (R.211/5 Tr. 92-93), but no transcripts of Exhibits 69, 70, and 72 were provided to the jury. See R.210/4A Tr. 170.

## CONCLUSION

This Court should affirm Graham's conviction.


Respectfully submitted,

Scott C. Blader
  United States Attorney

Eric S. Dreiband
  Assistant Attorney General

Julie Pfluger
  Assistant United States Attorney
  222 West Washington Avenue
  Suite 700
  Madison, WI  53703
  (608) 250-5449

Alexander V. Maugeri
  Deputy Assistant Attorney General

s/ Barbara Schwabauer
TOVAH R. CALDERON
BARBARA SCHWABAUER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 305-3034

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing BRIEF FOR THE UNITED STATES AS APPELLEE:

(1) complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,375 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

(2) complies with the typeface requirements of Circuit Rule 32(b) and Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2019 in 12-point Century Schoolbook font.

s/ Barbara Schwabauer
BARBARA SCHWABAUER
 Attorney

Date:  February 27, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2020, I electronically filed the foregoing

BRIEF FOR THE UNITED STATES AS APPELLEE with the United States Court

of Appeals for the Seventh Circuit by using the CM/ECF system. All participants in

this case are registered CM/ECF users, and service will be accomplished by the

appellate CM/ECF system.

s/ Barbara Schwabauer
BARBARA SCHWABAUER
 Attorney
