No. 19-2373

_____

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,    Appeal from the United States District Court
*Plaintiff-Appellee,*    for the Western District of Wisconsin

vs.

ERIN F. GRAHAM, JR.,
a/k/a Sonny,    Case No. 18-CR-043
*Defendant-Appellant.*    Honorable Judge James D. Peterson

_____

**REPLY BRIEF OF DEFENDANT-APPELLANT,
ERIN F. GRAHAM, JR.**

_____

Adam Stevenson
Clinical Associate Professor

Michael Doering    Natalia Gess
Law Student    Law Student

Carol English    Trenton Piltz
Law Student    Law Student

Alex Gelhar    Jordan Vassel
Law Student    Law Student

Frank J. Remington Center
University of Wisconsin Law School
975 Bascom Mall
Madison, WI 53706
Telephone:  608.262.9233
Fax:    608.263.3380
Email:    adam.stevenson@wisc.edu

Attorney for Defendant-Appellant,
ERIN F. GRAHAM, JR.

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ............................................................................ **2**

**TABLE OF AUTHORITIES** ..................................................................... **3**

**ARGUMENT** ............................................................................................... **5**

   I.   Ms. Moore's Statements Were Hearsay Because Their Only Logical Use at Trial Was for Their Truth ........................................................................................5

   II.  The District Court Was Correct When It Determined Ms. Moore's Statements Were Testimonial. ...............................................................................10

   III.  The Government Cannot Show the Videos Did Not Prejudice Mr. Graham Beyond a Reasonable Doubt ....................................................................................19

   IV.  Given the Sixth Amendment Values in Which *Bruton* and *Crawford* Are Rooted, No Curing Instruction Could Have Replaced Mr. Graham's Right to Cross-Examine Ms. Moore ..............................................................................22

   V.  The District Court Abused its Discretion Denying Mr. Graham's Motion for a Mistrial Because the Curing Instruction Given was Untimely, Ineffective, and Left an Overwhelming Probability that the Jury Would be Unable to Follow It ...............................................................................................28

**CONCLUSION** ...........................................................................................33

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)** ..................34

# TABLE OF AUTHORITIES

<u>Cases</u>

*Anderson v. Bessemer City*, 470 U.S. 564 (1985)............................................................5

*Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486 (7th Cir. 2019).................4

*Bruton v. United States*, 391 U.S. 123 (1968).......................................................21, 26

*Cossel v Miller*, 229 F.3d 649 (7th Cir. 2000) ...........................................................9

*Crawford v. Washington*, 541 U.S. 36 (2004) .......................................................12, 26

*Davis v. Washington*, 547 U.S. 813 (2006).....................................................11, 14, 16

*Geva v. Leo Burnett Co.*, 931 F.3d 1220 (7th Cir. 1991) ..............................................9

*Jones v. Basinger*, 635 F.3d 1030 (7th Cir. 2011) .........................................................5

*Michigan v. Bryant*, 562 U.S. 344 (2011) ...........................................................10, 11

*Pointer v. Texas*, 380 U.S. 400 (1965) ...............................................................21, 23

*States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014) ...................................................26

*United States v. Burgos-Martinez*, 539 F.3d 641 (7th Cir. 2008) ..................................5

*United States v. Castelan*, 219 F.3d 690 (7th Cir. 2000). .............................................18

*United States v. Del Valle*, 674 F.3d 696 (7th Cir. 2012)..............................................29

*United States v. Gujardo-Melendez*, 401 F.2d 35 (7th Cir. 1968) ...............................23

*United States v. Gullo*, 502 F.2d 759 (3rd Cir. 1974) ..................................................30

*United States v. Hanson*, 994 F.3d 403 (7th Cir. 1993) ................................................8

*United States v. Humphrey*, 34 F.3d 551 (7th Cir. 1994) ............................................27

*United States v. Mannie*, 509 F.3d 851 (7th Cir. 2007) ................................................21

*United States v. Montez*, 858 F.3d 1085 (7th Cir. 2017)................................................8

*United States v. Patterson*, 872 F.3d 426 (7th Cir. 2017) ..............................................5

*United States v. Smith*, 308 F.3d 726 (7th Cir. 2002) ...................................................28

*United States v. Walker*, 673 F.3d 649 (7th Cir. 2012) ...................................................6

*United States v. Warner*, 498 F.3d 666 (7th Cir. 2007) ................................................26

Statutes

Wis. Stat. § 944.30 ........................................................................................24

# ARGUMENT[1]

## I.  Ms. Moore's Statements Were Hearsay Because Their Only Logical Use at Trial Was for Their Truth.

The Government claims it introduced Ms. Moore's statements as non-hearsay to show their effect on Ms. Harwell's state of mind. (Gov't Br. 13-16.) Based on the circumstances of the testimony, however, the only reason the Government could have had for introducing Ms. Moore's statements to the jury was for their truth. (App. Br. 21.) As a result, that was the only way the jury could have used the statements. Therefore, the only possible conclusion to draw is that the statements were introduced for what they were, repeated references to Mr. Graham as a 'pimp' and 'kidnapper.'

The Government casts this issue as one of *de novo* review, but, here, we have conflicting possible standards. At trial, the district court determined the statements were hearsay, prejudicial, and could not be introduced if Ms. Moore would not testify. (*See* Trial Tr. 3P-11:10; 4A-6:18-25; App. A-9, A-16.) This Court reviews "evidentiary rulings for abuse of discretion and will reverse 'only if no reasonable person would agree with the district court's view.'" *Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486, 495 (7th Cir. 2019) (citation omitted). Evidentiary rulings implicating a defendant's Sixth Amendment confrontation

---

[1] In addition to those from his opening brief, the following abbreviations are used herein: Government's Brief, cited by page: "Gov't Br. _"; Appellant's Opening Brief, cited by page: "App. Br. _".

right, however, are reviewed *de novo. United States v. Burgos-Martinez*, 539 F.3d 641, 643 (7th Cir. 2008). That said, this Court has determined that "the purpose for which [the] statement was put before the jury is generally a question of fact, not law." *Jones v. Basinger*, 635 F.3d 1030, 1042 (7th Cir. 2011). This Court reviews district court findings of fact for clear error. *United States v. Patterson*, 872 F.3d 426, 434 (7th Cir. 2017). However, this Court will only find clear error when it is "left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (citation omitted).

In Mr. Graham's case, the district court found that the statements were hearsay, notwithstanding the Government's sole argument about the statements: that they were not offered for their truth. (Trial Tr. 3P-5:18-6:4; 4A-4:22-25; 4A-7:6; App. A-3-4, A-14, A-17.) Because the issue in this case relies on the purpose for which the Government offered Ms. Moore's statements, this Court should review for clear error.

The test for determining whether the statements were offered for their truth considers the "actual use" of evidence at trial, "based on all of the circumstances attendant to the offer of a particular statement into evidence." *Basinger*, 635 F.3d at 1042 n.2. With regard to "context," this Court has explained that out-of-court statements are admissible as non-hearsay when offered to make a defendant's recorded statements intelligible or when they are brief and essential to "bridge gaps in the trial testimony." *United States v. Walker*, 673 F.3d 649, 657-58 (7th Cir.

2012) (citation omitted). This rule does not allow law enforcement officers to "narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination." *Id.* at 658 (citation omitted).

In *Walker*, this Court held the government's use of an informant's out-of-court statement about the source of firearms could not be understood any other way than for the truth of the matter asserted. *Id.* at 658. Similar to Mr. Graham's case, prosecutors attempted to justify introducing out-of-court statements through law enforcement by arguing that none of the statements were being offered for their truth. *Id.* Unlike the circumstances of providing context for a one-word, otherwise unintelligible answer, this was something far different and troubling.

This Court was "disturbed by the government's assertion that [the statements] were introduced for the ostensibly non-hearsay purposes of providing 'context' and showing the course of the government's investigation." *Id.* at 657. "If other admissible evidence could not satisfactorily link these guns back to the defendants, prosecutors were not free to ignore the rules of evidence . . . ." *Id.* at 658. That is precisely the failing in the Government's *post hoc* justification for the hearsay statements here.

The Government offered no evidence to connect Ms. Moore's statements back to Ms. Harwell. At trial, it only once argued the statements were used for their effect, not truthfulness. This was outside the presence of the jury, after both

Ms. Harwell and Officer Waas testified and the videos played. (Trial Tr. 3P-6:3-4; App. A-4.)

For the first time in-depth on appeal,[2] the Government argues that Ms. Moore's statements were used to support Ms. Harwell's fear that Mr. Graham was untouchable by law enforcement. (Gov't Br. 16.) This is plainly inconsistent with the events at trial. The Government never asked Ms. Harwell about what Ms. Moore said outside the hotel room. It asked Ms. Harwell, "[w]hat did you think about Patience going to jail?" She responded by saying how she felt there was no getting out of the situation. (Trial Tr. 2P-13:20–23.) With regard to the incident in Grand Chute, Ms. Harwell testified she heard yelling inside the hotel. However, she offered no further explanation about whether she could hear anything that was said outside the room or any impact such statements had. (Trial Tr. 2P-13:1-17.)

Many hours and eight witnesses later, when the Government introduced Ms. Moore's statements through Officer Waas, it failed to connect the statements back to Ms. Harwell. (Trial Tr. 3A-127:22-140:20; App. B-1-13; App. Br. 43.) The Government never asked Officer Waas about Ms. Harwell. (*Id*.) Officer Waas's complete direct testimony regarding the videos was essentially the Government

---

[2] The only reference the Government makes to the "effect" Ms. Moore's statements had on Ms. Harwell was during the conversation with the district court, the Government, and the defense. (Trial Tr. 3P-6:4; 4A-9:16–19; App. A-4, A-19.)

asking him to use transcripts to repeat the statements Ms. Moore made to officers. It is only after Mr. Graham raised the Confrontation Clause issue that the Government attempted to excuse its actions by explaining it used the statements for their effect on Ms. Harwell.

In supporting its argument on appeal, the Government cites two cases, *United States v. Hanson*, 994 F.3d 403 (7th Cir. 1993), and *United States v. Montez*, 858 F.3d 1085 (7th Cir. 2017). (Gov't Br. 13; 15.) Both cases are readily distinguishable from this case. In *Hanson*, the defendant was testifying to his conversation with another person. When the defendant attempted to relate the other person's statement, the government objected on hearsay grounds and the district court sustained. *Hanson*, 994 F.3d at 406. This Court determined that the defendants sought to use the statement to show the effect it had on the defendant's understanding of what he was required to report, and overturned the district court. *Id*.

In contrast, *Montez* involved the government introducing recordings of wiretapped calls between the defendant and one of his co-conspirators. 858 F.3d at 1088. Over Montez's objections, the district court ruled that the co-conspirator's statements were necessary to provide context for Montez's own statements. *Id.* This Court affirmed. *Id.* at 1090. To put it plainly, in order to make sense of a 'yes' or 'no' answer, a court occasionally has to allow the preceding question or statement in to show the declarant's state of mind or provide context.

Mr. Graham's case is not analogous to either *Hanson* or *Montez*. Ms. Harwell did not testify to hearing Ms. Moore's statements, nor were the statements offered with a connection to any testimony for context. Officer Waas only testified to clarify the videos using transcripts, and Ms. Moore's statements were provided without any questions about impact on witnesses, ties back to prior statements, or any purpose other than the truth of the statements themselves. This is the ruling of the district court, and this Court should affirm that ruling.

## II. The District Court Was Correct When It Determined Ms. Moore's Statements Were Testimonial.

The district court found that Ms. Moore's statements were testimonial. (*See* Trial Tr. 3P-11:7-10; App. A-9) ("And I think [the instruction] will be adequate to address any prejudice that you might have from not being able to cross-examine Ms. Moore about any of the *prejudicial testimonial statements*.") (emphasis added.) Even though this issue was litigated in the district court following Mr. Graham's objection, the Government argues for the first time on appeal that Ms. Moore's statements are non-testimonial. (*See* Gov't Br. 16.) The Government did not address this issue below. Therefore, this Court should hold that the Government waived this argument. *See Geva v. Leo Burnett Co.*, 931 F.3d 1220, 1225 (7th Cir. 1991) (an issue not "properly preserved below" in the district court is generally waived); *Cossel v Miller*, 229 F.3d 649, 653 (7th Cir. 2000) ("A litigant that fails to present an argument to the district court cannot rely on that argument in the court

of appeals."). However, even if this Court does not hold that the Government waived its argument, the Government's positions on this point are unpersuasive.

Contrary to the Government's suggestion, the primary purpose of Ms. Moore's statements was not to assist police in addressing an ongoing emergency. Whether the primary purpose of the statements was to enable police assistance to meet an ongoing emergency depends on an objective analysis, which takes into consideration the circumstances of the encounter and the statements and actions of the parties. *Michigan v. Bryant*, 562 U.S. 344, 360 (2011). The Government heavily relies on the parties' *possible* motivations for their statements. However, the subjective mental state of the parties is irrelevant. *Id.* The relevant inquiry is "the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id.*

Reasonable participants would not have thought that the purpose of Ms. Moore's statements was to assist police in an ongoing emergency. In *Bryant*, the Supreme Court found that there was an ongoing emergency when police officers responded to a shooting. *Id.* at 349. Context was extremely important to the Supreme Court, describing the situation as "a nondomestic dispute, involving a victim found in a public location, suffering from a fatal gunshot wound, and a perpetrator whose location was unknown at the time the police located the victim." *Id.* at 359. The Supreme Court held that the gunshot victim's identification

and description of the shooter, as well as the location of the shooting, were non-testimonial statements because their primary purpose was to assist officers in locating the shooter in an ongoing and active emergency. *Id.*

In contrast, the Supreme Court in *Hammon v. Indiana* found that Amy Hammon's statements were testimonial, and objectively not made to assist police in responding to an emergency. *Davis v. Washington*, 547 U.S. 813, 830 (2006). *Hammon* involved domestic violence, a known and identified perpetrator, and a neutralized threat. *Bryant,* 562 U.S. at 363 (discussing the key facts in *Hammon*). Because of this, the Supreme Court focused on "the threat to the victims and assessed the ongoing emergency from the perspective of whether there was a continuing threat *to them.*" *Id.* (citation omitted).

Mr. Graham's case is directly analogous to *Hammon*. Police officers responded to a domestic incident, and both parties involved were known and identified immediately after police arrived. Additionally, the videos illustrate that that they were separated and no longer physically engaged. (Trial Tr. 3A-130:21-142:5; App. B-3-15; Gov. Ex. 69, 70, 72.) In *Hammon*, the Supreme Court found that removing the parties to separate rooms was sufficient to end the emergency. *Davis*, 547 U.S. at 830–32. Likewise, separation of Mr. Graham and Ms. Moore was sufficient to end the emergency. Finally, although there was no ongoing emergency when Ms. Moore made her statements, the existence of an ongoing emergency is not dispositive in the testimonial analysis. *See Bryant,* 562 U.S. at 366.

Thus, to the extent that the Government's argument relies on treating the existence of an ongoing emergency as dispositive, it is incorrect.

Even if this Court finds that there was an ongoing emergency present when Ms. Moore made her accusatory statements while separated from Mr. Graham and in police custody, her statements were testimonial because they were "made under circumstances which would lead an *objective* witness reasonably to believe that the statement[s] would be available for use at a later trial." *Crawford v. Washington*, 541 U.S. 36, 52 (2004) (defining "testimonial statement") (emphasis added). Notwithstanding the fact that most of Ms. Moore's statements were about Mr. Graham's alleged past criminal conduct, the Government argues that the primary purpose of Ms. Moore's statements to police was not to "establish or prove past events potentially relevant to later criminal prosecution." (Gov't. Br. 18) (citing *Davis*, 547 U.S. at 822 (2006)).

The Government's argument is inconsistent both internally and with the law governing testimonial statements. The Government states, in evaluating whether statements made to police are testimonial, that "[t]he subjective or actual purpose of the individuals involved is not relevant." (Gov't Br. 17) (internal quotes omitted.) However, the Government relies on the alleged specific, subjective mental states of Ms. Moore and Officer Grier-Welch. For example, the Government asserts, without any persuasive record support, that "Moore's outbursts *could have been* an attempt to get the police to neutralize the threat to her (or the women in

their hotel room) by incapacitating him temporarily" rather than pursuing future prosecution. (Gov't Br. 21) (emphasis added.) The Government also speculates that "Moore may have been continuing her defense against Graham . . . by hurling insults" or that Ms. Moore "may also have been trying to show Graham that she was not intimidated by his attempt to control her using the police." (*Id.*) The Government's speculation on this point is entirely irrelevant, as whether statements are testimonial depends on an objective analysis, not the subjective intent of the parties. In addition, whatever Ms. Moore's purpose in making the statements may have *actually* been, a reasonable individual listening to Ms. Moore accuse Mr. Graham of kidnapping and pimping in the presence of police officers would expect Mr. Graham to be arrested and possibly prosecuted. That that did not happen is not relevant, and surely not dispositive.

The other factors the Government points to also do not support its conclusion that Ms. Moore's statements were non-testimonial. First, the Government asserts that Ms. Moore made her statements "all within less than eight minutes of those she made while resisting Officer Grier-Welch upon his arrival on the scene." (Gov't Br. 23.) However, the Government does not cite any case law to support its suggestion that statements made while a declarant is being arrested (or shortly after they were arrested) cannot be testimonial in nature. (*Id.*) The Government further asserts that "[t]he quick succession of Moore's subsequent statements lacked any sense of formality to suggest that the

participants were focused 'on the possible future prosecutorial use of [t]he statements.'" (*Id.*) (quoting *Bryant*, 562 U.S. at 377). However, this suggestion is undermined by the fact that most of her statements were, in fact, solely concerned with expressing allegations of criminal conduct to law enforcement. Surely, a reasonable speaker in Ms. Moore's position would expect reasonable officers to follow up on serious criminal allegations. In addition, the Government's argument on this point seems to rely on this Court agreeing that there was an ongoing emergency but also that the emergency ended and statements made quickly after that emergency could not have possibly been testimonial. However, whatever emergency may have existed prior to law enforcement involvement was nonexistent in the period shown by the videos. To hold otherwise would greatly expand the scope of non-testimonial statements beyond that set by the Supreme Court. The Government's argument on this point is contrary to *Hammon* in which the Supreme Court found that statements made shortly after a domestic dispute *were* testimonial. *See Davis*, 547 U.S. at 832.

Second, the Government argues that Ms. Moore's discussion with the officers "lacked any sense of formality to suggest that the participants were focused on the possible future prosecutorial use of the statements." (Gov't Br. 23.) However, the majority of Ms. Moore's statements were not unfocused observations, but rather focused accusations regarding Mr. Graham's past criminality. One of the officers even followed-up on Ms. Moore's accusations by

asking her whether she was being pimped by Mr. Graham, a fact that the Government concedes. (Gov't Br. 22.) Also, the Government again improperly focuses on the participants' *actual* perceptions, rather than what an observer would likely conclude about the purpose of the statements. An observer, after hearing Ms. Moore accuse Mr. Graham of criminal acts several times, would conclude that Ms. Moore was focused on communicating Mr. Graham's criminal conduct to the officers surrounding her.

Relatedly, the Government argues that the nature of Ms. Moore's discussion with the officers undermines the testimonial nature of her statements. First, the Government surprisingly asserts that Ms. Moore's statements were directed to Mr. Graham rather than the officers. (Gov't Br. 23.) This assertion is undermined both by the grammatical construction of Ms. Moore's statements (she repeatedly referred to Mr. Graham using the singular pronoun, "he," suggesting she was speaking to somebody other than him) and the Government witness's own testimony, where Officer Waas said she was speaking to him. (Trial Tr. 3A-134:23-24; App. B-7.) Ms. Moore repeatedly saying "that *he's* got a 19-year-old prostitute and that *he* had taken her from New York" certainly indicates that she was speaking to the officers surrounding her, not Mr. Graham. (Trial Tr. 3A-134:21-22; App. B-7.)

The Government also relies heavily on the fact that Ms. Moore's statements were unprompted, and attempts to contrast her statements to a stationhouse

interrogation, which is more likely to involve testimonial statements. (*See* Gov't Br. 23–24.) However, the Supreme Court in *Davis* specifically noted that it did not intend to imply that "statements made in the absence of any interrogation are necessarily nontestimonial" and "[t]he Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogations." 547 U.S. at 822 n.1. The Government's multiple references to the statements as "unprompted" or "unsolicited" imply that those facts carry more weight than they do in the totality of the circumstances. Further, the Government's argument that statements made outside of a stationhouse interrogation are likely non-testimonial is inconsistent with the Supreme Court's statement in *Davis*. "In cases like this one, where [the] statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were 'initial inquiries' is immaterial." *Davis*, 547 U.S. at 832.

Finally, the Government argues that Ms. Moore's physical and emotional state at the time of her statements suggest a primary purpose other than to prove past events for a later prosecution. (Gov't Br. 25.) However, the Supreme Court rejected this idea in *Hammon*, noting that the declarant was visibly shaken and "frantic" when police arrived, but nevertheless held that her statements to police were testimonial. *Davis*, 547 U.S. at 818. Even though Ms. Moore was agitated

while talking to police, her repeated accusatory statements to officers clearly illustrate the focused purpose of communicating such accusations to the police. Even if made for the purpose of angry retribution toward Mr. Graham, such vengeance is only achieved if law enforcement intervenes, investigates, and arrests Mr. Graham for past conduct, making the statements clearly testimonial.

Ms. Moore's accusatory statements to police were testimonial, because an objective witness would reasonably believe that the statements would be available for use at a later trial. The statements were repeated accusations, to police officers as indicated by Officer Waas himself, that Mr. Graham was involved in criminal behavior. As the very duty of police officers is to investigate and arrest individuals engaged in criminal behavior, a witness to Ms. Moore's statements would likely conclude that her statements would be available in prosecuting Mr. Graham. Further, the Government's conclusion that "neither Officer Grier-Welch nor Moore would have expected the primary purpose of Moore's statements to be creating an out-of-court substitute for trial testimony," (Gov't Br. 22), is irrelevant in determining whether the statements at issue were testimonial. The test revolves around the objective reasonable participant, not the theorized subjective expectations of the parties. Thus, an objective look at the circumstances surrounding Ms. Moore's statements indicates a primary purpose of accusing Mr. Graham of kidnapping and prostitution, both past events unrelated to whatever emergency may have existed before the police arrived. Furthermore, to the extent

that this Court puts any weight on Ms. Moore's subjective expectations, making those statements at the time would only benefit her if she convinced the police to investigate and arrest Mr. Graham for criminal prosecution, demonstrating a testimonial purpose.

### III.     The Government Cannot Show the Videos Did Not Prejudice Mr. Graham Beyond a Reasonable Doubt.

The videos and statements were incredibly prejudicial and not harmless beyond a reasonable doubt, a burden the Government must carry. *United States v. Castelan*, 219 F.3d 690, 696 (7th Cir. 2000). In this case, the Government failed to meet that burden.

The Government failed to show beyond a reasonable doubt that the introduction of these videos and Ms. Moore's testimonial statements was not incredibly prejudicial.  Ms. Moore directly accused Mr. Graham of taking a 19-year-old girl from New York. That description could easily be confused with Ms. Harwell, who was in their room at the Grand Chute hotel at the time. Moreover, Ms. Moore accused Mr. Graham of acting as Ms. Moore's pimp after using force and/or fraud to take her. (Trial Tr. 2P-10:19-21; Trial Tr. 3A-134-35; App. A-7-8; Gov. Ex. 72 at 0:05-0:10.) Ms. Moore made these accusations against Mr. Graham

on multiple occasions during the police encounter, and it is not entirely clear from the videos who Ms. Moore was accusing Mr. Graham of taking from New York.[3]

Ms. Moore initially states that Mr. Graham "kidnapped me from fucking New York." (Gov. Ex. 72 at 0:05-0:08.) Five minutes later, Ms. Moore can be seen and heard yelling again. This time she states, "he's got a 19-year-old prostitute and he took her from New York." (Gov. Ex. 69 at 0:50-0:53.) The Government argues it is clear from the video that this statement in Exhibit 69 is in fact 'and he took *me* from New York,' (Gov't Br. 30) (emphasis in brief), but Officer Waas clarified at trial that Ms. Moore, in Exhibit 69, stated "that he's got a 19-year-old prostitute and that he had taken her from New York." (Trial Tr. 3A-134:21–22; App. B-7.) The "her" in this accusation refers to the 19-year-old prostitute, not Ms. Moore. Officer Waas clarified this statement using Government-prepared transcripts. (Trial Tr. 3A-133:18-21; App. B-6.)  It is clear from the captions that in Exhibit 72, Ms. Moore states that she was taken from New York; therefore, Ms. Moore's accusations accusing Mr. Graham of taking her from New York and the 19-year-old prostitute from New York were confusing and highly prejudicial.

---

[3] The Government correctly points out that Mr. Graham inconsistently quoted Ms. Moore in error in his opening brief, (Gov't. Br. 30), but Ms. Moore was also inconsistent in her own statements. On one instance she claimed Mr. Graham took her from New York and on another, separate instance, that Mr. Graham took a 19-year-old prostitute from New York. (Gov. Ex. 72 at 0:05-0:08); (Gov. Ex. 69 at 0:50-0:53.)

These are classic examples of a human trafficker. Therefore, the statements accusing Mr. Graham of kidnapping Ms. Moore, taking a 19-year-old from New York, and pimping women, were powerfully incriminating to Mr. Graham.

In addition to using the videos and statements as evidence against Mr. Graham, the Government also referred back to the videos and statements in its closing argument. (Trial Tr. 5-122:21-123:17.) For over a page in the transcripts, well after the attempted curing instruction, the Government drew the jury's attention back to the incident in Grand Chute. "[Y]ou saw what happened. You saw that Patience left the room, that she made such a disturbance that the police were called. You saw how upset she was." (Trial Tr. 5-123:7–9.) The jury never saw the alleged fight before police arrived. The jury only saw what happened after the officers arrived. It only heard about what happened in the room through the testimony of a single witness, Ms. Harwell. The Government then returned to the fact that Ms. Moore was the one that went to jail, and that's what made Ms. Harwell fearful. The Government repeatedly connected the effect of Ms. Moore's arrest on Ms. Harwell, not what Ms. Harwell felt hearing any statements. The Government's arguments are unpersuasive and fail to meet the burden to prove beyond a reasonable doubt that no prejudicial effect occurred from the introduction of these statements.

**IV.  Given the Sixth Amendment Values in Which *Bruton* and *Crawford* Are Rooted, No Curing Instruction Could Have Replaced Mr. Graham's Right to Cross-Examine Ms. Moore.**

The Government's caged analysis (Gov't Br. 36-39) amputates *Bruton's* reasoning from the principles at the heart of the Sixth Amendment, which the Supreme Court's opinion sought to protect in both *Bruton* and *Crawford*. *Bruton v. United States*, 391 U.S. 123, 137 (1968); *Crawford*, 541 U.S. at 62 . Because *Bruton* and *Crawford* were both rooted in Sixth Amendment values, they co-exist within the same framework. As a result, when one considers the risks discussed in *Bruton* in this *Crawford*-based Confrontation Clause violation, the same type of prejudice exists that no instruction can cure.

While this Court reviews a district court's decision not to grant a mistrial for abuse of discretion, a case involving a unique set of circumstances "compels this Court to return to first principles and ascertain what the right to a fair trial truly means." *United States v. Mannie*, 509 F.3d 851, 856 (7th Cir. 2007) (referencing *Bruton* amongst other cases). In *Bruton*, the Supreme Court stated the Confrontation Clause secures the right of cross-examination and is thereby directed at threats to a fair trial. 391 U.S. at 136 (citing *Pointer v. Texas*, 380 U.S. 400 (1965)). *Bruton* reaffirmed the core Sixth Amendment values the Supreme Court endorsed in *Pointer* that:

> [t]here are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an

essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.

380 U.S. at 405. Given these values, *Bruton* held that in some contexts, no curing instruction can replace a defendant's essential and fundamental right of confrontation and cross-examination. 391 U.S. at 126. That decision stands for the proposition that "given the recognized motivation to shift blame onto others" an accomplice's statements that incriminate a defendant are inherently unreliable. *Id.* at 136. The unreliability of such evidence is so "intolerably compounded when [an] alleged accomplice, as here, does not testify and cannot be tested by cross-examination," that the right to confront that individual is absolute, and there are no *post hoc* remedies available for such violations. *Id.* (referencing *Pointer*).

In *Bruton*, the Supreme Court acknowledged that some admissions of inadmissible hearsay might be cured with instructions. 391 U.S. at 135. However, "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great . . . that the practical and human limitations of the jury system cannot be ignored." *Id.* Such a context exists here.

Contrary to the Government's framing of the issue as whether "a curative instruction cannot remedy the harm of a *co-defendant's out-of-court statements*" (Gov't. Br. at 36) (emphasis added), the issue is whether, in light of the Sixth Amendment principles enshrined in *Bruton* and *Crawford*, no curing instruction could replace Mr. Graham's right to cross-examine Ms. Moore for the "kind of fair

trial which is this country's constitutional goal." *Pointer*, 380 U.S. at 405. That issue

turns on whether the jury would consider Ms. Moore's unreliable out-of-court

*accusations* against Mr. Graham, curing instruction notwithstanding. (App. Br. 37.)

When considering "first principles," this is exactly the type of situation where it is

impossible for a jury, even when instructed, to ignore a co-defendant's unreliable

accusations when that co-defendant is unavailable for cross-examination.

This Court has found no curing instruction could replace the right of cross-

examination in varied contexts. *See e.g. United States v. Gujardo-Melendez*, 401 F.2d

35, 38-41 (7th Cir. 1968) (finding a reversible error and remanding for new trial

"irrespective of the literal application of *Bruton*"). In *Gujardo-Melendez*, testimony

was introduced of an alleged hearsay statement of a guilty participant, that

incriminated the defendant. *Id.* at 40. The Court noted that this evidence was

particularly damaging as it contradicted the defendant's testimony. *Id.*

Accordingly, because the defense could not cross-examine the declarant, the Court

found that the defendant was denied his "sixth amendment right of confrontation

which could not be cured by instructions to the jury." *Id.* (citing *Bruton*, 391 U.S.

123).

Similarly, here, in light of the Sixth Amendment values that *Bruton*

protected, no curing instruction (however prudent) could replace Mr. Graham's

right to cross-examine Ms. Moore. Although some of the facts here are slight

variations of those in *Bruton*, similar factors increased the risk the jury would not,

or could not, follow any curing instructions. Mr. Graham and Ms. Moore faced allegations of joint criminal activity involving the compulsion of a 19-year-old woman to engage in commercial sex activity. (*See, e.g.*, Trial Tr. 1P-5:1-1P-25:12.) Ms. Moore, a guilty participant, made out-of-court accusations directly implicating Mr. Graham in activities related to crimes for which he was on trial. (Trial Tr. 3A-134:21-22; App. B-7.)

Further, while the concerns underlying *Bruton* and *Crawford* are not limited to self-admissions, those are present in this case as well. Despite the Government's characterization, Ms. Moore's statements were not "directed at Graham's activities alone." (Gov't Br. 38.) Ms. Moore made statements from which it could be directly inferred she was engaged in prostitution with Mr. Graham. (Trial Tr. 3A-135:14-17; App. B-8.) Although that may have been an area of well-exercised prosecutorial discretion, those were still self-incriminating statements: Ms. Moore implicated herself in prostitution generally and specifically in violation of Wis. Stat. § 944.30. Along with her self-incriminating admission, she directly accused Mr. Graham of conduct relevant to the charged crime, just not the exact means alleged. (Trial Tr. 3A-134:21-22; App. B-7.)

Whether characterized as self-incriminating statements or accusations by a co-conspirator, Ms. Moore's accusations against Mr. Graham were so "powerfully incriminating" that no cautionary instructions could replace his right to cross-examine her. Ms. Moore's statements that shifted blame to Mr. Graham were

evidently unreliable given that the Government charged her with the same conduct in the second superseding indictment, which was provided to the jury. (App. Br. 10; Trial Tr. 1A-7:1-7.) In addition, Ms. Moore's accusations contradicted parts of Mr. Graham's testimony, mirroring the issue in *Gujardo-Melendez*. For example, Mr. Graham testified about how he and Ms. Moore met and developed their relationship in Florida, where Ms. Moore introduced Mr. Graham to the world of prostitution. (Trial Tr. 4P-52:21-4P-58:2.) However, in Ms. Moore's out-of-court accusations, she accused Mr. Graham of "kidnapping me from fucking New York." (Gov't Br. 9.)

Ms. Moore's motivation to shift blame onto Mr. Graham is evident – the police were arresting her, she was getting defensive, and she was attempting to shift blame onto Mr. Graham while resisting arrest. (App. Br. 4-5.) Therefore, Ms. Moore's accusations against Mr. Graham were inherently unreliable because of her "motivation to shift blame onto others." Such unreliability was intolerably compounded when the Government deprived Mr. Graham of his right to cross-examine Ms. Moore, which was at the heart of *Bruton*. Under these circumstances, no curing instruction could replace Mr. Graham's Sixth Amendment right to cross-examine Ms. Moore.

Finally, in its excerpted passages from *Bruton's* progeny (Gov't Br. 37–38), the Government severed this Court's core concern with an accomplice's statements that were "powerfully incriminating" against the defendant, which is

not contingent on the separate issue of whether the statements were an admission or confession. *See, e.g., United States v. Volpendesto*, 746 F.3d 273, 291 (7th Cir. 2014) (holding there was no issue under *Bruton* because the statements were "not 'powerfully incriminating' either to [co-defendant] or [defendant]"); *United States v. Warner*, 498 F.3d 666, 701 (7th Cir. 2007) ("[t]here was also no *Bruton* issue, because the statements admitted at trial were not inculpatory and did not amount to a confession from Ryan."). In both *Volpendesto* and *Warner*, the inculpatory nature of the statements did not hinge on whether those statements were also a confession. Therefore, even if Ms. Moore had not made self-incriminating statements generally and specifically admitted to engaging in prostitution, the underlying principles of *Bruton* and its progeny are still implicated because she was an accomplice and her statements were "powerfully incriminating" to Mr. Graham. (App. Br. 34-36.)

In sum, the Supreme Court's holding in *Bruton* was rooted in the Sixth Amendment's broad principles of fairness and proper procedure. 391 U.S. at 137-38 (Stewart, J., concurring) (emphasizing that because of the "underlying rationale of the Sixth Amendment" the cautionary instruction was inadequate). Similarly, the Supreme Court's opinion in *Crawford* was based on the principles undergirding the Sixth Amendment. 541 U.S. at 67 ("Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth

Amendment prescribes."). Both *Bruton* and *Crawford* are firmly rooted in the Sixth Amendment, and as such, *Bruton* does not sit independent of *Crawford*. Rather, *Bruton* serves as a line in the Confrontation Clause, beyond which a violation cannot be resolved by any instruction. Although the Government distinguished *Bruton* from Mr. Graham's case by pointing to factual differences, (Gov't. Br. 37-38), those differences have no connection to the constitutional foundations of the Supreme Court's opinions.

**V.      The District Court Abused its Discretion Denying Mr. Graham's Motion for a Mistrial Because the Curing Instruction Given was Untimely, Ineffective, and Left an Overwhelming Probability that the Jury Would be Unable to Follow It.**

The introduction of Ms. Moore's statements was not harmless beyond a reasonable doubt as the Government asserts and is required to demonstrate. (Gov't Br. 27.) Therefore, this Court can review the district court's denial of Mr. Graham's motion for a mistrial for abuse of discretion. *United States v. Humphrey*, 34 F.3d 551, 556 (7th Cir. 1994). Despite issuing an instruction, the district court denied Mr. Graham a fair trial when it relied on an untimely, and ultimately ineffective jury instruction. The timing and wording of this instruction, when assessed in the context of the full trial, left an overwhelming probability that the jury would not be able to fully follow the district court's instruction, resulting in a fundamentally unfair trial.

In reviewing the decision to issue the instruction and its impact, the sequencing of events is telling. The jury heard the improper statements, admitted through the Government's exhibits, on the morning of the third day of trial. (Trial Tr. 3A-132:16-142:3; App. B-5-15.) Office Waas repeated several of these statements to clarify their content to the jury. (Trial Tr. 3A-132:16-142:3; App. B-5-15.) After the lunch break, shortly after the improper testimony infected the trial, the defense requested a strong instruction addressing the inadmissibility of the statements and for the court to strike the videos and the officer's testimony. (Trial Tr. 3P-5:1-5; App. A-3.) However, the district court did not offer a curing instruction with regard to the inadmissibility of these statements until the afternoon of the fourth day of the trial, and the district court allowed the jury to consider Officer Waas's statements. (Trial Tr. 4A-160:4-12; App. A-34.) During this day-long gap, the improperly admitted and incriminating statements infected the minds of the jury and framed in a more powerful light the upcoming testimony of additional witnesses, including alleged victims.

With regard to content, the Government acknowledges the instruction had a noticeable failing. The Government agrees that the instruction did not explicitly direct the jury to disregard Officer Waas's testimony and repetition of the statements. (Gov't Br. 28.) While it is true that "jurors are presumed to follow limiting and curative instructions," *United States v. Smith*, 308 F.3d 726, 739 (7th Cir. 2002), this presumption can be overcome if there is an "overwhelming

probability" that the jurors were unable to follow the instruction. *United States v. Del Valle*, 674 F.3d 696, 704 (7th Cir. 2012). However, rather than point to any specific instruction the jury was to follow, the Government asks this Court to expect jurors to act in the absence of instruction. In other words, despite the absence of language about Officer Waas in the instruction, the Government asks the Court to endorse the theory that the jury was empowered to apply, and was likely to apply, the instruction to Officer Waas's testimony themselves. This position would render instructions largely powerless, leaving juries free to evaluate the evidence as they see fit.

In addition to Officer Waas repeating verbatim a number of Ms. Moore's statements to the jury, he also referenced the content of those statements in his personal testimony. Shortly after repeating Ms. Moore's statement that "[Graham]'s got a 19-year-old prostitute and that he has taken her from New York," (Trial Tr. 3A-134:21-22; App. B-7), Officer Waas recounted to the jury how he walked with Mr. Graham up to the hotel room, inside of which were two young females. (Trial Tr. 3A-135:24-136:4; App. B-8-9.) When asked by the Government how old the females were, Officer Waas described one as "look[ing] younger, maybe 19 years old." (Trial Tr. 3A-136:5-6; App. B-9.) Officer Waas tied parts of Ms. Moore's inadmissible statements into his own testimony, further weakening the district court's instruction.

The Government also asserts that since Officer Waas's testimony was not a "separate occasion at trial" from the admission of Ms. Moore's statements, reasonable jurors would understand that the instruction applied to both her statements and the parroting by Officer Waas. (Gov't Br. 28-29.) This argument might be more compelling if the instruction had been given shortly after Officer Waas's testimony. As noted in Mr. Graham's brief, the majority of the case law in the Seventh Circuit on curative jury instructions features promptly delivered instructions to eliminate any harm done by the improper testimony. (App. Br. 39.) That was not the case here, with a day's delay allowing the improper statements to frame further testimony.

There is not authoritative case law in this Circuit regarding a significant delay in giving a curative instruction, but as discussed in Mr. Graham's opening brief, the Third Circuit offers insight. The facts in *United States v. Gullo*, 502 F.2d 759 (3d Cir. 1974), closely parallel what happened in Mr. Graham's case. (App. Br. 40-45.) In *Gullo*, the court viewed the totality of the circumstances regarding inadmissible, improper evidence entering the trial and the resulting curative instruction (which came nearly 24 hours later) as warranting a mistrial. *Id.* at 762. While the inadmissible, prejudicial evidence introduced into *Gullo* came via an improper question from the prosecutor, who then failed to call the necessary witness to cure it, that fact alone was not why the Third Circuit reversed. *Id.* As the court said, "the total effect of the improper question, the delay in giving proper

curative instructions, and the failure to call the witness as promised . . . combined to make the trial unsatisfactory." *Id.*

Further undermining Mr. Graham's right to a fair trial, the district court did not repeat the instruction at the end of the trial. The Government asserts that since Mr. Graham did not insist upon this during the discussion of the final instructions, the lack of a second instruction is meritless. (Gov't Br. 40) (Trial Tr. 4A-161-184.) However, this discussion of final jury instructions happened prior to the Government reinserting Ms. Moore's statements and Officer Waas's testimony into the minds of the jury during closing arguments. (Trial Tr. 4A-161:1-187:10.) The reminder of that vivid portion of the trial further obfuscates the already incomplete and delayed instruction the district court gave the jury the day before.

This incident, when viewed in conjunction with the numerous other issues surrounding the instruction itself, creates an overwhelming probability that the jury was unable to follow the district court's instruction. This resulted in a fundamentally unfair trial for Mr. Graham.

## CONCLUSION

For the foregoing reasons, and those discussed in his opening brief, Mr. Graham asks the Court to vacate his conviction and remand for a new trial.

Dated: April 3, 2020

Respectfully Submitted,

*/s/ Adam Stevenson*
Adam Stevenson,
Clinical Associate Professor

*/s/ Michael Doering*   */s/ Natalia Gess*
Michael Doering     Natalia Gess
Law Student      Law Student

*/s/ Carol English*    */s/ Trenton Piltz*
Carol English      Trenton Piltz
Law Student      Law Student

*/s/ Alex Gelhar*     */s/ Jordan Vassel*
Alex Gelhar      Jordan Vassel
Law Student      Law Student

Frank J. Remington Center
University of Wisconsin Law School

Attorney for Defendant-Appellant,
ERIN F. GRAHAM, JR.

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

The undersigned certifies that this brief complies with the volume limitations of Federal Rule of Appellate Procedure 32 and Circuit Rule 32 in that it contains 6,777 words as shown by Microsoft Word for Mac, Version 16.16.20.

Dated: April 3, 2020

*/s/ Adam Stevenson*
Adam Stevenson

Counsel for Defendant-Appellant
ERIN F. GRAHAM, JR.

No. 19-2373
_____

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
_____

UNITED STATES OF AMERICA,          Appeal from the United States District
Court
*Plaintiff-Appellee,*                           for the Western District of Wisconsin

vs.

ERIN F. GRAHAM, JR.,
a/k/a Sonny,                                   Case No. 18-CR-043
*Defendant-Appellant.*                      Honorable Judge James D. Peterson
_____

**CERTIFICATE OF SERVICE**
_____

PLEASE TAKE NOTICE that on April 3, 2020, the undersigned attorney filed the

preceding with the Clerk of the United States Court of Appeals for the Seventh

Circuit through the CM/ECF system. I certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the CM/ECF

system to:

    Tovah R. Calderon                          Barbara Schwabauer
    United States Department of Justice        United States Department
    Civil Rights Division, Appellate Sec.      Civil Division
    PO Box 14403                               Room 3724
    Ben Franklin Station                       950 Pennsylvania, Ave NW
    Washington, DC 20044                       Washington, DC 20530

    Dated in Madison, Wisconsin, April 3, 2020.

                               */s/ Adam Stevenson*

Adam Stevenson

Counsel for Defendant-Appellant
ERIN F. GRAHAM, JR.